## UNITED STATES of America, Plaintiff,

v.

## Dustin Lee HONKEN, Defendant.

### No. CR 01–3047–MWB.

United States District Court,
N.D. Iowa,
Central Division.

July 29, 2005.

ble, LLP, Des Moines, IA, Charles Myers Rogers, Wyrsch, Hobbs & Mirakian, PC, Kansas City, MO, Leon F. Spies, Mellon & Spies, Iowa City, IA, for Defendant.

Charles J. Williams, Patrick J. Reinert, U.S. Attorney's Office Northern District of Iowa, Thomas Henry Miller, AAG, Des Moines, IA, for Plaintiff.

MEMORANDUM OPINION AND OR-DER REGARDING THE DEFEN-DANT'S MOTION FOR JUDG-MENT OF ACQUITTAL OR NEW TRIAL

Alfredo G. Parrish, Parrish, Kruidenier, Moss, Dunn, Montgomery, Boles & Grib-

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. SYNOPSIS AND SUMMARY OF DISPOSITION ............................949

II. INTRODUCTION ................................................951
 A. Background ................................................951
 1. The 1993 case ................................................951
 2. The 1996 case ................................................952
 3. Discovery of the murder victims' bodies.............................952
 4. The indictments in this case .......................................953
 a. Non-capital charges.............................................953
 b. Capital charges ..............................................953
 5. Significant pre-trial rulings ......................................954
 6. Honken's trial and conviction......................................956
 a. Jury selection ................................................956
 b. The "merits phase" ............................................957
 c. The "penalty phase" ...........................................958
 7. Post-trial proceedings ............................................960
 a. The motion for judgment of acquittal or new trial ...............960
 b. The motion to investigate juror misconduct ......................960
 c. Oral arguments................................................962

III. LEGAL ANALYSIS ................................................962
 A. Applicable Standards ..............................................962
 1. Judgment of acquittal .............................................962
 2. New trial ................................................963
 C. Alleged Erroneous Pre-trial Rulings .................................964
 1. Former jeopardy .................................................964
 a. The prior ruling ..............................................964
 b. Arguments of the parties ......................................966
 c. Analysis of the renewed challenge .............................966
 2. Disqualification of the trial judge .................................967
 a. Factual background ...........................................967
 b. Arguments of the parties ......................................968
 c. Applicable standards..........................................969
 d. Analysis ................................................973
 3. Shackling of the defendant during trial .............................977

946

| | | a. | The prior ruling ................................................ 977 |
| | | b. | Arguments of the parties ...................................... 978 |
| | | c. | Analysis ...................................................... 979 |
| | 4. | Use of an "anonymous" jury .................................... 981 |
| | | a. | The prior ruling ............................................. 981 |
| | | b. | Arguments of the parties ..................................... 982 |
| | | c. | Analysis ..................................................... 983 |

D. Alleged Errors During Jury Selection ................................ 984
 1. Factual background ............................................... 984
 a. Juror 902 ...................................................... 984
 b. Prospective Juror 538 .......................................... 986
 c. Prospective Juror 813 .......................................... 987
 2. Arguments of the parties ......................................... 989
 3. Analysis ......................................................... 990
 a. Applicable standards ........................................... 990
 i. Jurors on whom the claim can be based ...................... 990
 ii. The standard for an "impartial" juror ...................... 991
 iii. The standard for erroneous rulings on motions to strike jurors ..................................................... 992
 b. Application of the standards ................................... 993
 i. Juror 902 ................................................. 993
 ii. Prospective Juror 538 ..................................... 994
 iii. Prospective Juror 813 ..................................... 994

E. Alleged Errors During Trial ........................................ 995
 1. Hearsay and Confrontation Clause errors .......................... 996
 a. Statements of Nicholson and DeGeus ............................ 996
 b. Co-conspirator hearsay ........................................ 997
 i. Angela Johnson's writings and maps ........................ 997
 ii. The telephone call to Rick Held ........................... 998
 c. Agent Mizell's testimony ...................................... 999
 i. The evidence in question .................................. 999
 ii. Arguments of the parties .................................. 999
 iii. Analysis .................................................. 1000
 2. Restrictions on cross-examination of Timothy Cutkomp ............. 1001
 3. Denial of the motion for mistrial based on Scott Gahn's testimony .... 1002
 a. The testimony in question ..................................... 1003
 b. Arguments of the parties ...................................... 1003
 c. Analysis ...................................................... 1004
 4. Cumulative effect of erroneous evidentiary rulings ............... 1005
 5. Alleged errors in "penalty phase" jury instructions ............. 1005
 a. Arguments of the parties ...................................... 1005
 b. Analysis ...................................................... 1006
 i. Improper weighing of mental state as an aggravating factor .................................................... 1006
 ii. Improper consideration of obstruction of justice as an aggravating factor ....................................... 1007

F. Alleged Insufficiency Of The Evidence .............................. 1009
 1. Non-capital offenses ............................................. 1009
 2. Capital offenses ................................................. 1010
 a. Alleged insufficiency of the circumstantial case .............. 1010
 b. Alleged insufficiency of the evidence on specific Counts ....... 1010
 i. Insufficiency of the evidence on the "conspiracy murder" counts .................................................... 1010
 ii. Insufficiency of the evidence on the "CCE murder" counts .................................................... 1012

G. Alleged Jury Misconduct Revealed By Johnson Juror 16 ............... 1014
 1. Factual and procedural background ................................ 1014
 2. Arguments of the parties ......................................... 1014
 3. Analysis ......................................................... 1015

H. Alleged Jury "Taint" Relating To Honken Juror 523 ................. 1017

1. Factual background ........................................1017
 a. Proceedings on October 21, 2004 ...............................1017
 b. Proceedings on October 22, 2004 ...............................1020
 c. Proceedings on October 25, 2004 ...............................1022
 i. Instructions to trial jurors .........................1022
 ii. Questioning of trial jurors ..........................1023
 iii. Instruction to alternate jurors.............................1024
 iv. Questioning of alternate jurors ............................1025
 v. Post-questioning proceedings ..............................1025
 d. Proceedings on December 16, 2004 ............................1026
 i. Questioning of officers and managers .....................1026
 ii. Further questioning of Juror 523 ..........................1029
2. Findings of fact ........................................1032
 a. Comments to Juror 523 ........................................1032
 b. Comments repeated to other jurors ...........................1034
3. Arguments of the parties ........................................1035
 a. Honken's opening argument ...................................1035
 b. The government's response ...................................1037
 c. Honken's reply ...........................................1038
4. Analysis ........................................1038
 a. The need for an inquiry ...................................1039
 b. The permissible scope of the inquiry ...........................1041
 i. Rule 606(b) .........................................1041
 ii. Tension between the Rule and the need for inquiry .........1042
 iii. Applicability of the Rule in pre-verdict inquiries ...........1043
 iv. Applicability of the rule to post-verdict inquiries to Juror
 523 ........................................1045
 c. Standards for relief ........................................1046
 d. The effect of the extraneous contact ........................1046
 i. Application of the "cure of prejudice" standard .............1046
 ii. Application of the "no Remmer presumption" standard....1049
 iii. Applicability of the Rule in pre-verdict inquiries ...........1052
 iv. Application of the "concealment of bias" standard .........1054
I. Cumulative Effect Of Alleged Errors ...................................1056

IV. CONCLUSION ................................................1056

For the first time in more than forty years, an Iowa jury has recommended that a person convicted of a crime be sentenced to death.[1] The jury's exercise of its awe-

[1] Victor Harry Feguer was tried in the United States District Court for the Northern District of Iowa on March 1 to 12, 1961, for violation of the Kidnapping Act, 18 U.S.C. § 1201(a), convicted, and upon a jury's recommendation, sentenced to death by hanging pursuant to 18 U.S.C. § 3566 and IOWA CODE § 792.9 (1958). See Feguer v. United States, 302 F.2d 214, 216 (8th Cir.1962). Feguer had kidnapped his victim, Dr. Edward Roy Bartels, in Dubuque, Iowa, on or about July 11, 1960, and transported him to Illinois, where Feguer killed him. Id. Dr. Bartels's body was found in a rural area on the Illinois side of the Mississippi river opposite Dubuque on July 21, 1960. Id. The Eighth Circuit Court of Appeals, in an opinion by then Circuit Judge Harry A. Blackmun, affirmed the conviction, see id., and the Supreme Court denied a petition for certiorari, 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110 (1962). President John F. Kennedy declined to commute Feguer's death sentence, and Feguer was hanged at the state prison in Fort Madison, Iowa, at 5:30 a.m. on March 15, 1963. See Ann Treneman, Bad Things Happen To Good People, THE TIMES OF LONDON, Oct. 20, 2001, 2001 WL 28998723. For thirty-eight years, until the execution of Timothy McVeigh, Feguer was the last person executed by the federal government. See, e.g., Kate Santich, Last Man To Die: Who Was Victor Feguer? Timothy McVeigh's Case Recalls The Government Execution 38 Years Ago, ORLANDO SENTINEL, June 9, 2001, 2001 WL 9190268. Iowa abolished the death penalty for state offenses in 1965. See Acts 1965 (61 G.A.) ch. 435, § 4.

some sentencing responsibility was far from the last word in this case, however, because the defendant has now moved for judgment of acquittal, or, in the alternative, for a new trial. The court must, therefore, give the defendant's conviction and the jury's verdict for a death sentence the conscientious review required by the Constitution, the Federal Rules of Criminal Procedure, and basic concerns of fundamental fairness, where a federal jury has determined that Honken should receive the ultimate punishment under federal law: the death penalty.[2]

Before turning to the merits of Honken's post-trial motions, a comment on the quality of counsels' representation in this litigation is appropriate. As Justice Sutherland explained so eloquently some seventy years ago,

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). The prosecutors in this case, Assistant U.S. Attor-

ney C.J. Williams, from Cedar Rapids, and Special Assistant U.S. Attorney Thomas Miller, from Des Moines, who was tapped from his usual duties as a Special Assistant Attorney General for the State of Iowa in charge of area prosecutions to serve as Mr. Williams's co-counsel in this case and the companion case against Angela Johnson, precisely fulfilled Justice Sutherland's conception of the role of a federal prosecutor. These two experienced and highly skilled prosecutors were exceptionally well-prepared and demonstrated unsurpassed skill in presenting the "merits" and "penalty" phases to the jury. Their zealousness in presenting the "merits" and "penalty" phases of the *Honken* trial was exceeded only by their professionalism and commitment to fairness.

Honken likewise enjoyed legal representation meeting or exceeding the standards for defense counsel, as conceived by Justice Stevens:

> [T]he adversarial process protected by the Sixth Amendment requires that the accused have "counsel acting in the role of an advocate." *Anders v. California,* 386 U.S. 738, 743, 87 S.Ct. 1396, 1399, 18 L.Ed.2d 493 (1967).... As Judge Wyzanski has written: "While a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators." *United States ex rel. Williams v. Twomey,* 510 F.2d 634, 640(CA7), *cert. denied sub nom. Sielaff v. Williams,* 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975).

*United States v. Cronic,* 466 U.S. 648, 656–57, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). By no means was Honken sacrificed unarmed to gladiators. Rather, his defense

---

**2.** As of June 30, 2005, the Federal Death Penalty Information Center website identified forty persons, including Dustin Honken and his separately-indicted co-defendant Angela Johnson, as federal death row prisoners. *See* http://www.deathpenaltyinfo.org.

team consisted of two exceptionally experienced and highly regarded criminal defense lawyers from Iowa, Alfredo Parrish, from Des Moines, and Leon Spies, from Iowa City. As required by statute, these two Iowa attorneys were joined by "learned" counsel in death penalty cases, who in this case was Charlie Rogers, a nationally recognized death penalty specialist from Kansas City, Missouri. Like the prosecutors, the three defense lawyers were exceptionally well-prepared, incredibly zealous and skillful, and highly professional, ably fulfilling "the role of advocate[s]." *Id.* Honken, thus, not only had "the guiding hand of counsel at every step in the proceedings against him," *Powell v. Alabama,* 287 U.S. 45, 69, 53 S.Ct. 55, 77 L.Ed. 158 (1932), but "the 'ample opportunity to meet the case of the prosecution' to which [he was] entitled." *Strickland v. Washington,* 466 U.S. 668, 685, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (quoting *Adams v. United States ex rel. McCann,* 317 U.S. 269, 275, 63 S.Ct. 236, 87 L.Ed. 268 (1942)).

## I. SYNOPSIS AND SUMMARY OF DISPOSITION

Defendant Dustin Lee Honken was charged with five counts of "conspiracy murder" and five counts of "CCE murder," in violation of 21 U.S.C. § 848(e)(1)(A), for the 1993 murders of five people who were witnesses to Honken's drug-trafficking, or other criminal conduct, or both.[3] Two of the murder victims were children, ages six and ten, who like their mother had had the misfortune to be at home when Honken and his then-girlfriend, Angela Johnson, came looking for one of Honken's drug dealers whom Honken suspected of cooperating with law enforcement officers. That drug dealer, his new female friend,

and her two children were killed in one episode, and a second drug dealer whom Honken suspected had or might cooperate with law enforcement officers was killed in a separate episode more than three months later. In the "merits phase" of his trial, the jury found Honken guilty of all ten capital counts. In the "penalty phase," the jury made a binding recommendation that Honken be sentenced to death for the murders of the two children, but recommended a life sentence for the murders of the three adults.

In his Motion For A Judgment Of Acquittal, Or, In The Alternative, For A New Trial Pursuant To Fed.R.Crim.P. 29(c) And 33, Dustin Honken contends that his convictions on the capital and non-capital charges in this case are flawed on numerous grounds. The government resists each of Honken's grounds for new trial or judgment of acquittal. The court will summarize very briefly here Honken's contentions and the court's disposition of them.

First, Honken alleges errors in various pre-trial rulings, consisting of errors in denying his motion to dismiss the capital charges on former jeopardy grounds, failure to disclose grounds for disqualification of the undersigned trial judge, ordering that he be shackled during trial, and empaneling an "anonymous" jury. The court denied Honken's pre-trial motion to dismiss the capital charges on the basis of former jeopardy in a published ruling, *United States v. Honken,* 271 F.Supp.2d 1097 (N.D.Iowa 2003), citing three alternative grounds, all of which led the court to the conclusion that the prior "conspiracy" charge was not, and was not intended by Congress to be, the "same offense" as either the "conspiracy murder" or "CCE murder" charges in the present indict-

---

**3.** Honken was also charged with seven non-capital crimes relating to the murders of the five witnesses and other criminal conduct.

ment. In his post-trial motion, Honken has not convinced the court that its prior ruling was wrong and, indeed, has failed to address two of the alternative grounds for the court's prior rejection of his former jeopardy argument.

As to the other pre-trial errors that Honken asserts, the court finds no basis to retreat from its pre-trial rulings that both an "anonymous" jury and shackling of the defendant during trial were appropriate. Moreover, Honken has failed to show that either ruling actually prejudiced him in this case, where the jurors were given a neutral—and accurate, if not altogether complete—explanation for their "anonymity," and the United States Marshal's Service executed with great care the court's instructions to keep jurors from becoming aware that Honken was shackled while at the counsel table or to allow them to see Honken in restraints while being moved in, to, or from the courtroom. Honken's contention that he was prejudiced by the inference that he must be restrained because incarcerated witnesses were restrained is unpersuasive. The court also finds that no reasonable person could have had doubts about the court's impartiality, simply because security measures that would have been imposed for any judge trying the case were imposed for the undersigned and his family and that pre-trial disclosure of those measures to Honken would have compromised their effectiveness.

Honken also alleges errors in jury selection, consisting of erroneously denying defense challenges to certain jurors and erroneously granting the government's challenges to other jurors. Focusing on only the three jurors as to whom a viable claim of this sort could be made, the court finds that the one challenged juror who actually sat on the jury demonstrated her ability to be fair and impartial and to fairly consider both penalties, life and death. As to the two prospective jurors as to whom Honken contends that the government's challenges for cause should not have been granted, the court reiterates its conclusion that both could not be "death-qualified," because they could not fairly consider imposition of the death penalty, where they would improperly require the government to meet a higher standard than proof beyond a reasonable doubt to impose the death sentence.

Next, Honken alleges errors during trial, consisting of Confrontation Clause violations and admission of hearsay, restriction of cross-examination of Timothy Cutkomp, denial of a motion for mistrial concerning a witness's testimony about Honken's alleged cocaine use, and errors in certain "penalty phase" jury instructions. The court concludes that each of its evidentiary rulings was proper and that, even if the rulings could be shown to be an abuse of discretion, those rulings were nevertheless harmless, where the other evidence of Honken's guilt was absolutely overwhelming, constituting not just proof beyond a reasonable doubt, but proof that was, in this court's view, beyond all doubt.

The centerpiece of Honken's challenge to his conviction is his allegation of juror misconduct of Juror 523 and other jurors, arising from purported comments about Honken's guilt and the penalty that he should suffer by Juror 523's boss. Indeed, this is the issue to which Honken devoted far and away the most attention in his briefs in support of his motion for judgment of acquittal or new trial, and the issue he chose to give exclusive attention in his oral arguments on that motion. Notwithstanding Honken's zealous argument of the matter, the court finds that only one comment was ever made by Juror 523's boss, and that one was a humorous suggestion for things that she could have said to get out of jury service, which

had no effect on Juror 523's ability to be fair and impartial in this case. The court finds that Juror 523's allegations of additional comments by her boss are not credible, and that the stress that she displayed was not the result of the comments or improper influences brought to bear upon her, but the result of being a juror in a capital case and the necessity of frequently switching gears from that activity to return to work when not in trial or deliberations. The court also finds that Juror 523's report of purported comments from her boss to other jurors had no effect on the ability of other jurors to be fair and impartial during their "penalty phase" deliberations and did not compromise the "merits" verdict in this case. The court concludes that the situation was properly remedied by removing Juror 523 from deliberations in the "penalty phase," replacing her with an alternate juror, of Honken's choosing, and instructing the reconstituted jury to begin anew its "penalty phase" deliberations.

Finally, Honken challenges the sufficiency of the evidence to convict him of either "conspiracy murder" or "CCE murder." While Honken challenges both the soundness of the government's circumstantial case and the sufficiency of the evidence to prove the existence of either the underlying conspiracy or the underlying CCE at the time of the murders, the court finds that the evidence on the issues identified was more than sufficient and, indeed, that the evidence of Honken's guilt on the capital charges was absolutely overwhelming.

In short, the court finds that a reasonable juror could have found the evidence sufficient to convict Honken; indeed, no reasonable juror could have found otherwise. Thus, judgment of acquittal is not required and, further or in the alternative, the interest of justice does not require a new trial in Honken's case. Therefore, Honken's motion for judgment of acquittal

or new trial will be denied. The court's much more detailed explication of the reasons for its conclusions follows.

## II. INTRODUCTION

### A. Background

As with other rulings in this case, the background to defendant Dustin Lee Honken's motion for judgment of acquittal or new trial begins with a survey of his prior prosecutions in this judicial district and a description of the charges against him in the present case. In addition, the court must now add a summary of the proceedings leading to Honken's conviction and jury recommendation for death sentences on four of the ten capital charges against him. However, specific incidents or factual circumstances may require further amplification, in the legal analysis to follow, as they become relevant to issues that Honken raises in his post-trial motion.

### 1. The 1993 case

Honken was first prosecuted for drug-trafficking offenses in this district in 1993 in Case No. CR 93–3019 ("the 1993 case"). As the Eighth Circuit Court of Appeals explained,

> In April 1993, a grand jury in the Northern District of Iowa indicted [Honken] for conspiracy to distribute methamphetamine. After the disappearance of one or more prospective prosecution witnesses, the government dismissed the indictment.

*United States v. Honken,* 184 F.3d 961, 963 (8th Cir.), *cert. denied,* 528 U.S. 1056, 120 S.Ct. 602, 145 L.Ed.2d 500 (1999). Thus, the first prosecution of Honken in this district did not lead to a conviction. The witnesses whose convenient disappearance ended the 1993 prosecution against Honken were Gregory Nicholson and Terry DeGeus, both of whom had been

methamphetamine dealers for Honken. At the same time that Gregory Nicholson disappeared, Lori Duncan, a friend of Nicholson's with whom Nicholson was then living, and Lori Duncan's daughters, Kandi Duncan and Amber Duncan, ages 10 and 6, respectively, also disappeared.

### 2. The 1996 case

Honken was again indicted on drug-trafficking charges on April 11, 1996, this time with co-defendant Timothy Cutkomp, in Case No. CR 96–3004–MWB ("the 1996 case"). Count 1 of the Indictment in the 1996 case charged Honken and Cutkomp with conspiracy, between about 1993 and February 7, 1996, to distribute, manufacture, and attempt to manufacture 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 100 grams or more of pure methamphetamine. Indictment in Case No. CR 96–3004–MWB (N.D.Iowa). Count 2 of the original Indictment in the 1996 case charged Honken with possessing and aiding and abetting the possession of listed chemicals, in violation of 21 U.S.C. § 841(d) and 18 U.S.C. § 2, and Count 3 charged possession and aiding and abetting the possession of drug paraphernalia intending to use such paraphernalia to manufacture and attempt to manufacture methamphetamine and listed chemicals, in violation of 21 U.S.C. § 843(a)(6) and 18 U.S.C. § 2, respectively. Id., Counts 2 & 3. A superseding indictment filed later in the 1996 case restated the first three charges and added a fourth charge of attempting to manufacture methamphetamine. See Superseding Indictment in Case No. CR 96–3004–MWB (N.D.Iowa).

Eventually, in 1997, Honken pleaded guilty to the conspiracy charge and the charge of attempting to manufacture methamphetamine, i.e., Counts 1 and 4, and the government dismissed Counts 2 and 3. See, e.g., Honken, 184 F.3d at 963. The court held an episodic sentencing hearing on December 15 and 16, 1997, and February 17, 18, and 24, 1998. Honken testified under oath on February 18 and 24, 1998. After the government's appeal of the sentence originally imposed by the undersigned, see id., Honken was resentenced on January 25, 2000. Honken then unsuccessfully appealed his sentence. See United States v. Honken, 2 Fed.Appx. 611 (8th Cir.2001). Honken is now serving his sentence on Counts 1 and 4 in the 1996 case.

### 3. Discovery of the murder victims' bodies

In 2000, Honken's some time girlfriend and mother of one of his children, Angela Johnson, was indicted for the killings of Nicholson, the Duncans, and DeGeus on non-capital charges of aiding and abetting the murder of witnesses in violation of 18 U.S.C. §§ 1512(a)(1)(A) and (C), 1512(a)(2)(A) or 1513(a)(1)(A) and (C),[4] 1111, and 2; one count of aiding and abetting the solicitation of the murder of witnesses, in violation of 18 U.S.C. §§ 373(a)(1) and 2; and one count of conspiracy to interfere with witnesses, in violation of 18 U.S.C. § 371. While she was incarcerated pending trial on these charges, Johnson gave a jailhouse informant a map that showed where the five murder victims were buried after the informant convinced Johnson that he could

---

4. The court notes that there is no subdivision (C) to 18 U.S.C. § 1513(a)(1), nor does it appear that there ever has been. See 18 U.S.C.A. § 1513(a) & Historical and Statutory Notes. Notwithstanding this fact, Count 1 of the Superseding Indictment in this case,

which alleges that Johnson aided and abetted the killing of Gregory Nicholson, alleges that the killing was, inter alia, "in violation of Title 18, United States Code, Sections ... 1513(a)(1)(A) & (C)...." Superseding Indictment, Count 1.

get someone already serving a life sentence to confess to the killings, if she could give him information that would provide a credible basis for the false confession. The informant turned the map over to law enforcement officers. The map led law enforcement officers to two shallow graves containing the bodies of the five murder victims.

#### 4. The indictments in this case

Following discovery of the bodies, a Grand Jury handed down separate indictments against Honken and Johnson in 2001 charging each of them with ten capital offenses for the murders of Nicholson, the Duncans, and DeGeus. Honken was also charged with seven non-capital offenses that mirrored the seven non-capital offenses already brought against Johnson in the 2000 indictment. On August 23, 2002, a Grand Jury handed down a Superseding Indictment in this case that amended the capital charges against Honken in Counts 8 through 17. *See* Superseding Indictment (docket no. 46). The court will examine the charges in this case in more detail to put in context the discussion of Honken's motion for judgment of acquittal or new trial.

##### a. Non-capital charges

Counts 1 through 5 of the Superseding Indictment charged "witness tampering." More specifically, each count alleged that Honken "did willfully, deliberately, maliciously, and with premeditation and malice aforethought, unlawfully kill" one of five witnesses—Gregory Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, or Terry DeGeus—in violation of 18 U.S.C. § 1512(a)(1)(A) & (C); 1513(a)(1)(A) & (B) and 1111. The Superseding Indictment included, in support of Counts 1 through 5, allegations of "Findings under 18 U.S.C. § 3591 and 3592," which the court finds it unnecessary to repeat here, because the government did not seek the death penalty

against Honken on the "witness tampering" charges. Count 6 charged Honken with soliciting Dean Donaldson and Anthony Altimus to murder Timothy Cutkomp and Daniel Cobeen to prevent them from testifying in the 1996 case against Honken in violation of 18 U.S.C. § 373(a)(1). Count 7 charged Honken with conspiracy to tamper with witnesses and to solicit the murder of witnesses in violation of 18 U.S.C. § 371. Count 7 included fourteen numbered paragraphs of allegations of "Background to Overt Acts" and thirty numbered paragraphs of allegations of "Overt Acts" in furtherance of the conspiracy, which the court will not quote here.

##### b. Capital charges

Honken was also charged in Counts 8 through 12 of the Superseding Indictment in this case with five counts of murder while engaging in a drug-trafficking conspiracy ("conspiracy murder"), in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. These Counts each charged the "conspiracy murder" of one of five people— Gregory Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, or Terry DeGeus—as follows:

> On or about July 25, 1993 [November 5, 1993, as to DeGeus], in the Northern District of Iowa, DUSTIN LEE HONKEN, while knowingly engaging in an offense punishable under Title 21, United States Code, Sections 846 and 841(b)(1)(A), that is between 1992 and 1998 DUSTIN LEE HONKEN did knowingly and unlawfully conspired [sic] to: 1) manufacture 100 grams or more of pure methamphetamine and 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 2) distribute 100 grams or more of pure methamphetamine and 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine,

intentionally killed and counseled, commanded, induced, procured, and caused and aided and abetted the intentional killing of [the named individual], and such killing resulted.

All in violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2. Superseding Indictment, Counts 8 through 12.

Counts 13 through 17 of the Superseding Indictment in this case charged Honken with the murder of the same five individuals, respectively, while engaging in or working in furtherance of a continuing criminal enterprise ("CCE murder"), also in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2, as follows:

On or about July 25, 1993 [November 5, 1993, as to DeGeus], in the Northern District of Iowa, DUSTIN LEE HONKEN, while engaging in and working in furtherance of a continuing criminal enterprise in violation of Title 21, United States Code, Section 848(c), intentionally killed and counseled, commanded, induced, procured, and caused and aided and abetted the intentional killing of [the named individual], and such killing resulted.

The continuing criminal enterprise DUSTIN LEE HONKEN engaged in and worked in furtherance of was undertaken by DUSTIN LEE HONKEN in concert with five or more other persons including, but not limited to, Timothy Cutkomp, Gregory Nicholson, Terry DeGeus, Angela Jane Johnson, and Jeffery Honken. In the organization, DUSTIN LEE HONKEN occupied a position of organizer, supervisor or other position of management. The criminal enterprise involved the commission of a continuing series of narcotics violations under Title 21, United States Code, Section 801 *et. [sic] seq.* occurring between 1992 and 2000, specifically:

[18 numbered paragraphs omitted].

From this continuing criminal enterprise, DUSTIN HONKEN and others derived substantial income and resources.

All in violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2. Superseding Indictment, Counts 13 through 17.

On June 10, 2003, the government filed its Notice Of Intent To Seek The Death Penalty Under 21 U.S.C. § 848 (docket no. 120), thereby giving notice of the government's intent to seek the death penalty on the "conspiracy murder" and "CCE murder" offenses in Counts 8 through 17. On July 21, 2003, in a ruling that Honken challenges post-trial, this court denied Honken's motion to dismiss Counts 8 through 17 on the basis of "former jeopardy" in light of his prior conviction in the 1996 case. *See United States v. Honken,* 271 F.Supp.2d 1097 (N.D.Iowa 2003). Therefore, this matter proceeded to trial on August 18, 2004, on all seventeen of the charges in the Superseding Indictment.

### 5. Significant pre-trial rulings

Prior to trial, this court entered a number of rulings on evidentiary and other issues, which the court has only recently submitted for publication.[5] Because Honken challenges some of those pre-trial rulings, the court will summarize the salient points of those rulings in the pertinent sections of its legal analysis, below. Nevertheless, a synopsis of those rulings is appropriate here.

---

**5.** Several of these rulings were filed under seal. However, some of the rulings were recently unsealed after the completion of the trial against Honken's separately-indicted co-defendant, Angela Johnson.

On January 29, 2004, the court filed a memorandum opinion and order granting the government's motion for an "anonymous" jury (docket no. 201), *United States v. Honken,* 378 F.Supp.2d 880 (N.D.Iowa 2004). More specifically, pursuant to the court's ruling, the jurors in this case were "anonymous" to the extent that their names, addresses, and places of employment, and the names of spouses and their places of employment, were not disclosed to the parties, their counsel, or the public, either before or after selection of the jury panel. However, pursuant to this ruling, each juror's community of residence and the "nature" of his or her employment, and the "nature" of his or her spouse's employment, were disclosed to the parties, their counsel, and the public. By order dated May 14, 2004 (docket no. 249), *United States v. Honken,* 378 F.Supp.2d 925 (N.D.Iowa 2004), the court denied Honken's motion to reconsider this ruling. Honken expressly challenges the original ruling and the ruling on the motion to reconsider on the "anonymous jury" issue in his post-trial motion for judgment of acquittal or new trial.

On June 7, 2004, the court entered a ruling on the government's pre-trial motions (docket no. 272), *United States v. Honken,* 378 F.Supp.2d 928 (N.D.Iowa 2004). That ruling granted the government's motion to admit evidence of Honken's admissions during his guilty plea, sentencing, and conviction of drug charges in the 1996 case; granted the government's motion to admit the maps showing the locations of the graves of the murder victims that Angela Johnson had given to a jailhouse informant in 2000; granted the government's motion to admit certain audio recordings of conversations between Honken and Gregory Nicholson and between Honken and Timothy Cutkomp; and reserved for trial the question of the admissibility, for demonstrative purposes, of a replica firearm. The replica firearm was later admitted at trial after the court determined that sufficient evidence had been presented to show that Honken possessed a weapon matching the description of the replica firearm and that such a weapon could reasonably have been the murder weapon. Honken challenges some of these rulings post-trial.

The court entered a ruling on a "second series" of pre-trial motions by the parties on July 16, 2004 (docket no. 323), *United States v. Honken,* 378 F.Supp.2d 970 (N.D.Iowa 2004). In that ruling, the court granted the government's motion to exclude evidence of witness Timothy Cutkomp's incidents of indecent exposure to the extent that the parties, counsel, and witnesses were allowed to make reference to Cutkomp's "misdemeanor conviction" and "acts constituting misdemeanor violations of the law" that caused Cutkomp to see a psychiatrist or that Cutkomp may have failed to disclose fully to law enforcement officers, but they were not allowed to refer to the incidents as incidents of "indecent exposure." The court also granted the government's motion to admit certain hearsay statements by murder victim Terry DeGeus pursuant to Rule 803(3) (then existing mental, emotional, or physical condition) or conditionally pursuant to Rule 804(b)(6) (forfeiture by wrongdoing), and likewise granted the government's motion to admit certain hearsay statements by murder victim Gregory Nicholson conditionally pursuant to Rule 804(b)(6). The court also granted the government's motion to bar evidence or discussion concerning certain aspects of the death penalty, but with certain specific exceptions noted in the ruling. In the same ruling, the court also granted in part and denied in part Honken's motion to exclude certain evidence, which is not pertinent to his present motion for judgment of acquittal or new trial; denied the government's motion to exclude evidence from one of Honk-

en's experts, subject to conditions the court had set during oral arguments; and denied the government's motion to exclude evidence from Honken's mitigation specialist. Honken also challenges some of these rulings post-trial.

On July 21, 2004, the court granted the government's motion to have Honken wear shackles at trial (docket no. 328), *United States v. Honken,* 378 F.Supp.2d 1010 (N.D.Iowa 2004). Honken also expressly challenges this ruling post-trial. Therefore, the court will summarize the content and basis for that ruling in the pertinent section of its legal analysis below.

Finally, on September 1, 2004, during the course of jury selection, the court entered a ruling (docket no. 432), *United States v. Honken,* 378 F.Supp.2d 1040 (N.D.Iowa 2004), addressing whether or not the jury would be instructed that it could consider any "residual" or "lingering" doubts as to Honken's guilt or involvement in the charged offenses as a mitigating factor during the "penalty phase," if any. Honken had raised this issue during *voir dire* of various prospective jurors. The court concluded that it would permit Honken to raise the issue of "residual doubt" in the presentation of the "penalty phase," if any, and that it would include a "residual doubt" instruction in its "penalty phase" instructions to the jury. The court did ultimately include such an instruction in the final "penalty phase" jury instructions.

### 6. Honken's trial and conviction

#### a. Jury selection

Well in advance of trial, the court authorized the use of an extensive juror questionnaire to obtain basic biographical information about each prospective juror, as well as more detailed information about the juror's views on trial-related issues, such as the death penalty. The court also authorized Honken's defense team to hire a jury consultant, who participated in the drafting of the juror questionnaire. The questionnaire was distributed to one thousand prospective jurors. If a questionnaire was returned as undeliverable, Clerk's Office personnel attempted to determine whether the prospective juror had moved or died and, if possible, would resend the questionnaire to the prospective juror. Based on directions from the court, the Clerk's Office excused jurors who could not be located. Prior to trial, counsel for the parties met to review the hundreds of responses to the juror questionnaires that had been returned. The parties then agreed to excuse over two hundred prospective jurors for hardship or inability to qualify to serve on the jury in this death-penalty case. The remaining prospective jurors were randomly sorted into panels of fifteen and each juror was notified of the day on which his or her panel was to appear for preliminary jury selection. After panel assignment notices were sent out, the court excused several additional jurors for hardship based on renewed requests for excuses from service.

Jury selection began in Honken's trial on August 18, 2004, with the appearance of the first panel of approximately fifteen prospective jurors for group and individual *voir dire.* Each day, with each new panel, by agreement with the parties, the court initiated the jury selection process. However, also by prior agreement and pursuant to certain rulings, the lawyers on both sides were provided considerable latitude in questioning the panel as a whole and then questioning each individual prospective juror. In the course of each day of jury selection, prospective jurors were excused for hardship or on challenges for cause. Prospective jurors not so excused were "qualified" for the final juror pool. Once seventy-five prospective jurors were "qualified" in this manner, the "qualified pool" was notified to appear for final jury

selection. A sufficient pool of "qualified" prospective jurors was eventually obtained after twelve daily panels were interviewed.

The "qualified pool" of seventy-five prospective jurors appeared on September 8, 2004, and after further *voir dire*, three prospective jurors were excused for hardship and one was stricken for cause. The parties then exercised their peremptory challenges, and a panel of twelve trial jurors and six alternates was seated. The jurors selected were not made aware at this time whether they were trial jurors or alternates. The court then read its preliminary "merits phase" jury instructions. After the reading of the jury instructions, one juror, a local Sioux City lawyer, notified the court that she had just realized that she had read various rulings in the companion case against Angela Johnson, and the court and the parties agreed to strike that juror for cause. Therefore, trial continued with a total of seventeen jurors, five of whom were alternates.

### b. The "merits phase"

The "merits phase" of Honken's jury trial began on September 9, 2004, with opening arguments and the start of the presentation of evidence in the government's case-in-chief. Prior to or in the course of trial, the government narrowed some of the charges to conform to proof. Specifically, as to the non-capital charge of solicitation of murder in Count 6, the government withdrew its allegation that Honken solicited the murder of Daniel Cobeen, and Count 6 went to the jury only on solicitation of the murder of Timothy Cutkomp. As to the capital charges of "CCE murder" in Counts 13 through 17, the government withdrew the "working in furtherance of the CCE" alternative, and submitted only the "engaging in the CCE" alternative. Thus, the government was required to prove that Honken was actually guilty of the underlying CCE offense and, indeed, that he was the "organizer,

supervisor, or manager" of the CCE. The government also narrowed from eighteen to thirteen the field of alleged violations constituting the series of three or more related felony violations required for the underlying CCE offense.

During the "merits phase," the jury heard the testimony of sixty-five witnesses, eleven of whom were called by Honken, and the court admitted nearly four hundred exhibits, six of which were offered by Honken. The court also permitted the government to use nineteen demonstrative exhibits. Trial was ordinarily held four days per week, with Fridays off.

On October 7, 2004, the fifteenth trial day, the presentation of "merits phase" evidence concluded, and the court read the jury most of the final "merits phase" jury instructions. On October 11, 2004, after closing arguments, the court read the remaining jury instructions on deliberations, and dismissed alternate jurors until required for any "penalty phase," then submitted the "merits phase" of Honken's trial to the jury.

The jury returned its "merits phase" verdict on October 14, 2004, after approximately two-and-one-half days of deliberations. The jury found Honken guilty on all seventeen counts against him. As to the capital charges of "conspiracy murder" in Counts 8 through 12, the jury found that the objectives of the underlying conspiracy were the manufacture and distribution of 100 grams or more of actual (pure) methamphetamine. The jury also found that Honken intentionally killed, rather than aided and abetted the killing, of each of the five murder victims. As to the capital charges of "CCE murder" in Counts 13 through 17, the jury found that the underlying CCE involved all thirteen of the offenses allegedly constituting the series of three or more violations, and that Honken intentionally killed, rather than aided and abetted the killing, of each of the five

murder victims. The jurors were not required to respond to any query regarding the members of the CCE, because the prosecution only alleged that five persons, in addition to Honken, the minimum required for a CCE violation, *see* 21 U.S.C. § 848(c), were members of the CCE.

### c. The "penalty phase"

The "penalty phase" of Honken's trial began after a brief hiatus on October 18, 2004, with the reading of preliminary "penalty phase" jury instructions, opening statements, and the presentation of evidence by both the government and the defense. During the "penalty phase," the jury heard the testimony of twenty witnesses, nine of whom were called by Honken, and the court admitted thirteen government exhibits and sixty-six defense exhibits. The defense's "penalty phase" evidence continued through the morning of October 19, 2004, and most of the day on October 20, 2004. The government's rebuttal evidence occupied the late afternoon on October 20, 2004. The court read the final "penalty phase" jury instructions to the jury on October 21, 2004, and the parties made their closing arguments. The "penalty phase" of Honken's trial was submitted to the jury before noon on October 21, 2004. Although the alternate jurors heard all of the "penalty phase" evidence, before the trial jurors began their "penalty phase" deliberations the alternates were again excused pending possible recall, if needed.

Without objection from the parties, the court allowed the jurors to determine their own schedule for deliberations, including whether or not to deliberate on Fridays. The jurors chose to end their deliberations early on Thursday, October 21, 2004, and informed the court that they had decided not to deliberate on Friday, October 22, 2004. However, before the jurors were

escorted back to their dispersal site, one of the jurors, Juror 523, asked a Deputy Clerk of Court for an excuse from work for the remainder of the day and the following day, because she alleged that her boss had been making inappropriate comments to her about the trial. The Deputy Clerk brought the matter to the court's attention, and the court, in turn, informed the parties.

A hearing on the matter, including questioning of Juror 523, occupied most of the afternoon on October 21, 2004. A further hearing was held on October 22, 2004, involving further questioning of Juror 523. All of the jurors, trial jurors and alternates, were recalled on October 25, 2004. Before they were allowed to begin any deliberations, all of the jurors, trial jurors and alternates, were questioned individually in court concerning what, if anything, they had heard from Juror 523 about her boss's comments. Juror 523 was excused and the defendant was given a choice of continuing the "penalty phase" deliberations with eleven jurors or seating one of the alternate jurors. Honken chose the latter option, so Juror 523 was replaced with an alternate juror of Honken's choosing and to whom the government had no objection, and the jury was instructed to begin its deliberations anew. The court will return to the circumstances surrounding this incident in more detail below, as this incident is the centerpiece of Honken's motion for a new trial.

The reconstituted jury returned its "penalty phase" verdict on October 27, 2004. The verdict form required the jurors to state their verdict in five "steps." In **Step 1,** for each of the eight capital counts, the jury found as an "eligibility aggravating factor," that Honken intentionally killed the victim identified in that count. *See* 21 U.S.C. § 848(n)(1)(A).[6] In **Step 2,** the jury found that the prosecution

---

**6.** The only other "eligibility aggravating fac-

tor" submitted to the jury was whether or not

had proved all of "statutory aggravating factors" alleged, with the exception that the jury did not find that Honken committed the killings of the children, Kandi and Amber Duncan, after substantial planning and premeditation.[7] In **Step 3,** the jury found that the prosecution had proved all of the "non-statutory aggravating factors" upon which it had relied.[8] In **Step 4,** at least one juror also found each of the "mitigating factors" asserted by Honken, with the exception that not a single juror found any "residual or lingering doubts as to Dustin Honken's guilt or innocence or his role in the offenses, even though those doubts did not rise to the level of 'reasonable doubts' during the 'merits phase' of the trial." *See* Verdict Form, Step 4.[9] The

the defendant "intentionally engaged in conduct intending that the victim in question be killed or that lethal force be employed against the victim, which resulted in the death of the victim." 21 U.S.C. § 848(n)(1)(C).

7. More specifically, as to the four "statutory aggravating factors" asserted by the prosecution, the jury found as follows: as to the killings of the three adults, that Honken committed the offenses in question after substantial planning and premeditation, *see* 21 U.S.C. § 848(n)(8), but did not so find as to the killings of the two children; as to the three adult victims, the only ones as to whom this aggravating factor was asserted, that Honken committed the offenses in question in an especially heinous, cruel, or depraved manner, with a specific finding that the offenses involved both torture and serious physical abuse, *see* 21 U.S.C. § 848(n)(12); and as to the children, the only victims as to whom this aggravating factor was asserted, that the victims were particularly vulnerable due to their young age, *see* 21 U.S.C. § 848(n)(9).

8. More specifically, as to the four "non-statutory aggravating factors" asserted by the prosecution, the jury found that Honken would be a danger in the future to the lives and safety of other persons; that Honken obstructed justice by preventing the victims from providing testimony or information to law enforcement officers or by retaliating against the victims for cooperating with authorities; that Honken intentionally killed more than one person in a single criminal episode, a factor not asserted as to the killing of Terry DeGeus; and that the effect of the crimes upon the victim's families was injurious.

9. More specifically, as to all eight capital counts, twelve jurors found that Honken does not have a history of significant criminal convictions prior to the offenses at issue here; twelve jurors found that Honken does not have a history of violent or assaultive behavior prior to the offenses at issue here; nine jurors found that Honken loves his son, Ryan; seven jurors found that Honken is loved by his son, Ryan, and that the execution of Honken would cause his innocent son extraordinary emotional harm; nine jurors found that Honken loves his daughter, Marvea; seven jurors found that Honken is loved by his daughter, Marvea, and that the execution of Honken would cause his innocent daughter extraordinary emotional harm; nine jurors found that Honken loves Kathy Rick's son, Brandon, and has always treated Brandon as if he were Honken's biological son; seven jurors found that Honken is loved by Kathy Rick's son, Brandon, and that the execution of Honken would cause Kathy Rick's son, Brandon, extraordinary emotional harm; nine jurors found that Honken is loved by his mother and stepfather, Marvea and Ron Smidt, and that the execution of Honken would cause them extraordinary emotional harm; ten jurors found that Honken is loved by his sister, Alyssa Nelson, and that the execution of Honken would cause his sister, Alyssa Nelson, extraordinary emotional harm; one juror found that Honken's father, Jim Honken, was an alcoholic convict who was proud of his criminal lifestyle and who bragged to his sons about his crimes; one juror found that, as an infant, Honken did not experience normal parental love and nurturing, because his mother, Marvea, was depressed and unhappy in her marriage to Jim Honken, Jim Honken worked out of town Monday through Friday, and Jim Honken was usually intoxicated all weekend; three jurors found that Honken's father, Jim, never participated in caring for Dustin by holding him, feeding him, or changing his diapers, never played ball with him, or participated in any one-on-one father-son activities with him; twelve jurors found that Honken's natural parents, Jim and Marvea Honken, were di-

jurors did not indicate that they found any additional "mitigating factors" not expressly argued by defense counsel. Finally, in **Step 5,** after weighing all of the pertinent factors, the jury found that a sentence of life imprisonment without possibility of release should be imposed upon Honken for the killings of Gregory Nicholson, Lori Duncan, and Terry DeGeus, but that a sentence of death should be imposed for the killings of Kandi and Amber Duncan.

### 7. Post-trial proceedings

#### a. The motion for judgment of acquittal or new trial

On October 28, 2004, the court entered an order (docket no. 550) extending Honken's deadline for any post-trial motions to and including November 17, 2004. On November 4, 2004, the court entered another order (docket no. 563) setting an evidentiary hearing on post-trial motions for December 16, 2004. On November 17, 2004, Honken filed his Motion For A Judgment Of Acquittal, Or, In The Alternative, For A New Trial Pursuant To Fed.R.Crim.P. 29(c) And 33 (docket no. 578), which is now before the court. Honken was not, however, required to file a brief with his motion until after the evidentiary hearing scheduled for December 16, 2004, and the government was, likewise, granted an extension of time to resist Honken's motion until after Honken filed his brief.

The court held the post-trial evidentiary hearing as scheduled on December 16, 2004. The focus of the hearing was the alleged jury-tampering issue involving Juror 523's report of inappropriate comments about the trial by her boss. At the hearing, the government called six persons identified as officers or managers of the company at which Juror 523 was employed. Defendant Honken called Juror 523 and Duane Walhof, the Supervisory Deputy United States Marshal for the Sioux City Office of the United States Marshal's Service. Another officer or manager of the company at which Juror 523 was employed was subsequently deposed by the parties.

Following the hearing, the court granted Honken further extensions of time to file his brief in support of his post-trial motions. Honken ultimately filed his brief on March 14, 2005 (docket no. 634). The government filed its resistance on March 25, 2005 (docket no. 642), and, after several extensions of time to do so, Honken filed a reply brief on May 25, 2005 (docket no. 664). By order dated June 7, 2005 (docket no. 670), the court set telephonic oral arguments on Honken's motion for new trial for June 22, 2005, after carefully balancing Honken's rights with security and cost concerns, and determining that telephonic oral arguments would be adequate to protect Honken's rights and were appropriate under the circumstances. However, when Honken moved to continue the oral arguments on his motion for judgment or new trial owing to conflicts with counsels' schedules, the court canceled the oral arguments. The oral arguments were eventually heard on July 12, 2004.

#### b. The motion to investigate juror misconduct

In a separate, unresisted motion, filed May 2, 2005, Honken sought the juror questionnaire of a potential juror in the companion case of *United States v. John-*

---

vorced when Dustin was only eight years old, and Dustin had only sporadic contact with Jim Honken between the ages of eight and fifteen; and twelve jurors found that, since being incarcerated in the Federal Bureau of Prisons, Honken has generally been a well-behaved inmate, in that he has received only three citations for disciplinary infractions in over seven years (two for possession of a home-made alcoholic beverage, and one for fighting without serious injury).

*son,* No. CR 01–3046–MWB (N.D.Iowa). *See* Honken's Unresisted Application To Obtain Juror Questionnaire Of Potential [Johnson] Juror #16 (docket no. 655). The motion was prompted by a letter dated April 21, 2005, from the court to counsel for both parties in this case advising them that a comment in a questionnaire of Prospective Juror 16 in *United States v. Johnson* had raised some concerns about a juror in Honken's case. In an order dated May 3, 2005 (docket no. 656), the court found that, notwithstanding the government's lack of objection, Honken's motion was deficient to obtain the relief he sought, because the application was not accompanied by a brief and failed to identify the applicable standards for obtaining the information in question or making further inquiry or investigation into the incident in question. Therefore, the court gave defendant Honken to and including Tuesday, May 17, 2005, to submit a brief in support of his application that, at a minimum, cited and applied the standards applicable to his request to obtain the juror questionnaire at issue or otherwise to make further inquiry or investigation into the incident. The court also gave the government to and including Tuesday, May 24, 2005, to file any responsive brief.

A week later, on May 10, 2005, the court entered another order (docket no. 659), explaining that the court's own preliminary research had brought to the court's attention the recent decision of the Eighth Circuit Court of Appeals in *United States v. Gianakos,* 404 F.3d 1065 (8th Cir.2005). In its May 10, 2005, order, the court stated its opinion that it was likely that the decision in *Gianakos* foreclosed further inquiry and investigation regarding the incident underlying defendant Honken's motion for the juror questionnaire of Prospective Johnson Juror 16, and, moreover, that the decision in *Gianakos* was likely dispositive of any issue of alleged juror misconduct to which that motion related. Consequently,

the court directed that, in his brief due May 17, 2005, concerning his request for the juror questionnaire of Prospective Johnson Juror 16, Honken was to consider the impact of the *Gianakos* decision. The court likewise directed the government to consider the impact of the *Gianakos* decision in its responsive brief, if any.

Honken did not file any timely brief on or before May 17, 2005, in support of his request for the juror questionnaire for Prospective Johnson Juror 16, as required by the court's order of May 10, 2005, nor did he file any timely request for an extension of time to do so. After allowing an additional month to elapse, the court entered an order dated June 16, 2005 (docket no. 675), in which the court denied Honken's May 2, 2005, Unresisted Application To Obtain Juror Questionnaire Of Potential [Johnson] Juror #16 (docket no. 655) on three alternative grounds: waiver of the issue, failure to comply with a court order to file a brief in support of the motion, and failure on the merits.

In response to that order, on June 22, 2005, Honken filed a Motion For Five Additional Days To File A Brief In Support Of His Motion To Reconsider Denial Of Juror Questionnaire (docket no. 676). While not convinced that Honken had shown good cause or excusable neglect for his failure to file a timely response to the court's order to file a brief in support of his original motion requesting the juror questionnaire of Prospective Johnson Juror 16, in an abundance of caution, the court granted Honken leave to file a motion to reconsider the June 16, 2005, ruling. The court cautioned Honken that he must now address not only the merits of his original motion, but also address whether adequate grounds existed to reconsider the denial of that motion.

On June 28, 2004, Honken filed both a brief in support of his motion to obtain the

juror questionnaire of Prospective Johnson Juror 16 and a brief in support of his motion to reconsider the order denying his original motion (docket nos. 685–1 and 685–2). The government filed a response to the motion to obtain the juror questionnaire on June 29, 2005 (docket no. 687). Therefore, the issue of whether or not Honken may obtain the juror questionnaire of Prospective Johnson Juror 16 is now fully submitted.

### c. Oral arguments

At the telephonic oral arguments on Honken's post-trial motion for judgment of acquittal or new trial, the United States was represented by C.J. Williams, Assistant United States Attorney, from Cedar Rapids, Iowa, who argued the government's position, and Thomas Henry Miller, Assistant Iowa Attorney General, from Des Moines, Iowa. Defendant Dustin Lee Honken participated by telephone and was represented by Alfredo G. Parrish of Parrish, Kruidenier, Moss, Dunn, Montgomery, Boles & Gribble, L.L.P., in Des Moines, Iowa; Leon F. Spies of Mellon & Spies in Iowa City, Iowa; and Charles Rogers of Wyrsch, Hobbs & Mirakian, P.C., in Kansas City, Missouri. The court initiated the teleconference from the first floor courtroom in Sioux City, Iowa, so that members of the press and public could audit the arguments. However, no one appeared in person to audit the arguments, although certain members of the press who had requested prior permission to do so were permitted to audit the oral arguments by telephone.

At the conclusion of the oral arguments, Honken requested leave to file a supplemental brief, because he had not been able to consult privately with counsel during the telephonic arguments. The court granted that request, and Honken filed his supplemental reply brief on July 20, 2005 (docket no. 690). The prosecution had indicated at the oral arguments that it did not need the opportunity to respond to any supplemental reply brief that Honken might file. Therefore, Honken's post-trial motion for judgment of acquittal or new trial is now fully submitted.

### III. LEGAL ANALYSIS

### (Including Essential Findings Of Fact)

### A. Applicable Standards

The court will consider each of Honken's challenges to his conviction in turn. However, because Honken has not always clearly articulated whether the alleged "errors" he asserts should earn him a judgment of acquittal or a new trial, the court must first determine on which grounds Honken seeks a judgment of acquittal and on which he seeks a new trial. That question is resolved by examining the standards applicable to each kind of challenge to his conviction.

### 1. Judgment of acquittal

Rule 29(a) of the Federal Rules of Criminal Procedure provides, in pertinent part, that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which *the evidence is insufficient to sustain a conviction.*" FED. R.CRIM.P. 29(a) (emphasis added). While Rule 29(a) expressly provides for such a motion before the case is submitted to the jury, *see id.,* Rule 29(c) provides, in pertinent part, that "[a] defendant may move for judgment of acquittal, or renew such a motion ... within any ... time the court sets during the 7–day period" after a guilty verdict or discharge of the jury. FED.R.CRIM.P. 29(c)(1). Honken has filed such a timely motion for judgment of acquittal within the extended time the court authorized.

 As the Eighth Circuit Court of Appeals has explained, "A motion for a judgment of acquittal should be *denied*

where the evidence, viewed in the light most favorable to the government, is such that a reasonable jury could have found each of the essential elements of the crime beyond a reasonable doubt." *United States v. Moyer,* 182 F.3d 1018, 1021 (8th Cir.1999) (emphasis added) (citing *United States v. Hood,* 51 F.3d 128, 129 (8th Cir. 1995), and *United States v. Huntsman,* 959 F.2d 1429, 1436–37 (8th Cir.1992), *cert. denied,* 506 U.S. 870, 113 S.Ct. 201, 121 L.Ed.2d 143 (1992)), *cert. denied,* 530 U.S. 1203, 120 S.Ct. 2196, 147 L.Ed.2d 232 (2000). To put it another way, " '[a] motion for judgment of acquittal should only be *granted* where the evidence, viewed in the light most favorable to the government, is such that a reasonably minded jury must have a reasonable doubt as to the existence of any essential elements of the crime charged.' " *United States v. Pardue,* 983 F.2d 843, 847 (8th Cir.1993) (quoting *United States v. Mundt,* 846 F.2d 1157, 1158 (8th Cir.1988), with citation omitted and emphasis added), *cert. denied,* 509 U.S. 925, 113 S.Ct. 3043, 125 L.Ed.2d 728 (1993). Thus, in either the trial court or the appellate court, the standard is the same:

> [T]he test is whether "a reasonable fact finder could have found guilt beyond a reasonable doubt." *United States v. Garrett,* 948 F.2d 474, 476 (8th Cir.1991) (citation omitted). Under this standard, the district court has "very limited latitude." *United States v. Jewell,* 893 F.2d 193, 194 (8th Cir.1990). In deciding a motion for judgment of acquittal, the court can neither weigh the evidence nor assess the credibility of the witnesses. *Burks v. United States,* 437 U.S. 1, 16, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978).

*Pardue,* 983 F.2d at 847.

Honken's only challenges couched in terms of sufficiency of the evidence are his challenges to the sufficiency of the evidence supporting his convictions for "conspiracy murder" and "CCE murder"; thus, Honken plainly seeks judgment of acquittal on these charges. *See* FED.R.CRIM.P. 29(a) (a judgment of acquittal must be granted if the evidence is insufficient to sustain the conviction). Similarly, his reassertion of "former jeopardy" as barring his prosecution on the capital charges is also an argument that there is no legal and evidentiary distinction between the present capital charges and his former "conspiracy" conviction to satisfy the Double Jeopardy Clause. Therefore, the court also construes the "former jeopardy" argument to be an argument for judgment of acquittal on the capital offenses. Unless the court indicates otherwise, however, the court will assume that the relief that Honken seeks on all of his other challenges is a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

### 2. New trial

Rule 33 of the Federal Rules of Criminal Procedure provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial *if the interest of justice so requires.*" FED. R.CRIM.P. 33(a) (emphasis added). Although a new trial may be based on newly discovered evidence, *see* FED. R.CRIM. P. 33(b)(1) (stating the time for filing of a motion for new trial based on "newly discovered evidence"); *see also United States v. Gianakos,* 404 F.3d 1065, 1079 (8th Cir. 2005) (stating showings required to obtain a new trial based on newly discovered evidence), that is not the only ground. *See, e.g.,* FED.R.CRIM.P. 33(b)(2) (stating the time to file a motion for new trial "grounded on any reason other than newly discovered evidence").

"The granting of a new trial under Rule 33 is a remedy to be used only 'sparingly and with caution.' " *United States v. Dodd,* 391 F.3d 930, 934 (8th Cir.2004) (quoting *United States v. Campos,* 306

F.3d 577, 579 (8th Cir.2002), in turn quoting *United States v. Lincoln,* 630 F.2d 1313, 1319 (8th Cir.1980)). Somewhat more specifically,

> The Rule specifies that the remedy should be granted only where "the interest of justice so requires." Fed. R.Crim.P. 33. The decision to grant a Rule 33 motion is within the sound discretion of the District Court, and we will reverse only for an abuse of that discretion. *Campos,* 306 F.3d at 579–80. The District Court's discretion is broad in that it may "weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." *Id.* at 579. This discretion is abused, however, if the District Court fails to consider a factor that should have been given significant weight, considers and gives significant weight to an improper or irrelevant factor, or commits a clear error of judgment in considering and weighing only proper factors. *Id.* at 580.

*Dodd,* 391 F.3d at 934. *"Unless the district court ultimately determines that a miscarriage of justice will occur,* the jury's verdict must be allowed to stand." *Campos,* 306 F.3d at 579 (emphasis added) (citing *United States v. Lacey,* 219 F.3d 779, 783 (8th Cir.2000)); *accord Ortega v. United States,* 270 F.3d 540, 547 (8th Cir. 2001) ("A district court may grant a new trial under Rule 33 ' "only if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred." ' ") (quoting *Lacey,* 219 F.3d at 783, in turn quoting *United States v. Brown,* 956 F.2d 782, 786 (8th Cir.1992)).

With the exception of his challenge to the sufficiency of the evidence of "conspiracy murder" and "CCE murder," based on either trial evidence or "former jeopardy" grounds, Honken's post-trial motions appear to seek relief from what he asserts would be a miscarriage of justice. *See id.* (stating that the "ultimate" standard for a new trial is whether a miscarriage of justice will otherwise occur). Thus, unless otherwise stated below, the court construes Honken's other challenges to seek a new trial.

### C. *Alleged Erroneous Pre-trial Rulings*

Most of Honken's challenges to pre-trial rulings concern issues that have already been strenuously litigated and considered in detailed rulings. Therefore, unless Honken asserts a new argument, these resurrected issues will receive only the cursory discussion that even careful reconsideration would require. Truly new issues, however, may require more extended discussion.

#### 1. *Former jeopardy*

As his first ground for relief from the jury's verdict, Honken contends that the court erroneously denied his motion to dismiss the capital offenses on "former jeopardy" grounds. The government resists any relief on this ground, for the same reasons that relief was denied pre-trial.

#### a. *The prior ruling*

In a detailed published ruling, *United States v. Honken,* 271 F.Supp.2d 1097 (N.D.Iowa 2003), the court concluded that there was no double-jeopardy violation in Honken's successive prosecution for conspiracy and either "conspiracy murder" or "CCE murder" on three alternative grounds. The court will summarize those three alternatives briefly here to put in context Honken's renewed challenge.

First, the court concluded that it was clear that Congress intended to impose cumulative punishment, and hence successive prosecution, for a CCE offense and "CCE murder," and it would be absurd to read 21 U.S.C. § 848(e) as not also authorizing cumulative punishment, and hence successive prosecution, for a drug conspir-

acy and a "conspiracy murder" or "CCE murder." *Honken,* 271 F.Supp.2d at 1110–11. Thus, the court held that Honken's double-jeopardy challenge failed, "because Congress has expressly authorized cumulative punishment, and hence successive prosecutions, for a drug conspiracy offense and conspiracy murder or CCE murder." *Id.* at 1111.

In the alternative, the court also performed a *"Blockburger* analysis." *See id.* at 1105 (citing *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), as setting a standard for determining whether offenses are "the same" for double jeopardy purposes). The court concluded that under the *Blockburger* "statutory intent test," Congress clearly intended to define "conspiracy murder" and "CCE murder" as separate offenses from an underlying drug conspiracy offense, because Congress separately prohibited and separately penalized murder in furtherance of a conspiracy or CCE, and because the gravamen of a § 848(e)(1)(A) offense was the *murder,* not the *drug conspiracy. Id.* at 1112. Under the *Blockburger* "same offense test," the court also concluded that the conspiracy underlying the "conspiracy murder" charges here was "bigger" and "lasted longer" than the conspiracy charged in the 1996 case, such that the "conspiracy murder" charges did not involve the "same offense" as the previous conspiracy charge. *Id.* at 1115. As to "CCE murder," for the "engaging in" alternative, the court again concluded that the conspiracy underlying the "CCE murder" was not the "same" as the conspiracy to which Honken had previously pleaded guilty, for the same reasons that the previ-

ous conspiracy was not the same as the conspiracy underlying the "conspiracy murder" offense. *Id.* at 1117.[10]

Again in the alternative, this court concluded that the "CCE murder" and "conspiracy murder" offenses were not the "same" offenses as the previous conspiracy under the "same offense" test set forth in *Garrett v. United States,* 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985). The court concluded that this was so, because the "conspiracy murder" statute prohibited and punished murder, which was collateral to the course of conduct prohibited and punished by the drug conspiracy statute, which was an agreement to commit drug-trafficking offenses; hence, the court concluded that the "greater" "conspiracy murder" offense did not involve a single course of conduct shared with the "lesser" conspiracy offense. *Id.* at 1115–16. Therefore, under *Garrett,* the "conspiracy murder" charges do not involve the "same" offense as the drug conspiracy to which Honken previously pleaded guilty. *Id.* at 1116. Similarly, for "CCE murder," the court concluded that the "CCE murder" statute prohibited and punished murder, but the conspiracy statute prohibited and punished an agreement to commit drug-trafficking offenses, so that the "CCE murder" statute punished a collateral course of conduct to the conduct at issue in the drug conspiracy offense; hence, the "greater" "CCE murder" offense did not involve a single course of conduct shared with the "lesser" conspiracy offense. *Id.* at 1117–18. Therefore, this court also concluded that, under *Garrett,* the "CCE murder" charges do not involve the "same"

10. As to the "working in furtherance" alternative for "CCE murder," the court also concluded that the "CCE murder" offense was not the "same offense" as the previous conspiracy under *Blockburger,* because the conspiracy offense required that Honken be a member of the conspiracy, while the "CCE

murder" offense did not, and the "CCE murder" offense required that Honken commit a murder, which the conspiracy offense did not. *Id.* at 1116–17. However, the government did not ultimately assert the "working in furtherance" alternative to "CCE murder" at trial.

offense as the drug conspiracy to which Honken previously pleaded guilty.

Each of these alternative findings led the court to the conclusion that there was no "former jeopardy" bar on Honken's prosecution for either "conspiracy murder" or "CCE murder" after his conviction for a drug conspiracy offense.

### b. Arguments of the parties

Just as he did pre-trial, Honken argues that the conspiracy to which he pleaded guilty in the 1996 case is the same conspiracy charged in the "conspiracy murder" charges in Counts 8 through 12 of the present indictment, although he now adds that the evidence at trial demonstrates this fact. From this central proposition, Honken also argues that the drug conspiracy in the 1996 case is a lesser-included offense of the "CCE murder" charges in Counts 13 through 17 of the present indictment, and that the existence of the CCE is an essential element of the "CCE murder" charges. Thus, he argues, the Double Jeopardy Clause bars his successive prosecution on the capital offenses in this subsequent case, because the capital offenses charge the "same offense" as the conspiracy charge to which he previously pleaded guilty. The government resists this portion of Honken's motion on the grounds that Honken asserts no new arguments and no new authority for his "former jeopardy" challenge, and the court properly rejected his arguments pre-trial.

### c. Analysis of the renewed challenge

■ Honken has not presented any convincing argument that the court's prior ruling on this "former jeopardy" issue was erroneous. The court notes that Honken's renewed "former jeopardy" arguments do not even address all of the alternative grounds on which the court rejected his "former jeopardy" challenge the first time. Even if the court were now to conclude that, under a *Blockburger* "same offense"

test, the trial evidence proved only the "same" conspiracy underlying the "conspiracy murder" and "CCE murder" offenses as Honken pleaded guilty to in the 1996 case—a conclusion that this court finds is not altogether supported by the trial evidence—that conclusion would not require the court to grant Honken a judgment of acquittal or new trial. This is so, because such a conclusion would not eliminate either the first alternative (Congress's intent to impose cumulative punishment, and hence, to permit successive prosecutions) or third alternative (not the "same offense" under *Garrett*) on which the court previously concluded that there was no double jeopardy violation. Nowhere in his renewed double jeopardy challenge does Honken ever address, let alone rebut, the court's first and third alternatives for denying his original challenge. Rather, he relies repeatedly on *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977), which the Supreme Court distinguished in *Garrett*. *See Garrett*, 471 U.S. at 787, 105 S.Ct. 2407.

■ Thus, the court concludes that the capital offenses in this case are factually and legally distinct from the conspiracy offense to which Honken previously pleaded guilty, so that the evidence was sufficient to sustain his conviction on the capital offenses without violating the Double Jeopardy Clause. To put it another way, a reasonable jury could have found Honken guilty beyond a reasonable doubt of "conspiracy murder" and "CCE murder" charges that are distinct from the prior conspiracy charge, so that judgment of acquittal on the capital offenses is not appropriate on "former jeopardy" grounds. *See* FED.R.CRIM.P. 29(a) (judgment of acquittal is appropriate if the evidence is insufficient to sustain a conviction); *Moyer*, 182 F.3d at 1021 (stating the "reasonable juror" standard); *Pardue*, 983 F.2d at

847 (same). To the extent that Honken's former jeopardy argument can be construed to seek a new trial, rather than judgment of acquittal, the court also concludes that no miscarriage of justice will occur as the result of denial of Honken's motion to dismiss on former jeopardy grounds, because he has not been convicted of the "same offense" to which he previously pleaded guilty. *Campos,* 306 F.3d at 579 ("Unless the district court ultimately determines that a miscarriage of justice will occur, the jury's verdict must be allowed to stand."); *accord Ortega,* 270 F.3d at 547; *Lacey,* 219 F.3d at 783.

Therefore, Honken's motion for judgment of acquittal or new trial on this ground will be denied.

### 2. Disqualification of the trial judge

Honken's next contention, which is plainly asserted as a ground for a new trial, is one of the few truly "new" issues presented in his post-trial motion: He contends that the trial judge should either have disqualified himself based on security measures taken for his safety and the safety of his family, or should have disclosed those security measures to Honken, so that Honken could decide whether or not to seek disqualification of the trial judge or to determine whether any of the trial judge's pre-trial and trial rulings were tainted by personal bias arising from the security measures. The government resists relief on this ground.

### a. Factual background

At the evidentiary hearing on Honken's post-trial motion on December 16, 2004, Supervisory Deputy United States Marshal Duane Walhof testified that he was responsible for the security measures in place for court personnel and the court itself during Honken's trial. He explained that, as a result of a joint decision involving the United States Marshal's Office for the Northern District of Iowa and the head office in Washington, D.C., security measures were put in place to protect the trial judge and his family.

More specifically, Deputy Walhof testified that the request for security measures for the judge and his family was made jointly by the United States Marshal for the Northern District of Iowa and the Judicial Security Inspector, Toby Michael, who is a Deputy United States Marshal in the Cedar Rapids, Iowa, office. He testified, further, that no security measures were yet in place at the time of the July 15, 2004, hearing on pre-trial matters in this case. At that point, the details of the request to the Washington, D.C., office for potential security measures were still being worked out. Deputy Walhof explained that approval of the security measures came from the Washington office at some point shortly before trial, those measures were actually put in place on the first day of jury selection, and those measures remained in place throughout the trial. Deputy Walhof testified that the security measures were not disclosed to the parties, because disclosure of the measures would have jeopardized their effectiveness. On cross-examination by the government, Deputy Walhof agreed that the decision to establish security measures for the undersigned and his family was made after a review by authorities in Washington, D.C., of the level of threat that may have been posed or perceived to be posed by this case.

Although these following circumstances were not raised by defense counsel in Honken's motion for judgment of acquittal or new trial, for the sake of historical accuracy, the court adds that, prior to trial, a "taint team" in the United States Attorney's Office for the Northern District of Iowa twice provided the court with information from confidential informants about Honken with requests for guidance

about disclosing the information from those confidential informants to Honken's defense team and/or the prosecution team. Such information about one confidential informant was provided to the court on July 14, 2004, and concerned Honken's alleged plans to try to kill witnesses to defeat the prosecution's case and to escape. The court directed that the information be filed, under seal, in a "miscellaneous case." After an *ex parte* hearing with members of the "taint team," the court entered an order in the miscellaneous case on July 15, 2004, ordering disclosure of information from that confidential informant to Honken's defense team. The "taint team" provided the court with information about a second confidential informant on August 4, 2004. That information was likewise filed in the miscellaneous case. The second confidential informant, who had recently been released from USP Marion, where Honken had also been incarcerated, stated, *inter alia,* that Honken had asked him to make arrangements for threats to be made against the trial judge by name, the prosecutor, and two witnesses at the time Honken's trial was going on. Because the second confidential informant had offered himself as an informant, the possibility that the threats that Honken had asked him to make would ever be carried out was non-existent. After another *ex parte* conference with members of the "taint team," the court again entered an order in the miscellaneous case on August 5, 2004, directing disclosure to Honken's defense team of the information provided by the second confidential informant as well as a general disclosure by the government of the existence of information concerning this confidential informant's mental status. Honken's defense team never made any motions requesting more information about either confidential informant or asking the undersigned to recuse or consider whether he should recuse himself. Nor did Honken's defense team question Deputy Walhof during the December 16, 2004, post-trial hearing about what impact, if any, the information from the two confidential informants, which had been provided to Honken's counsel by the "taint team" pursuant to court orders, had on the decision to provide security measures for the undersigned and his family or any other security measures.

The court finds, based Deputy Walhof's testimony, that the same security measures would have been put in place for any judge trying the case, because the United States Marshal's Service had determined that this defendant posed a significant security risk. Indeed, the same security measures would ultimately have been taken, even if the judge who actually tried the case had disclosed the security arrangements to the defense and had recused himself. At the same time, no decisions in this case were affected in any way by the establishment of security measures for the undersigned and his family. Indeed, the court had already ruled on the motions for an "anonymous" jury and to shackle Honken during trial before the court was apprised of the decision of United States Marshal's Service to provide security measures for the undersigned and his family. Nor were any rulings influenced by information about any threat to the undersigned.

#### b. *Arguments of the parties*

Honken contends that he learned, only after trial, that security measures had been implemented before and during his trial to protect the trial judge and his family, based on supposed threats made by Honken. However, Honken contends that the existence and the nature of the security measures were not disclosed to him before trial, so that he might assess the impact of such measures upon his right to a fair trial. Specifically, he cites the

court's rulings to have him shackled during trial and to use an "anonymous" jury as rulings that might have been improperly influenced by the security measures taken for the trial judge's personal safety and the safety of his family. Honken complains that he was not informed at a pretrial hearing on July 15, 2004, that such security measures were in force or contemplated. Honken contends that the trial judge had a duty to disclose the security measures for himself and his family. Because those security measures were not disclosed, he contends that he was improperly deprived of the opportunity to make informed decisions about whether he should seek to have the trial judge recused and whether the trial judge might have been biased against him in any pre-trial or trial rulings. In essence, Honken contends that a reasonable person would have questioned the court's impartiality knowing what he did not know about security measures for the trial judge and his family, whatever the trial judge might have thought of the danger to himself or his family.

The government, on the other hand, contends that Honken was not entitled to notice of security provided to the court nor was Honken prejudiced by the lack of advance knowledge of any security precautions or, indeed, by the actual security measures employed. The government contends that there is no record establishing that the trial judge apprehended any fear of Honken, no evidence that any such apprehension, if it existed, had any effect on the trial judge's objectivity, and no authority for Honken's contention that he had a right to notice that security measures were in place to protect the trial judge and his family. The government maintains, quite simply, that a judge's knowledge of a threat against him or her is not enough to mandate recusal without a showing that such knowledge contributed to an appearance of prejudice. The gov-

ernment also points out that the United States Marshal Service was responsible for assessing the need for and determining the nature of security measures for the judge and his family, and that the Deputy Marshal in charge testified that disclosure of the security measures would have jeopardized the effectiveness of those measures.

### c. *Applicable standards*

As the parties point out, 28 U.S.C. § 455(a) provides for disqualification of a justice, judge, or magistrate judge, in pertinent part, as follows:

> (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
>
> (b) He shall also disqualify himself in the following circumstances:
>
> > (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding. . . .

28 U.S.C. § 455(a) & (b)(1). " 'The goal of section 455(a) is to avoid even the appearance of partiality.' " *Nichols v. Alley*, 71 F.3d 347, 351 (10th Cir.1995) (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988)). Thus, the Tenth Circuit Court of Appeals has read the statute to impose upon the trial judge " 'a continuing duty to ask himself [sic] what a reasonable person, knowing all the relevant facts, would think about his [sic] impartiality.' " *United States v. Greenspan*, 26 F.3d 1001, 1005 (10th Cir.1994) (quoting *United States v. Hines*, 696 F.2d 722, 728 (10th Cir.1982)); *accord United States v. Heldt*, 668 F.2d 1238, 1271 (D.C.Cir.1981) ("Section 455 ... imposes a duty directly upon the judge to evaluate his [sic] own conduct."), *cert. denied sub nom. Hubbard v.*

*United States,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982). On the other hand, " '[t]he statute must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice.' " *Nichols,* 71 F.3d at 351 (quoting *United States v. Cooley,* 1 F.3d 985, 993 (10th Cir.1993), with internal citations and quotations omitted). "Neither is the statute intended to bestow veto power over judges or to be used as a judge shopping device." *Id.* This is so, because "a judge has as strong a duty to sit when there is no legitimate reason to recuse as he does to recuse when the law and facts require." *Id.; Greenspan,* 26 F.3d at 1005 ("[A] judge has as much obligation not to recuse himself where there is no reason to do so as he does to recuse himself when the converse is true."). Thus, decisions of the Eighth Circuit Court of Appeals "reveal a reluctance to require a judge to recuse himself or herself *sua sponte.*" *United States v. Sypolt,* 346 F.3d 838, 839 (8th Cir.2003) (adding, "Despite the sweeping language of 28 U.S.C. § 455(a), which calls for recusal whenever a judge's 'impartiality might reasonably be questioned,' the statute does not extend literally to any kind of doubtful behavior."), *cert. denied,* 540 U.S. 1209, 124 S.Ct. 1484, 158 L.Ed.2d 134 (2004).

■ Whether recusal is required is determined by an objective test that considers what a reasonable person might believe, not a subjective test considering what the judge in question felt about his or her ability to rule without bias under the circumstances. *United States v. Tucker,* 78 F.3d 1313, 1325 (8th Cir.1996) ("Section 455(a) 'was designed to promote public confidence in the integrity of the judicial process by replacing the subjective "in his opinion" standard with an objective test.' ") (quoting *Liljeberg,* 486 U.S. at 858 n. 7, 108 S.Ct. 2194), *cert. denied,* 519 U.S. 820, 117 S.Ct. 76, 136 L.Ed.2d 35 (1996); *Nichols,*

71 F.3d at 350 (§ 455 "was broadened in 1974 by replacing the subjective standard with an objective test," pursuant to which " '[w]hat matters is not the reality of the bias or prejudice, but its appearance' ") (quoting *Liteky v. United States,* 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)). Thus, the Eighth Circuit Court of Appeals has formulated the test to be whether " 'a reasonable person who knew the circumstances would question the judge's impartiality, even though no actual bias or prejudice has been shown.' " *Tucker,* 78 F.3d at 1324 (quoting *Gray v. University of Ark.,* 883 F.2d 1394, 1398 (8th Cir.1989)); *United States v. Darden,* 70 F.3d 1507, 1536 (8th Cir.1995) ("The test is one of objective reasonableness, that is, whether the judicial officer's impartiality might reasonably be questioned under the circumstances."), *cert. denied,* 517 U.S. 1149, 116 S.Ct. 1449, 134 L.Ed.2d 569 (1996). The formulation of the test by other Circuit Courts of Appeals is similar. *See In re Nettles,* 394 F.3d 1001, 1002 (7th Cir.2005) (framing the test as whether "a reasonable observer would think there was 'a significant risk that the judge will resolve the case on a basis other than the merits' ") (quoting *Hook v. McDade,* 89 F.3d 350, 354 (7th Cir.1996)); *United States v. Yousef,* 327 F.3d 56, 169 (2d Cir.2003) (formulating the test as "whether 'an objective, disinterested observer fully informed of the underlying facts, [would] entertain significant doubt that justice would be done absent recusal,' or alternatively, whether 'a reasonable person, knowing all the facts,' would question the judge's impartiality.") (quoting *United States v. Lovaglia,* 954 F.2d 811, 815 (2d Cir.1992)), *cert. denied,* 540 U.S. 933, 124 S.Ct. 353, 157 L.Ed.2d 241 (2003); *Nichols,* 71 F.3d at 350–51 ("Given the statutory parameters, we must determine whether a reasonable person, knowing all the relevant facts, would harbor doubts about

the judge's impartiality.") (internal quotation marks and citations omitted). However, the Seventh Circuit Court of Appeals has cautioned that the hypothetical "reasonable observers" " 'are less inclined to credit judges' impartiality and mental discipline than the judiciary itself will be.' " *Nettles*, 394 F.3d at 1002 (quoting *In re Mason*, 916 F.2d 384, 386 (7th Cir.1990)). Nevertheless, the Eighth Circuit Court of Appeals has pointed out that, "where a judge's opinions are based on 'facts introduced or events occurring in the course of the current proceedings,' those opinions warrant recusal under § 455(a) only if they 'display a deep-seated favoritism or antagonism that would make fair judgment impossible.' " *Sypolt*, 346 F.3d at 839 (quoting *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)).

The Tenth Circuit Court of Appeals has observed that "cases within § 455 are extremely fact driven 'and must be judged on [their] unique facts and circumstances more than by comparison to situations considered in prior jurisprudence.' " *Nichols*, 71 F.3d at 351 (quoting *United States v. Jordan*, 49 F.3d 152, 157 (5th Cir.1995)). Although such cases must be judged on their "unique facts," the Tenth Circuit Court of Appeals has nevertheless identified a "nonexhaustive list of various matters not ordinarily sufficient to require § 455(a) recusal," consisting of the following:

> (1) Rumor, speculation, beliefs, conclusions, innuendo, suspicion, opinion, and similar non-factual matters; (2) the mere fact that a judge has previously expressed an opinion on a point of law or has expressed a dedication to upholding the law or a determination to impose severe punishment within the limits of the law upon those found guilty of a particular offense; (3) prior rulings in the proceeding, or another proceeding, solely because they were adverse; (4) mere familiarity with the defendant(s), or the type of charge, or kind of defense presented; (5) baseless personal attacks on or suits against the judge by a party; (6) reporters' personal opinions or characterizations appearing in the media, media notoriety, and reports in the media purporting to be factual, such as quotes attributed to the judge or others, but which are in fact false or materially inaccurate or misleading; and (7) threats or other attempts to intimidate the judge.

*Nichols*, 71 F.3d at 351 (quoting the list from *Cooley*, 1 F.3d at 993–94).

Honken relies on three cases involving threats to the judge as suggesting that recusal was or might have been appropriate in this case, citing *In re Nettles*, 394 F.3d 1001, 1002 (7th Cir.2005), *United States v. Greenspan*, 26 F.3d 1001, 1007 (10th Cir.1994), and *United States v. Cerrella*, 529 F.Supp. 1373, 1380–81 (S.D.Fla. 1982). However, these and other rulings based on "threats or other attempts to intimidate the judge" indicate just how fact-driven such cases can be. *See Nichols*, 71 F.3d at 351 (cases for recusal are "extremely fact driven").

For example, in *Nettles*, the Seventh Circuit Court of Appeals concluded that a threat to a judge that appears to be genuine and not just motivated by a desire to recuse the judge requires recusal. *Nettles*, 394 F.3d at 1002 (citing cases). In *Nettles*, the Seventh Circuit Court of Appeals held that recusal was required not only by the trial judge, but by all judges in the Northern District of Illinois and the Seventh Circuit, from the case of a defendant charged with attempting to damage and destroy the Dirksen Courthouse in downtown Chicago. *Id.* While serving time on a sentence imposed by a judge in the Northern District of Illinois, the defendant had told a jailhouse informant that he

wanted to bomb the Dirksen Courthouse with a truck bomb, and the informant passed on the threat to the FBI. *Id.* The FBI provided the informant with a telephone number of a purported supplier of ammonium nitrate to give to the defendant. When the defendant got out of prison, he called the number and made arrangements to purchase ammonium nitrate from one undercover agent to resell to another undercover agent posing as a terrorist willing to bomb the building. *Id.* The appellate court concluded that, notwithstanding that "the actual threat to the Dirksen Courthouse was nil because [the defendant's] accomplices were federal agents," recusal of the trial judge and other judges of the district and circuit was required. *Id.* at 1003. The court found that the defendant had no proceedings then pending in the district, so that his actions could not have been taken simply to obtain recusal or to delay or derail a case against him; that a reasonable observer would think that a judge who works in the target building would want the defendant to be convicted and given a long sentence, rather than set free; and that such a judge might also be convinced of the defendant's guilt, yet concerned that a jury might acquit the defendant, so that the judge would rule against the defendant on evidentiary and procedural issues. *Id.*

In *Greenspan,* on which Honken also relies heavily, the appellate court held that the trial judge should have recused himself after learning before the defendant's sentencing that the FBI was investigating allegations that the defendant had conspired to kill the judge and his family. *Greenspan,* 26 F.3d at 1005. The conspiracy allegedly "spanned several states and included a number of persons who had allegedly contributed large sums of money for hiring a 'hit man.'" *Id.* In addition, the trial judge's behavior contributed to the appearance of bias, because the trial judge "accelerated the date of [the defen-

dant's] sentencing, for the stated reason that the court wanted to get [the defendant] into the penitentiary system as quickly as possible, and the trial court refused to grant a continuance of the sentencing hearing even though defendant's counsel had been appointed only two days before the sentencing date." *Id.* at 1006.

Similarly, in *Cerrella,* the last of Honken's three "threat" cases, the trial judge recused himself after trial and appeal, when he learned of a plan by the defendant to kill him, even though there was no pending case, and even though there was already an investigation afoot, and known to the defendant, into his plan, because the court believed that, "[b]eyond all legal argument, beyond all case precedent, a reasonable person in the street, faced with a judge sitting on post-conviction matters that could free from incarceration a man who has put out a 'contract' on the judge, would have to harbor doubts as to the judge's impartiality." *Cerrella,* 529 F.Supp. at 1382; *see also Nichols,* 71 F.3d at 352 (holding that recusal was appropriate, because the trial judge's impartiality might reasonably be questioned, in the trial of an accessory to the bombing of the Murrah federal building in Oklahoma City, because the blast had damaged the judge's courtroom and chambers and had injured a member of his staff, as well as other court personnel and their families).

These cases finding a "threat" sufficient to require recusal must be contrasted with other cases in which courts found that the "unique facts" did not require recusal. For example, in *United States v. Yousef,* 327 F.3d 56 (2d Cir.2003), the Second Circuit Court of Appeals found that the trial judge was not required to recuse himself, even if the appellate court assumed that the trial judge was aware of the defendants' threat to kidnap and harm a federal judge and perceived that threat to be di-

rected against him. *Yousef,* 327 F.3d at 169–70. This was so, the appellate court concluded, because "the threat was immediately called into question" by a co-defendant's information that the defendants had abandoned the plan owing to their belief that extensive security measures would thwart it, and because the later collusion of the defendants to misinform the government concerning another matter suggested that the threat in question may well have been nothing more than an attempt to harass the government and divert resources. *Id.* at 170.

Similarly, in *United States v. Yu–Leung,* 51 F.3d 1116 (2d Cir.1995), the Second Circuit Court of Appeals held that an objective evaluation of the trial judge's actual behavior after being advised that the defendant had made a death threat against him demonstrated no basis for the defendant's personal bias claim. *Yu–Leung,* 51 F.3d at 1120. Specifically, the trial judge had learned of the threat before ruling in the defendant's favor on a motion to suppress, and the trial judge never made any statements or other indications that would suggest that he considered the death threats to be serious. *Id.*

Moreover, in *Greenspan,* one of Honken's "threat" cases, the Tenth Circuit Court of Appeals stated the general rule to be that death threats against a judge do not necessarily mandate recusal, if the circumstances allow a conclusion that the defendant's motivation appears to be to obtain recusal or delay. *Greenspan,* 26 F.3d at 1006 (suggesting that such circumstances may exist if the defendant makes the threat directly to the judge, and thereafter seeks recusal).

Thus, these cases finding the specific "threat" at issue insufficient appear to be applications of the rule set out by the Eighth Circuit Court of Appeals that, "where a judge's opinions are based on 'facts introduced or events occurring in the course of the current proceedings,' those opinions warrant recusal under § 455(a) only if they 'display a deep-seated favoritism or antagonism that would make fair judgment impossible.'" *Sypolt,* 346 F.3d at 839 (quoting *Liteky,* 510 U.S. at 555, 114 S.Ct. 1147). In *Yousef* and *Yu–Leung,* the judges' opinions were based on the facts introduced, rather than the "threat," and no "deep-seated favoritism or antagonism" that could be attributed to the "threat" was apparent.

### d. Analysis

The undersigned does not believe that he was required either to recuse himself in this case or to provide Honken with notice of the security measures taken to protect the undersigned and his family. The court will explain these conclusions in turn.

 As to the disclosure issue, Honken cites no authority whatsoever for his contention that the undersigned was required to disclose the security measures to him, so that he could assess whether or not to request that the undersigned recuse himself. While § 455 imposes a duty upon a trial judge to consider whether or not the judge's impartiality might reasonably be questioned, *see Greenspan,* 26 F.3d at 1005 (so stating); *United States v. Heldt,* 668 F.2d 1238, 1271 (D.C.Cir.1981) (same), *cert. denied sub nom. Hubbard v. United States,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982), no court appears to have read the statute to require the court to disclose to the defendant in a criminal prosecution security measures that the court does not find could reasonably compromise its impartiality. Rather, the only authority directly addressing this issue that is cited by the parties or found by the court is to the contrary: In *Heldt,* the District of Columbia Circuit Court of Appeals concluded that, even if a trial judge had reasonable grounds to fear that defen-

dants or some isolated associates "might be carried away by the passion of the moment and take some rash action, [the judge] had no obligation to tell [the defendants] or their counsel that the security was imposed for that reason," because, *inter alia,* disclosing security measures could diminish their effectiveness. *Heldt,* 668 F.2d at 1273. Similarly, in this case, Deputy Walhof testified that disclosing security measures to the defendant and his counsel could have compromised the effectiveness of those measures. Therefore, the undersigned properly did not disclose to Honken the security measures for the undersigned and his family.

▆▆▆ Thus, the question is really whether the undersigned should have recused himself *sua sponte,* which is something the Eighth Circuit Court of Appeals has been reluctant to require. *See Sypolt,* 346 F.3d at 839 (decisions of the Eighth Circuit Court of Appeals "reveal a reluctance to require a judge to recuse himself or herself *sua sponte* "). Throughout this trial, and in every other case before this court, the undersigned has conscientiously endeavored to fulfill his " 'continuing duty to ask himself what a reasonable person, knowing all the relevant facts, would think about his impartiality.' " *See Greenspan,* 26 F.3d at 1005 (reading § 455 to impose such a duty) (quoting *Hines,* 696 F.2d at 728); *Heldt,* 668 F.2d at 1271 (same). Moreover, the undersigned has disclosed to the parties any circumstance that the undersigned felt could reasonably call into question his impartiality. However, the undersigned concludes that the circumstances of security measures for himself and his family simply did not fall into the category of circumstances that required either disclosure or recusal, because the court firmly believes that no " 'reasonable person who knew the circumstances would question [his] impartiality.' " *Tucker,* 78 F.3d at 1324 (quoting *Gray,* 883 F.2d at 1398, for this standard); *accord Nettles,*

394 F.3d at 1002 (stating a similar objective standard for recusal); *Yousef,* 327 F.3d at 169; *Nichols,* 71 F.3d at 351. The court believes that this is so, even recognizing that "reasonable observers" " 'are less inclined to credit judges' impartiality and mental discipline than the judiciary itself will be.' " *Nettles,* 394 F.3d at 1002. There are several reasons for this conclusion.

First, while Honken seems to suppose that the security measures for the undersigned and his family were prompted by some specific threat to them, that is simply not the case. The security measures in question, the court finds, would have been imposed whoever tried the case, because Honken was reasonably recognized by the United States Marshal's Service as a high security risk, based on his past conduct of plotting the murders of those who got in his way, even while incarcerated. Thus, cases such as *Nettles, Greenspan,* and *Cerrella,* each of which involved some specific threat to the presiding judge, are distinguishable. Instead, this case falls into the categories of cases involving either "mere familiarity with the defendant(s), or the type of charge, or kind of defense presented," or generalized "threats" posed by the defendant, or both, but neither category automatically or ordinarily requires recusal. *See, e.g., Nichols,* 71 F.3d at 351 (citing these and other categories of circumstances as not ordinarily requiring recusal); *Cooley,* 1 F.3d at 993–94 (same).

Second, even supposing that the security measures for the undersigned and his family were imposed because of specific threats or other attempts to intimidate the undersigned, such threats or other attempts to intimidate the judge also are "matters [that are] not ordinarily sufficient to require a § 455(a) recusal." *Nichols,* 71 F.3d at 351; *Cooley,* 1 F.3d at 993–94. Although the court had premised its rulings requiring an "anonymous" jury and

shackling of the defendant during trial in part on the defendant's demonstrated ability to reach beyond the prison walls to recruit others to carry out his plans for violent retribution, reasonable precautions like shackling the defendant, using an "anonymous" jury, and instituting security measures for the safety of the undersigned and his family, eliminated any real likelihood that Honken would actually be able to wreak the havoc that the evidence demonstrated that Honken might have wished to wreak. *Cf. Yousef,* 327 F.3d at 169–70 (a threat to the judge was "immediately called into question," where the defendants reportedly abandoned their plan because they believed that security measures would thwart it). This is not the sort of situation in which there was evidence that the defendant had actually moved beyond threats to an attempt to carry out some violent acts against the judge or his family, as was the case in *Nettles,* 394 F.3d at 1002, where the defendant actually attempted to purchase bomb ingredients, albeit from an undercover agent, and to hire someone to carry out the bombing, albeit another undercover agent. Nor is it like the situation in *Nichols,* 71 F.3d at 352, in which the defendant's previous deadly attack had damaged the judge's chambers and injured some of his associates. It is also not like the situations in *Greenspan* or *Cerrella,* in which an active conspiracy to hire a "hit man" was afoot. *Greenspan,* 26 F.3d at 1005; *Cerrella,* 529 F.Supp. at 1382.

Third, again because reasonable precautions had been taken to ensure the security of the courthouse, the undersigned, and his family, the undersigned's mere knowledge that the United States Marshal's Service had taken such security measures could only have alleviated any concerns that Honken would pose any actual threat to the undersigned during the trial. Thus, knowledge of the security measures actually made any personal bias on the part of the undersigned far less likely, because the undersigned was able to act without any concern for his personal safety or the safety of his family.

Finally, there is absolutely nothing in the court's conduct before or during the trial from which a reasonable person could have developed doubts about the undersigned's impartiality. *Compare Greenspan,* 26 F.3d at 1006 (bias could reasonably be inferred, after the trial judge learned of a conspiracy to kill the judge and the judge's family, because the trial judge "accelerated the date of [the defendant's] sentencing, for the stated reason that the court wanted to get [the defendant] into the penitentiary system as quickly as possible, and the trial court refused to grant a continuance of the sentencing hearing even though defendant's counsel had been appointed only two days before the sentencing date"). Contrary to Honken's concerns, the rulings requiring an "anonymous" jury and requiring that he be shackled during trial were "based on 'facts introduced or events occurring in the course of the current proceedings,'" and the rulings themselves did not reasonably "'display a deep-seated favoritism or antagonism that would make fair judgment impossible.'" *Sypolt,* 346 F.3d at 839 (quoting *Liteky,* 510 U.S. at 555, 114 S.Ct. 1147). Moreover, those rulings could not have been influenced by any security measures for the undersigned or his family, because the court was not apprised that the Marshal was actually going to use such measures until just before trial beginning in August of 2004, well after both of those rulings had been filed, the "anonymous" jury ruling on January 29, 2004 (docket no. 201), *United States v. Honken,* 378 F.Supp.2d 880 (N.D.Iowa 2004), and the shackling ruling on July 21, 2004 (docket no. 328), *United States v. Honken,* 378 F.Supp.2d 1010 (N.D.Iowa 2004). The court had also made these rulings before learning on August 4, 2004, about informa-

tion from the second confidential informant that Honken had purportedly asked that informant to threaten the undersigned. Moreover, during trial, and after such security measures had been imposed, the undersigned often ruled in a manner favorable to the defendant, even on matters well within the court's discretion, which the undersigned clearly would not have done had the undersigned harbored prejudice against the defendant. *See Yu–Leung,* 51 F.3d at 1120 (the trial judge's actual behavior after learning that the defendant had made death threats against him demonstrated no basis for the defendant's personal bias claim). Such rulings included giving unprecedented leeway to Honken in cross-examination; allowing considerable modification of the trial schedule to permit Honken to present his witnesses in the order he preferred, which the undersigned was clearly not required to do; giving an instruction on "residual doubt" at Honken's behest, based on limited, out-of-circuit, district court authority; and prohibiting the government from using a full photo array of all prosecution witnesses during closing arguments, which the court finds was the government's fanciest and clearly most powerful demonstrative aid.[11] To

11. The first photograph below is of the composite display, proffered by the government, of the photographs of all fifty-four witnesses called by the prosecution during the "merits phase" of Honken's trial. The court includes this photograph here to provide a sense of the impact of such a composite display. The photographs were mounted on three display boards, but individual photographs were mounted with velcro, so that they could be taken off the board and displayed to the jury separately, as shown in the second photograph below.

The court did not permit the government to use the full display of prosecution witnesses in Honken's trial, because the issue of its use arose at the eleventh hour, immediately before final arguments, neither the defense nor the court had previously been shown the display, the defense strenuously objected to use of the full display on the grounds of surprise and prejudice, and there was little time for the court to reflect on the matter. The court did, however, permit the government to use the individual photographs of witnesses during its closing argument.

In the companion case against Angela Johnson, the defense team again objected to use of the photo array. Although defense counsel objected to the court's suggestion that each juror be given a notebook containing the photographs of all of the witnesses as they appeared during trial, defense counsel did not object to giving the jury a single such notebook. Therefore, no photo array was used in Johnson's case, either, but the jury was given a single notebook with the photographs of all of the witnesses who testified, subdivided into "merits phase" and "penalty phase" witnesses. The government also used during closing arguments, without objection from the defendant, a PowerPoint presentation that displayed photographs of witnesses when the prosecutor referred to their testimony on a particular issue, linked to a slide of "bullet points" summarizing the government's argument on that issue.

this tally should be added the court's early decision to appoint three lawyers, rather than the minimum of two required by statute, and the court's very generous approval of defense experts and modifications to the budget right up to and through the trial.

Therefore, neither the court's failure to disclose the security measures for himself and his family, nor the fact that such security measures were in place, implicates the "interest of justice," such that a new trial is required. *See* FED.R.CRIM.P. 33(a) (providing for a new trial "if the interest of justice so requires"). To put it another way, no "miscarriage of justice will occur," if the jury's verdict is allowed to stand, despite the undersigned's failure to disclose those security measures or the fact that such security measures were instituted. *See Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a)). Therefore, Honken's motion for new trial on this ground will be denied.

### 3. *Shackling of the defendant during trial*

Next, Honken contends that the court erred by granting the government's motion to have him wear leg shackles and an electronic stun belt during the trial. The government also resists this ground for a new trial.

#### a. *The prior ruling*

In its fifty-one page pre-trial ruling on this issue, *see* Memorandum Opinion And Order Regarding The Government's Motion To Have The Defendant Wear Shackles At Trial (Filed Under Seal), July 21, 2004 (docket no. 328), *United States v. Honken,* 378 F.Supp.2d 1010 (N.D.Iowa 2004), the court considered the "need" for security measures and the possibility of "prejudice" from use of such security measures, citing, *inter alia, Zeitvogel v. Delo,* 84 F.3d 276, 283 (8th Cir.), *cert. denied,* 519 U.S. 953, 117 S.Ct. 368, 136 L.Ed.2d 258 (1996). The court acknowledged that there was no record of *courtroom* disruption by Honken, nor any evidence of dangerous or disrespectful conduct toward deputy U.S. Marshals while transporting Honken, but nevertheless concluded that some of his other conduct, including the offenses with which he is presently charged, plainly suggested that he was a security risk: Honken had or had allegedly attempted to escape and to recruit persons inside and outside of the jail to assist him in both his escape attempt and his attempts to murder or intimidate witnesses, law enforcement officers, and prosecutors, and there was sufficient evidence in the record to provide a credible basis for those allegations. The court also found that several of the witnesses against whom Honken had made threats had been placed in witness protection, but would be present at some point in the trial, providing Honken with a rare opportunity for violence against them. Therefore, the court found that the use of shackles on Honken during trial was justified to further the essential governmental interests in safety of the courtroom and trial participants and prevention of Honken's escape from custody. These factors justified not only shackling Honken, but bolting his shackles to the floor while he was at counsel table. As to "prejudice," the court concluded that the use of shackles was not unfairly prejudicial where Honken posed a unique threat, and also concluded that the "inherent prejudice" of shackles could be significantly ameliorated where the shackles were concealed under the counsel table, which, like all counsel tables in the courtroom, was equipped with a "skirt" to keep the defendant's lower body out of view, and the defendant was not moved in the presence of the jury, the press, or any members of the public.

The court, therefore, granted the government's motion to have the defendant shackled at trial as follows:

1. **While in the courtroom,** defendant Dustin Honken shall be placed in a stun belt and shackles bolted to the floor. It is further ordered that

 a. Honken shall not be moved in the presence of the jury;

 b. table skirts shall be placed on all counsel tables to prevent the jurors from seeing the shackles and bolt;

 c. the Marshal shall determine the best available means to prevent the shackles from making any noticeable noise during ordinary movements of the defendant while seated; and

 d. the shackles and bolt shall be fitted with sufficient chain to permit Honken to stand naturally when required and to confer with defense counsel at all times.

2. **While being moved to and from the courtroom,** defendant Dustin Honken, may be placed in shackles, handcuffs, and a stun belt, but the Marshal may determine, in his discretion, that a lesser level of security, for example, involving only the stun belt and handcuffs, will suffice at such times.

3. **The Marshal shall clear jurors and members of the public**

 a. from the third floor, elevators, and stairwells of the courthouse before Honken is moved to or from the courtroom; and

 b. from the courtroom before Honken is moved within the courtroom, for example, to a conference room or to the witness box, should he testify in this matter.

4. **The Marshal and the parties** shall bring to the court's attention any circumstances that develop during trial that cause particular concerns for security or prejudice to the defendant.

Order of July 21, 2004 (docket no. 328), *United States v. Honken,* 378 F.Supp.2d 1010 (N.D.Iowa 2004).

#### *b. Arguments of the parties*

Honken contends that the evidentiary record upon which the court relied in ordering that he be shackled during trial was insufficient to warrant such extreme security measures. He contends that the court instead relied on stale, speculative, and unreliable evidence, particularly where there was no evidence of any disruptive conduct by Honken in the courtroom. Although he concedes that he cannot establish that any member of the jury saw the leg shackles or stun belt, he nevertheless contends that the use of manacles and law enforcement escorts for imprisoned witnesses would have led jurors to conclude that he, too, was physically restrained. Thus, he contends that his trial rights, including his right to be afforded the dignity and usual accommodations of one accused of a crime, were adversely affected.

In response, the government contends that there was more than sufficient evidence to support the court's conclusion that Honken posed a serious danger of escape and a danger to court personnel, such that security measures and restraints were appropriate. The government also points out that Honken's primary concern pre-trial was that the jury might learn of the fact and nature of his restraints. However, the government contends that there is no indication that any jurors were ever aware of any restraints placed on Honken's movements, owing to the measures imposed by the court and the care with which the Marshal's Deputies and Court Security Officers executed those measures. The government notes that, for the first time, Honken now expresses concern about inferences that the jury might have drawn about restraints on him from the fact that imprisoned witnesses were

restrained. In response to this new argument, the government contends that restraints on such witnesses were also justified, because the escape plan that in part prompted Honken's shackling during trial purportedly involved using other incarcerated witnesses that he had called to attempt to overpower guards. The government asserts that requiring imprisoned witnesses to appear in restraints was, if anything, far more detrimental to the government's case than it was to Honken's case. The government contends that Honken's assertion that the jury could have reasoned from the restraints on imprisoned witnesses that he was also restrained is nothing but speculation and conjecture.

### c. Analysis

■ The court now reaffirms post-trial its previous conclusions and rulings on this issue. Honken has presented nothing post-trial to convince the court that those rulings were in error. The court sees no reason to revisit its conclusion that there was sufficient need for the restraints imposed and Honken has utterly failed to point to any evidence that he was actually prejudiced by those restraints or the manner in which they were imposed. Indeed, as Honken concedes, there is no evidence that any jurors were ever aware of the existence or nature of the restraints imposed upon him in the courtroom. As required by the pertinent order, the jury was carefully controlled by the United States Marshal's Service and the Court Security Officers, so that there were virtually no opportunities for jurors to observe Honken in restraints: the jurors were picked up each day from an assembly point designated by the Marshal's Service and transported to and from the courthouse so that their arrival or departure could be orchestrated with Honken's own arrival or departure; when not in court, jurors were kept in a jury room on a different floor

from the courtroom and cellblock in which Honken was held when not in court; Honken was never moved in the courthouse or within the courtroom unless the jurors were in the jury room or not at the courthouse; and the jury was not brought into the courtroom until Honken was in place at defense counsels' table and all security measures, including shackling, had been taken. The United States Marshal's Service is to be commended for the care with which deputies ensured that adequate security measures would not be employed in a prejudicial manner. The Marshal's Service conscientiously complied with the court's direction that Honken's shackles have sufficient "slack" to allow him to stand normally at all appropriate times and move in his chair to talk with counsel. The Marshal's Service also conscientiously complied with the court's direction that nothing call attention to the shackles if Honken moved by dipping the chains in a plastic coating to prevent them from making any audible noise and by painting any uncoated portions of the shackles and bolt flat black to prevent any noticeable reflection or shine.

No party cited in their post-trial briefing the Supreme Court's May 23, 2005, ruling in *Deck v. Missouri*, —— U.S. ——, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005), concerning constitutional limits on shackling of defendants. Nevertheless, the court finds that its procedures for shackling Honken complied with the Supreme Court's subsequent statement of constitutional requirements. In *Deck*, the Court first reiterated that "[t]he law has long forbidden routine use of visible shackles during the guilt phase; it permits a State to shackle a criminal defendant only in the presence of a special need." *Deck*, —— U.S. at ——, 125 S.Ct. at 2010. More specifically, the court held,

[T]he Fifth and Fourteenth Amendments prohibit the use of physical re-

straints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial. Such a determination may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.

*Id.* at ——, 125 S.Ct. at 2012. The Court then considered whether shackling during the "penalty phase" of a capital trail made a constitutional difference. *Id.* The Court reiterated the need for courts to restrain dangerous defendants, but concluded that, "given their prejudicial effect, due process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case." *Id.* at ——, 125 S.Ct. at 2013. The Court then concluded, "The considerations that militate against the routine use of visible shackles during the guilt phase of a criminal trial apply with like force to penalty proceedings in capital cases," even though the presumption of innocence no longer applies, because of the significance and finality of the sanction that the jury is considering in that phase. *Id.* at ——, 125 S.Ct. at 2014. The Court granted relief in the case before it, because the record evidence showed that the jurors were aware of the defendant's restraints; the trial court contained no formal or informal findings justifying the restraints, such as a risk of escape or a threat to courtroom security, or explaining why the chosen restraints were necessary; and the shackling of the defendant was "inherently prejudicial," so that it could not be upheld without adequate justification. *Id.* at ——, 125 S.Ct. at 2015–16.

Although this court's ruling on security measures for Honken's trial antedated the *Deck* decision, this court nevertheless considered the same constitutional concerns, and made the same balancing of the defendant's constitutional rights against the spe-

cial security needs of this particular case that *Deck* requires. *Id.* at ——, 125 S.Ct. at 2010–14. The court also made every effort to insure that jurors were not aware of the shackles or stunbelt, by directing the careful management of the movements of Honken, the jury, the public, and the press, as well as directing the coating and painting of the shackles, and requiring use of shackles that permitted Honken to confer with counsel and to sit, stand, and move naturally when required to do so. There is absolutely no evidence that Honken's jurors, let alone any member of the public or the press, was ever aware that he was shackled or wearing a stunbelt. The court also made specific findings justifying the court's conclusion that security measures, and the specific security measures used, were necessary. Thus, the court did all that it could to mitigate the "inherently prejudicial" effects of shackling the defendant. *Compare id.* at ——, 125 S.Ct. at 2015–16.

Honken's only additional assertion post-trial is that jurors may have inferred from the restraints used on all imprisoned witnesses that he was also restrained. Even if Honken had made a timely assertion of this argument before or during trial, which he did not, the court would not have found the argument persuasive, and the court does not find it persuasive now. While the inference that Honken asserts the jurors may have drawn from the shackling of other incarcerated witnesses may be reasonable, there is no indication that any juror actually drew such an inference. Moreover, for many of the same reasons that the court concluded in its July 21, 2004, ruling that Honken would not be prejudiced even if a juror were to see him in handcuffs while being moved into, in, or out of the courtroom, the court now concludes that Honken would not have been prejudiced had jurors inferred from restraints on other witnesses that he was

also in some kind of restraints in the courtroom.

Somewhat more specifically, as commonplace as the sight of handcuffs on arrestees and criminal defendants has become, the inference that a capital murder defendant—charged with five killings related to his drug-trafficking or other criminal activities—was in some restraints while inside or outside of the courtroom would be unlikely to suggest anything more than routine security measures. Furthermore, Honken was not like a defendant out on bond, because he was already serving a lengthy sentence on prior drug-trafficking convictions, which the jury did inevitably learn, on several occasions, in the course of trial. *See Zeitvogel,* 84 F.3d at 283 (the trial court's decision to require restraints did not prejudice the defendant, because even without seeing the shackles, the jurors would have learned from the trial evidence that the defendant was an inmate). Therefore, the inference that Honken was somehow restrained was unlikely to, and the court finds, did not, generate any unfair prejudice. The court also agrees with the government that the use of restraints on imprisoned witnesses, in the circumstances of this case, was far more potentially prejudicial to the government than it was to Honken.

The court's ruling that Honken be shackled during trial does not implicate the "interest of justice," such that a new trial is required. *See* FED.R.CRIM.P. 33(a) (providing for a new trial "if the interest of justice so requires"). No "miscarriage of justice will occur," if the jury's verdict is allowed to stand, despite the use of shackles and other restraints on Honken during his trial. *See Campos,* 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a)). Therefore, Honken's motion for new trial on this ground will also be denied.

### 4. Use of an "anonymous" jury

As the last of his alleged "pre-trial" errors, Honken contends that the court erred by ordering that the jury in this case be "anonymous." The government also resists this ground for new trial.

#### a. The prior ruling

In a ruling dated January 29, 2004 (docket no. 201), *United States v. Honken,* 378 F.Supp.2d 880 (N.D.Iowa 2004), the court granted the government's motion for an "anonymous" jury. More specifically, the court ruled that the jurors would be "anonymous" to the extent that their names, addresses, and places of employment, and the names of spouses and their places of employment, were not disclosed to the parties, their counsel, or the public, either before or after selection of the jury panel. However, pursuant to this ruling, each juror's community of residence and the "nature" of his or her employment, and the "nature" of his or her spouse's employment, were disclosed to the parties, their counsel, and the public. In its ruling, the court summarized its reasons for finding that Honken had the present capacity to jeopardize the life or safety of jurors and others, as follows:

> [T]he court finds, by a preponderance of the other evidence submitted, that Honken's past participation in a group with the capacity to harm jurors, his past attempts to interfere with the judicial process, and his past attempts to reach out of his prison to harm witnesses and investigators, through associates or persons recruited for precisely such activity, show that Honken, either by himself or through associates or an organization, still has the present or future capacity to harm jurors. In other words, this evidence shows that disclosure to Honken of a list of venire members, including biographical information

such as their names and "abodes," "may jeopardize the life or safety of any person." The court concludes that this potential for jeopardy to juror safety becomes even clearer when the court turns to the next factor in the analysis, Honken's potential sentence in this case.

\* \* \*

*[A]t least where there is other evidence showing that the defendant has the capacity to harm jurors, and has in the past been willing to exercise that capacity,* this court concludes that the defendant's potential death sentence is also a factor weighing in favor of an anonymous jury under § 3432, because it suggests that the defendant may be under a "strong inducement" actually to use his capacity to harm jurors.

The court finds, by the preponderance of the evidence, that Honken engaged in, or attempted to engage in, murderous conduct to obstruct justice when he was facing only a sentence for a term of years on drug-trafficking charges. Where he now faces the even stronger inducement to obstruct justice arising from his potential for a death penalty, the evidence of his past obstructive conduct is not too "stale" to be relevant, but is instead given a whole new vitality in the present circumstances. Thus, in the totality of the circumstances, Honken's potential death sentence is also a factor convincing the court, by the preponderance of the evidence, that disclosure of a list of venire persons to Honken *"may* jeopardize the life or safety of any person," including jurors.

January 29, 2004, Sealed Ruling (docket no. 201) at 54–56 (citations omitted; emphasis in the original), *United States v. Honken,* 378 F.Supp.2d 880, 910–911 (N.D.Iowa 2004).

By order dated May 14, 2004 (docket no. 249), *United States v. Honken,* 378 F.Supp.2d 925 (N.D.Iowa 2004), the court denied Honken's motion to reconsider the January 29, 2004, ruling. On reconsideration, the court again expressly rejected Honken's contention that the original decision had been based on "stale" evidence, reiterating its conclusion that Honken's history of using violent means, associates, and recruits to obstruct justice, coupled with his motivation at trial to use such means again arising from the gravity of the charges against him and potential death penalty, demonstrated the necessary potential jeopardy to life and safety of jurors and others to satisfy the statutory standard under 18 U.S.C. § 3432 for an anonymous jury.

At the commencement of jury selection with each daily panel of prospective jurors, and again in the jury instructions given at trial, the court provided the prospective jurors and ultimately the trial jurors with a "neutral" explanation for their anonymity. The pertinent "merits phase" Jury Instruction stated the following:

[A]s I explained during jury selection, in this case, we are identifying you by numbers, rather than by names, to protect you from contact by the media or other persons, such as curiosity seekers; to protect you from unwanted publicity; and to ensure that no outside information is communicated to you during the trial, so that both parties receive a fair trial. The fact that we are identifying you by numbers should not have any impact on the presumption that Mr. Honken is innocent or any other impact on the way that you decide this case.

Preliminary ["Merits Phase"] Jury Instruction No. 2 (docket no. 444).

### b. *Arguments of the parties*

Honken expressly challenges the original ruling and the ruling on the motion to reconsider on the "anonymous jury" issue in his post-trial motions. In his post-trial

challenge, Honken contends that the court erred in concluding that a preponderance of the *evidence* established that disclosure of juror identity information to the parties "may jeopardize the life or safety of any person," as required by 18 U.S.C. § 3432, if the court is to prevent the defendant from obtaining such information. He also contends that there was no "strong evidence" to believe that the jury needed protection. He contends that the record failed to establish that he was affiliated with any confederates who remained at large during trial or that the nature of the criminal enterprise to which he belonged involved or could be involved in harming jurors. At most, he contends that the evidentiary record revealed a past effort to harm or intimidate witnesses, but is completely devoid of any danger to the safety of jurors. Honken contends that the court gave undue weight to past allegations against him in its attempt to discern a present capacity to harm jurors. He also contends that the court's "neutral" explanation was not sufficient to overcome the sort of "de-individualization" in jury determinations that is described in a study by his jury consultant, so that his right to an impartial jury was prejudiced.

The government rejects these contentions. The government reiterates its position that use of an anonymous jury was necessary in this case to protect the jurors from outside influences by Honken, his agents, the press, or third parties. The government also contends that the court eliminated any concern that jurors might infer that they were anonymous because they were in danger from the defendant by instructing the jurors that they were anonymous because of the concern that, in this high-publicity case, they would be bothered by people if their identities were published in the news media. Therefore, the government contends that the court's ruling on this issue was in accord with the facts and the law and does not warrant a new trial.

### c. Analysis

As with the ruling on shackling the defendant during trial, the court now reaffirms post-trial its previous conclusions and rulings on the anonymous jury issue. Honken has presented nothing post-trial to convince the court that either the original ruling or the ruling on the motion to reconsider was in error. The court is no more persuaded by Honken's arguments the third time around, and the court sees no reason to revisit its conclusion that there was sufficient need for an "anonymous" jury—that is, a jury that was "anonymous" only to the extent specified in the ruling. While Honken contends that there is no evidence that he posed a threat to *jurors*, Honken had never before been tried by a jury. Where there was substantial evidence that Honken had plotted to intimidate or kill everyone else involved in the investigation and prosecution of his criminal activities—witnesses, law enforcement officers, and prosecutors—it was simply not unreasonable to find that disclosure of juror identity information to the parties "[might have] jeopardize[d] the life or safety of any person," as required by 18 U.S.C. § 3432, when Honken finally faced a jury trial in which the stakes were so very high.

Moreover, Honken has utterly failed to point to any evidence that he was actually prejudiced by the use of an "anonymous" jury, because the court provided a "neutral" explanation for the "anonymity" of the jurors. Nor is the court persuaded by Honken's challenge to the sufficiency and effect of that "neutral" explanation. Rather, that explanation provided a reasonable and more than sufficient explanation to the jurors for their "anonymity" in this high-profile case in a state that does not, itself, have the death penalty. Thus, that expla-

nation was "reasonably calculated to ensure that the use of numbers [to identify jurors] did not cause undue prejudice." *See United States v. Peoples*, 250 F.3d 630, 636 (8th Cir.2001). Finally, based on the overwhelming evidence against Honken presented at trial, the court cannot find that the jury's "anonymity" had any prejudicial impact upon either the "merits" verdict or the "penalty" verdict in his case.

The court's ruling that Honken be tried by an "anonymous" jury does not implicate the "interest of justice," such that a new trial is required. *See* FED.R.CRIM.P. 33(a) (providing for a new trial "if the interest of justice so requires"). No "miscarriage of justice will occur," if the jury's verdict is allowed to stand, despite their "anonymity." *See Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a)). Therefore, Honken's motion for new trial on this ground will also be denied.

### D. Alleged Errors During Jury Selection

Honken contends that there were also errors during jury selection that warrant a new trial, consisting of erroneous denial of his challenges to certain jurors and erroneous granting of the government's challenges to others. The government, again, resists a new trial on this ground.

### 1. Factual background

Honken contends that the court erroneously denied his challenges for cause to Prospective Jurors 140, 642, 99, 849, 170, 552, 365, 711, 902, and 556. Honken used peremptory strikes to remove Prospective Jurors 140, 642, 99, 849, 170, 552, 365, and 711, and to remove Prospective Juror 556 as an alternate. However, Juror 902 actually sat on the jury that convicted Honken on all charges and handed down a verdict for a death sentence on four of the ten capital charges. Honken also contends that the court erroneously granted the

government's challenges for cause to Prospective Jurors 538 and 813, even though he contends that both of these jurors were qualified to serve in this death-penalty case. For reasons explained in the legal analysis of this issue, below, the court need only consider the alleged errors involving Juror 902 and Prospective Jurors 538 and 813.

### a. Juror 902

The court finds that Juror 902 had an unusually clear grasp of the process for determining whether or not the defendant was guilty and, if guilty, what the penalty should be. Specifically, her questionnaire and *voir dire* demonstrated that she understood that determination of the appropriate punishment would involve weighing aggravating and mitigating factors and that, regardless of the weighing of those factors, she would never be required to vote for the death penalty. *See, e.g.*, Excerpt Of Transcript Of Trial, September 1, 2004, Individual Questioning Of Prospective Juror 902 (Juror 902 Transcript) (docket no. 623), p. 9, *ll.* 18–25 (answering "yes" to the prosecutor's question about whether she understood that the parties were seeking jurors "having an open mind and being able to fairly consider both punishment options and weighing the aggravating and mitigating factors in accordance with the judge's instructions," including the prosecutor's comment that the juror clearly understood this process from her juror questionnaire); *id.* at p. 11, *ll.* 22–24 (acknowledging the prosecutor's statement that she understood that "in no event would [jurors] be required to impose the death penalty"); *id.* at p. 13, *ll.* 2–6 (affirming that she understood that she would never be required to return a death verdict, even if she found no mitigating factors and did find beyond a reasonable doubt that there were aggravating factors).

Juror 902 also repeatedly stated that she could keep an open mind during the penalty phase, if any, even after finding the defendant guilty; that she would base the decision on the evidence, not emotion; and that she would weigh the aggravating and mitigating factors, with an open mind to both possible sentences, even if the evidence proved the murder of children. *Id.* at p. 12, *l.* 8, to p. 13, *l.* 14 (repeatedly affirming during questioning by the prosecutor that she could keep an open mind about the appropriate penalty, even after finding the defendant guilty, and could consider aggravating and mitigating factors, and consider both possible sentences, but would never be required to impose the death penalty); *id.* at p. 20, *ll.* 20–25 (answering, "I think so," to questioning by defendant's counsel about whether she could fairly consider both options); *id.* at p. 23, *ll.* 14–25 (observing during defense counsel's questioning that she would "try [her] best" to be fair, and that she "will be fair," but acknowledging that "we haven't even found him guilty yet"); *id.* at 24, *ll.* 14–19 (answering the court's question about whether she could fairly consider both penalties by stating, "I think so. I don't think my mind's set on which punishment is right because I know nothing of the crimes yet. I mean, I don't know any of the facts of the crimes."); *id.* at p. 25, *ll.* 3–6 (answering "yes" to the court's question, "Do you think you'd be able to follow the law in my instructions which would require you to fairly consider both options?"); *id.* at 28, *ll.* 16–25 (stating that she did understand the court's statement that deciding guilt and punishment could not be done "based on emotion"); *id.* at p. 29, *ll.* 1–6 (answering "yes" to the court's question, "[D]o you think you could decide the case both in the merits phase and in the penalty phase based on the evidence presented and the law in my instructions?"); *id.* at 30, *ll.* 12–20 (in response to questioning by the prosecutor, acknowl-edging that the deaths of children would trouble her, but that "I think in my mind if I had all the evidence and he—and I beyond a reasonable doubt thought he was guilty of the murder of the kids also, I think I could be fair and impartial because his life is on the line too.").

This is not to say that Juror 902's answers were always unequivocal. Indeed, she frequently called into question her own ability to be fair. *See id.* at p. 20, *ll.* 7–25 (answering "I think I could" to defense counsel's question about whether she could be fair in deciding the appropriate punishment in a case in which two children were dead); *id.* at p. 21, *l.* 25, to p. 22, *l.* 17 (explaining, in response to defense counsel's questions, that she would have some "difficulty" being fair, in a case involving the murder of children, because "I don't know hardly anything, just what you guys have told me, and it's hard for me to sit here and tell somebody that—you know, even though his life is on the line, it's hard for me to sit here and tell him that, you know, my life is in his hands [sic] after that," adding an acknowledgment to a question that the problem was that she "may not be able to be fair to him"); *id.* at 23, *ll.* 14–25 (stating only that she would "try my best" to be fair, then that she "will be fair," but acknowledging that "[i]t's hard, though"); *id.* at p. 25, *ll.* 18–21 (acknowledging to defense counsel that she had reservations in thinking that she could be fair to the defendant, because "[o]therwise I wouldn't be sitting here thinking about it"); *id.* at p. 26, *ll.* 4–17 (admitting, during questioning by the court, that she may have changed her answers, but that she "can fairly consider both [life and death sentences]," and her doubts were because "I don't know, but there's something in my mind that tells me I don't know if I could be fair if he's found guilty of the crimes that he's accused of, and I don't know," then reiterating that she

"could weigh each option. I could weigh life in prison. I could weigh the death penalty."); *id.* at 27, *ll.* 7–23 (acknowledging in response to questions by the court that she had "reservations," but that the reservations stemmed in part from thinking that it was unfair to ask jurors to make such a weighty decision). She also stated that she believed that the death penalty would be appropriate in "heinous" cases, although no specific examples of what she would consider a "heinous" case were elicited by counsel. *See id.* at p. 18, *ll.* 22–24 (explaining that a case in which the death penalty ought to be applied or when it was appropriate as, "When somebody is found guilty of a crime that is heinous and you don't feel that there's any hope left, I mean, and I do believe that it's a deterrence to crime.").

At the end of questioning, Honken challenged Juror 902 for cause, primarily on the ground that she "did clearly indicate she could not be fair with kids involved." *Id.* at p. 31, *ll.* 3–21. The prosecution, however, resisted removing Juror 902 for cause, because the prosecution believed that she had repeatedly indicated that she could consider both possible penalties fairly and was well aware of the weighty responsibility that she would have in both options. *Id.* at p. 31, *l.* 24, to p. 32, *l.* 8. The court denied Honken's motion to strike this juror for cause, on the ground that the court found that the juror took the responsibility seriously and had consistently answered the court's questions that she would fairly look at both options. *Id.* at p. 32, *ll.* 9–18. Juror 902 was placed in the pool of "qualified" jurors and was not stricken during final jury selection. Therefore, she served as a trial juror for both the "merits phase" and the "penalty phase" of Honken's trial.

### b. *Prospective Juror 538*

Honken also contends that the court erroneously granted the government's challenge to Prospective Juror 538. As noted by the prosecutor, in her juror questionnaire, Prospective Juror 538 had indicated that she was philosophically, morally, or religiously opposed to the death penalty. Realtime Unedited Transcript, Questioning of Juror 538 (Docket no. 387, Exhibit 1), p. 7, *ll.* 13–23. Under questioning from both counsel, Prospective Juror 538 expounded upon that answer. She repeatedly stated that she could only impose the death penalty if the defendant's involvement in the capital crime was proved "beyond all doubt," giving as examples "near confession" or an actual confession. *Id.* at p. 9, *ll.* 10–16 (in response to the prosecutor's question, "Given your personal, philosophical, moral position on the death penalty, can you [sign your name to a verdict form imposing the death penalty] in this case?" the juror stated, "If I could be—beyond a reasonable doubt that this man is guilty, it would have to be, I mean, near confession. It would have to be proven to me without any doubt at all."); *id.* at p. 10, *ll.* 3–18 (reiterating, under questioning by the prosecutor, that the only way that the juror would choose the death penalty would be if she had no doubt at all); *id.* at p. 14, *l.* 11, to p. 15, *l.* 7 (under questioning by defense counsel, stating that even if given instructions to follow, whether or not she could impose the death penalty "still goes to whether I feel strong enough that this crime was done for sure by this man"); *id.* at p. 16, *l.* 7–19 (although the juror answered a question by defense counsel that she could "sleep at night" if she imposed the death penalty, she added that she could only do so "if it was the last resort, if it was the sure thing that was supposed to be done"); *id.* at p. 18, *ll.* 3–9 (under questioning from the prosecutor, the juror stated, "For the death penalty, reasonable doubt is not good enough," and she agreed that there was "no way [she] could follow the instruction on that"). She

adhered to this position, even after both the prosecutor and defense counsel advised her that the legal standard was proof beyond a reasonable doubt, not proof beyond all doubt. *See id.* at p. 9, *l.* 17, to p. 10, *l.* 18 (prosecutor's clarification that proof beyond a reasonable doubt is the applicable standard); *id.* at p. 17, *l.* 13, to p. 18, *l.* 9 (defense counsel's clarification that proof beyond a reasonable doubt is the applicable standard). The only other circumstances in which the juror thought that she could impose the death penalty were a case in which her own children were harmed, *see id.* at p. 13, *l.* 15, to p. 14, *l.* 10, or a crime that was "terrible enough." *See id.* at p. 15, *ll.* 1–7.

The government moved to strike Juror 538 for cause, on the ground that she had plainly stated that she could not follow the applicable legal standard, but would instead require proof beyond *all* doubt before imposing the death penalty. Honken resisted, on the ground that the juror had only indicated that she would find "residual doubt" about the defendant's guilt to be a mitigating factor. The court conditionally seated Prospective Juror 538 in the "qualified" pool, but directed the parties to brief the question of whether she should be stricken for cause. *See, e.g.,* Minutes of Day 2 of Jury Selection, August 18, 2004 (docket no. 379). The government filed a memorandum in support of its request to strike Prospective Juror 538 on August 20, 2004 (docket no. 383), and subsequently filed a formal motion to strike the juror on August 23, 2004 (docket no. 387). Honken filed a response on August 23, 2004 (docket no. 386). After duly considering the matter, the court orally granted the government's request to strike Prospective Juror 538 on the record on the last day of jury selection from daily panels, September 7, 2004. *See, e.g.,* Minutes of Day 12 of Jury Selection, September 7, 2004 (docket no. 441).

### c. Prospective Juror 813

Honken also contends that the court erred by granting the government's motion to strike Prospective Juror 813 for cause. Under questioning by the prosecutor, Prospective Juror 813 initially stated that, based on her experiences and those of her family members with the justice system, she realized "that things need to be looked at very explicitly to see that justice is done, so I guess it's sort of been, like I said, a double-edged sword [in that] [i]t's made me feel very strongly that people are listened to and things are done properly." Excerpt Of Transcript Of Trial, August 30, 2004, Individual Questioning Of Prospective Juror 813 (Juror 813 Transcript) (docket no. 622), p. 7, *ll.* 12–19. She also averred that she would be fair and impartial to the defendant and give him the full benefit of the presumption of innocence. *Id.* at p. 9, *l.* 21, to p. 10, *l.* 1; *see also id.* at p. 17, *ll.* 14–17 (in response to questioning by defense counsel, stating, "I really feel that I could be fair. I've never done this before. I don't think you can say right down to the last drop what you would do until you go through it. I feel I could be fair. That's all I can tell you.").

However, in response to the prosecutor's question about the apparent inconsistencies in her questionnaire—in which she had indicated that she was philosophically, morally, or religiously opposed to the death penalty, and that she was generally opposed to the death penalty, but that she could go either way—Prospective Juror 813 explained,

> I think it's kind of hard to separate. I have a hard time with [the death penalty], but I have known a few cases that if I had to I could, but I would have to make hundred percent positive in my mind that that was the right thing to do and that we weren't wrongly sending

someone to their death. I would have to make very sure.

Juror 813 Transcript at p. 11, *ll.* 8–12. This statement led to more questioning by the prosecutor on what standard Prospective Juror 813 would apply to the case. In response to that further questioning, the juror repeatedly stated that she would have to be "very, very sure" or that she would impose a standard higher than reasonable doubt to a determination to impose the death penalty. *See id.* at p. 12, *ll.* 5–22 (also observing that "if it was a heinous-enough crime, which obviously it would have to be if they were going for the death penalty, I could do it"); p. 13, *ll.* 1–17 (answering, "I think so," to the prosecutor's question, "Would you need it to be proven to you beyond all possible doubt before you could impose the death penalty?"; even after the prosecutor pointed out that the judge would instruct that the standard was beyond a reasonable doubt, answering, "Probably, yes," to the prosecutor's question, whether she would require proof beyond all possible doubt; and finally, answering, "I guess if you put it that way, yes," to the prosecutor's question, "if the instruction was the government only has to prove it beyond a reasonable doubt, you'd have a hard time following that instruction").

Defense counsel then attempted to establish that the juror would be able to apply the correct "beyond a reasonable doubt" standard. *See id.* at p. 18, *ll.* 9–22 (defense counsel elicited assurances that the juror would hold the prosecution to a reasonable doubt standard, would not hold the prosecution to any higher burden, and would apply the appropriate burden of proof stated by the judge). Defense counsel also attempted to establish that the juror was really a "residual doubt" juror, that is, one who would consider any "leftover doubts" about the defendant's guilt in determining the appropriate penalty, through the following exchange:

Q. Okay. If and only if the jury finds Mr. Honken guilty beyond a reasonable doubt of some capital offense would the issue of punishment ever arise; okay? Now, what I think I heard you telling [the prosecutor] was if I'm in that situation, if I have any doubt whatsoever in my mind, even though it wasn't enough to keep me from finding him guilty, that might keep me from imposing the death penalty. Is that what you were saying?

A. Yes.

Q. And would that be the same as saying if there's still some—I'll call it leftover doubt, not—because we've already had proof beyond a reasonable doubt, there's some leftover doubt as to guilt, would you consider that as some reason not to impose the death penalty?

A. All I can say is what I've said before. I would find it very hard to do that, and I guess I would just have to know in my heart that that was warranted.

Q. Okay. And that would include being very sure, as you put in the questionnaire, that he was guilty of the capital offense; right?

A. (Witness nodded head.)

Q. Is that true?

A. Yes, yes.

Q. But it wouldn't mean you would not be able to consider and weigh everything that you've heard in making that decision.

A. No, sir.

Q. And it wouldn't mean that the decision's already made in your mind, would it?

A. Oh, no.

Juror 813 Transcript at p. 18, *l.* 23, to p. 19, *l.* 25.

The prosecutor was then given the opportunity to ask further questions to attempt to clarify Prospective Juror 813's

views. In the course of that questioning, the juror denied that her views on the death penalty would substantially impair her ability to consider the death penalty as a penalty in this case, although it would be "very hard" for her to consider imposing the death penalty. *See id.* at p. 20, *l.* 8, to p. 21, *l.* 22.

Honken contends that Prospective Juror 813 was then subjected to "scathing questioning" by the court concerning her opinion about the verdict in the O.J. Simpson trial, which Honken asserts was totally unrelated to the case at bar. It is true that the court expressed its puzzlement that this prospective juror could have an opinion about the O.J. Simpson case when she had neither attended every day of trial, purchased the complete transcript, or seen and heard all of the evidence. *See id.* at p. 22, *l.* 3, to p. 23, *l.* 2. Under questioning from the court, Prospective Juror 813 admitted that perhaps it wasn't fair to have an opinion in such circumstances, and also acknowledged that a single piece of evidence could be critical in a particular case, so that it was wrong to have an opinion when one had not heard all of the evidence. *See id.; see also id.* at p. 23, *l.* 3, to p. 24, *l.* 12.

Upon conclusion of the court's questioning, the prosecutor moved to strike Prospective Juror 813 for cause, on the grounds that she had stated that she would require proof beyond all possible doubt and could not follow the court's instructions. *Id.* at p. 24, *ll.* 19–23. The court then stated its view on why this juror was not a "residual doubt" juror:

> THE COURT: And I think that would—this is why I think it's not a residual doubt case. The way the questions were phrased, it is reasonable for me to conclude that she would require the government to prove an aggravating factor beyond all possible doubt. In other words, she'd have to be a hundred percent sure. It wouldn't be enough for the government to prove an aggravating factor beyond a reasonable doubt. That's how I understood her testimony.

Juror 813 Transcript at p. 24, *l.* 24, to p. 25, *l.* 6. The prosecutor concurred in the court's assessment. *Id.* at p. 25, *ll.* 7–10. Defense counsel at first complained that he had not been given another opportunity to question the juror after the prosecutor's second round of questions, but acknowledged that he had not asked the court for the opportunity to do so and that he had no reason to believe that the court would have denied him the opportunity, had he asked. *See id.* at p. 25, *l.* 12, to p. 26, *l.* 12. As to more substantive matters, defense counsel asserted, "[I]t seems clear to me that a fair reading of her answers, the entire examination, would show that this is exactly a residual doubt kind of case," *id.* at p. 26, *ll.* 13–15, and that the juror was a "fairly scrupled juror" who was qualified under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and *Wainwright v. Witt,* 469 U.S. 810, 105 S.Ct. 70, 83 L.Ed.2d 20 (1984). *Id.* at p. 28, *ll.* 10–17. While acknowledging that no party expressly asked the juror about what burden of proof she would apply to aggravating factors, the court reiterated its view that the prospective juror's testimony showed that she would require proof of such factors to a higher standard than was required by law. *Id.* at p. 27, *l.* 6, to p. 28, *l.* 9. Recognizing that defense counsel disagreed, the court ruled that the juror would be excluded for cause. *Id.* at p. 29, *ll.* 1–2.

### 2. Arguments of the parties

Despite the substantial factual background to the issue, Honken's arguments concerning errors in jury selection are fairly succinct. Honken argues that he was prejudiced by the erroneous denial of his challenges for cause to several of the

jurors, including Juror 902, because the challenged jurors each indicated that they would always choose to impose a death sentence if permitted to do so under the law and the court's instructions. Honken contends that he was actually prejudiced, because Juror 902 actually served on the jury that convicted him and voted for a death sentence. In support of his argument that government challenges were erroneously granted, Honken contends that the erroneous exclusion of a juror who is qualified under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and *Wainwright v. Witt,* 469 U.S. 810, 105 S.Ct. 70, 83 L.Ed.2d 20 (1984), mandates a new trial, because it affected the composition of the jury panel as a whole, citing *Gray v. Mississippi,* 481 U.S. 648, 665, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987). He contends that a fair consideration of the questioning of Prospective Jurors 538 and 813 reveals that these jurors' scruples would not have substantially impaired their ability to follow the court's instructions with regard to determining punishment.

The government, not surprisingly, takes the contrary view as to each of the challenged rulings. The government contends that the court need not consider purported error in refusing to strike jurors who were later removed by the defendant's exercise of peremptory challenges. Thus, the government contends, only Juror 902 can be the basis for allegedly erroneous refusal to strike a juror for cause. The government also contends that Honken's challenge to Juror 902 was properly denied, because that juror's questionnaire and *voir dire* clearly demonstrated that she could fairly and impartially perform her duties and could fairly consider both possible penalties. The government contends, further, that the court's credibility determination in this regard is virtually unassailable posttrial or on appeal. As to government motions to strike for cause allegedly errone-

ously granted, the government contends that Prospective Juror 538 would have required proof beyond all possible doubt, not simply proof beyond a reasonable doubt, to impose a death sentence. Such a standard is not the same as "residual doubt," the government contends, and in any event, there is no constitutional right to have "residual doubt" presented as a mitigating factor. The government also contends that Prospective Juror 538 was properly stricken, because she indicated that the only circumstance in which she could impose the death penalty would be if she or her family were victims. Similarly, the government contends that Prospective Juror 813 was properly stricken, because she also indicated that she would require the government to prove its case for the death penalty by a higher standard than proof beyond a reasonable doubt and that she could not follow the court's instruction on the applicable burden of proof. Thus, the government contends that her ability to be fair and impartial was substantially impaired.

### 3. Analysis

#### a. Applicable standards

■ *i. Jurors on whom the claim can be based.* As the court intimated above, the court need not consider Honken's contentions that the court erroneously denied his motions to strike certain jurors for cause, unless those jurors actually served on the panel that convicted him and entered a verdict for the death sentence. *See United States v. Nelson,* 347 F.3d 701, 711 (8th Cir.2003) ("Nelson argues that the district court unconstitutionally denied his for-cause challenges to jurors 21, 38, 114, and 116. Nelson used peremptory challenges to strike each of these jurors and thereby prevented them from sitting on the penalty phase jury. As such, Nelson's argument has no merit.") (citing *United*

**991**

States v. Martinez–Salazar, 528 U.S. 304, 307, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), as "holding that where the district court erroneously fails to remove a juror for cause, 'that if the defendant elects to cure such an error by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any rule-based or constitutional right,'" and United States v. Paul, 217 F.3d 989, 1004 (8th Cir.2000), cert. denied, 534 U.S. 829, 122 S.Ct. 71, 151 L.Ed.2d 37 (2001), as concluding under similar facts that the right to exercise peremptory challenges was not impaired and that the Sixth Amendment right to fair trial was not violated because the venirepersons did not serve on the petit jury), cert. denied, —— U.S. ——, 125 S.Ct. 486, 160 L.Ed.2d 355 (2004); United States v. Ortiz, 315 F.3d 873, 892 (8th Cir.2002) ("[T]he necessity of using a peremptory strike does not establish actual prejudice."), cert. denied, 540 U.S. 1073, 124 S.Ct. 920, 157 L.Ed.2d 742 (2003). Therefore, Honken cannot prevail on a claim of error based on the court's refusal to strike Prospective Jurors 140, 642, 99, 849, 170, 552, 365, 711, 902, and 556, all of whom he later excluded with peremptory challenges. The remainder of the court's analysis will focus entirely on the decisions not to strike Juror 902 and to strike Prospective Jurors 538 and 813.

■ **ii. The standard for an "impartial" juror.** Turning to the substantive question of whether these jurors were properly allowed to serve or properly stricken, the Sixth Amendment guarantees the defendant the right to trial "by an impartial jury." U.S. CONST. AMEND VI. "Voir dire serves the purpose of assuring a criminal defendant that this right will be protected." Ortiz, 315 F.3d at 888 (citing Rosales–Lopez v. United States, 451 U.S. 182, 188, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981)). "Impartiality [of jurors] is presumed 'so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case.'" United States v. Wright, 340 F.3d 724, 733 (8th Cir.2003) (quoting United States v. Evans, 272 F.3d 1069, 1078 (8th Cir.2001), cert. denied, 535 U.S. 1029, 122 S.Ct. 1638, 152 L.Ed.2d 642 (2002), in turn quoting Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986)). As the Eighth Circuit Court of Appeals has explained, "[t]he test for assessing impartiality asks whether the prospective juror 'can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'" Wright, 340 F.3d at 733 (quoting United States v. Johnson, 906 F.2d 1285, 1288 (8th Cir.1990), with internal quotation marks omitted).

In Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), the Supreme Court held that, not only is a capital defendant entitled to an impartial jury, but such a defendant is also entitled to strike for cause any juror who will automatically vote for death if the defendant is convicted, without regard to the facts or the court's instructions on the law. See United States v. Paul, 217 F.3d 989, 1004 (8th Cir.2000) (pursuant to Morgan, "[a] defendant subject to the death penalty may properly challenge for cause any juror 'who will automatically vote for the death penalty in every case' and who will not consider aggravating and mitigating circumstances as required by the instructions") (quoting Morgan, 504 U.S. at 729, 112 S.Ct. 2222). In Morgan, the Court also reiterated that, in order to "death qualify" the jury, as required by Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the prosecution is entitled to discover whether a prospective juror would automatically vote against the death penalty no matter what the facts of the case were, and may strike for cause any juror who would do so.

*Morgan,* 504 U.S. at 722–23, 112 S.Ct. 2222. *See generally Ortiz,* 315 F.3d at 892 (summarizing the standards for death-qualification of individual jurors).

 *iii. The standard for erroneous rulings on motions to strike jurors.* The Eighth Circuit Court of Appeals has recently reiterated the standards for determining whether a court erroneously denied or granted a motion to strike a prospective juror for cause, as follows:

> As a general rule, " 'a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *United States v. Ortiz,* 315 F.3d 873, 892 (8th Cir.2002) (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)), [*cert. denied,* 538 U.S. 1042, 123 S.Ct. 2095, 155 L.Ed.2d 1078 (2003) ]. "Moreover, bias does not have to be evident from voir dire with unmistakable clarity because many veniremen simply cannot be asked enough questions to reach the point where their bias has been made unmistakably clear." *Id.* (internal quotations and citation omitted). Thus, we must afford substantial deference to the district court and affirm its judgment where the decision is fairly supported by the record. *See Swindler [v. Lockhart],* 885 F.2d [1342,] 1345 [ (8th Cir.1989) ] ("[T]he question whether a venireman is biased has traditionally been determined through voir dire culminating in a finding by the trial judge concerning the venireman's state of mind.... [S]uch a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province. Such determinations [are] entitled to deference ...." (quoting *Wainwright v. Witt,* 469 U.S. 412, 428–29, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985))). "Because

the trial judge is in the best position to analyze the demeanor and credibility of a venireman, we will not reverse a court's ruling absent an abuse of discretion." *Ortiz,* 315 F.3d at 888.

\* \* \*

We reiterate that:

> [t]he question whether a jury was actually impartial is plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed. Because a determination of this kind is essentially one of credibility, and therefore largely one of demeanor, the trial court's resolution of the question is entitled to special deference and may be overturned only for manifest error.

*Pruett [v. Norris],* 153 F.3d [579,] 587 [ (8th Cir.1998) ] (internal quotations and citations omitted); *see also United States v. Moore,* 149 F.3d 773, 780 (8th Cir.1998) (concluding that district court's credibility determination concerning juror partiality "cannot be manifest error; indeed it is virtually unassailable on appeal"), *cert. denied,* 525 U.S. 1030, 119 S.Ct. 570, 142 L.Ed.2d 475 (1998) and 525 U.S. 1082, 119 S.Ct. 826, 142 L.Ed.2d 684 (1999).

*Nelson,* 347 F.3d at 710–11; *accord Wright,* 340 F.3d at 733 ("The district court has substantial discretion in conducting voir dire, so most rulings on juror challenges are reviewed for abuse of discretion. *United States v. Blom,* 242 F.3d 799, 805 (8th Cir.2001), *cert. denied,* 534 U.S. 880, 122 S.Ct. 184, 151 L.Ed.2d 128 (2001). We will not interfere with the district court's discretion to strike jurors for cause 'absent a showing of actual prejudice.' *United States v. Johnson,* 906 F.2d 1285, 1288 (8th Cir.1990)."). Equivocal re-

sponses may provide sufficient support for a court's decision to strike a juror for cause, because the court is entitled to resolve ambiguities about a juror's ability to be fair and impartial. *See Nelson,* 347 F.3d at 712 (jurors "strong responses against the death penalty in the jury questionnaires in combination with their equivocal responses given during voir dire provide fair support for the district court's decision [to strike them].") (citing *Moore,* 149 F.3d at 780, and *Antwine v. Delo,* 54 F.3d 1357, 1369 (8th Cir.1995), *cert. denied sub nom. Bowersox v. Antwine,* 516 U.S. 1067, 116 S.Ct. 753, 133 L.Ed.2d 700 (1996)).

### b. Application of the standards

 **i. Juror 902.** The court found above that Juror 902 repeatedly stated that she could keep an open mind during the penalty phase, if any, even after finding the defendant guilty, and that she would base her decision on the evidence, not emotion. Thus, the *voir dire* of this juror plainly demonstrates that she was capable of " 'lay[ing] aside [her] impression or opinion and render[ing] a verdict based on the evidence presented in court.' " *Wright,* 340 F.3d at 733 (test for assessing impartiality of prospective jurors) (quoting *Johnson,* 906 F.2d at 1288, with internal quotation marks omitted). Moreover, as the court also found above, the *voir dire* of Juror 902 demonstrated that she would weigh the aggravating and mitigating factors, with an open mind to both possible sentences, even if the evidence proved the murder of children, contrary to Honken's unfounded contention that this juror clearly indicated that she could not be fair in a case involving the murder of children. Thus, this juror was both life- and death-qualified as required by *Morgan. See Morgan,* 504 U.S. at 722–23, 112 S.Ct. 2222 (reiterating the "death qualification" requirements of *Witherspoon* ); *Paul,* 217 F.3d at 1004 (*Morgan* requires life-quali-

fied jurors). To put it another way, there is no convincing evidence that the views of this juror would prevent or substantially impair the performance of her duties as a juror in accordance with her instructions and oath, and indeed, the court finds that her *voir dire* demonstrated that she would be fair and impartial. *Nelson,* 347 F.3d at 710 (a juror may not be challenged for cause unless her views would so prevent or impair the juror's performance).

On the other hand, the court recognized above that Juror 902's answers were not always unequivocal. Although a prospective juror's equivocation may entitle the court to resolve the matter by striking the juror, *see Nelson,* 347 F.3d at 712, the court finds that, taking all of Juror 902's questioning into account, Juror 902's apparent equivocation was the result of a conscientious person, aware of the stakes, acknowledging some reasonable self doubts. Her statements clearly were *not* unequivocal statements to the effect that— or equivocal statements from which it could reasonably be inferred that—this juror could not be fair and impartial or knew that she could not be fair and impartial in considering both possible penalties, even in a case involving the murder of children. *See id.* at 710–11 (citing *Swindler,* 885 F.2d at 1345, which states, *inter alia,* "determinations of demeanor and credibility . . . are peculiarly within a trial judge's province"). The court has difficulty imagining that such a self-aware and self-critical juror was not precisely the kind of juror that *both* sides would want on the panel deciding a case in which the stakes were so high.

Consequently, the court concludes that it properly denied Honken's motion to strike this juror for cause, and holds that the presence of this juror on Honken's panel does not implicate the "interest of justice," such that his motion for new trial

should be granted. *See* FED.R.CRIM.P. 33(a) (providing for a new trial "if the interest of justice so requires"). No "miscarriage of justice will occur," if the jury's verdict is allowed to stand, despite the presence of Juror 902 on the panel. *See Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a)). Therefore, Honken's motion for new trial on this ground will also be denied.

**ii. Prospective Juror 538.** Applying the appropriate standards, the court also finds that it properly granted the government's motion to strike Prospective Juror 538. As the court found above, this prospective juror repeatedly stated that she could only impose the death penalty if the defendant's involvement in the capital crime was proved beyond *all* doubt, giving as examples "near confession" or an actual confession. Therefore, the court finds that this juror strongly suggested, and the court in fact finds that she expressly stated, that she could not follow the court's instructions and could not be death-qualified. *Morgan*, 504 U.S. at 722–23, 112 S.Ct. 2222 (the prosecution is entitled to exclude a prospective juror who would automatically vote against the death penalty no matter what the facts of the case were); *Nelson*, 347 F.3d at 710 (a juror may be challenged for cause if his or her views would prevent or substantially impair the performance of the juror's duties in accordance with the juror's instructions and oath). While defense counsel's examination of this prospective juror may have muddied the waters somewhat, placing in the juror's mouth a suggestion that the juror was possibly a "residual doubt" juror rather than an "improper standard" juror, the court is not required to find that the juror's bias is revealed with "unmistakable clarity," *see Nelson*, 347 F.3d at 710, and may resolve ambiguities about a prospective juror's ability to be fair and impartial

by striking the juror for cause. *Id.* at 712 (equivocal responses provide sufficient support for a court's decision to strike a juror for cause). Here, those equivocations and ambiguities lead the court to find that this juror could not apply the proper standards and could not be impartial. Moreover, unlike Juror 902, this prospective juror's *voir dire* does not contain, or reasonably suggest, an undertaking to consider fairly both possible penalties, life and death. *See id.* at 711 (citing this determinative question from *Pruett*, 153 F.3d at 587).

Consequently, the court concludes that it properly granted the government's motion to strike this prospective juror for cause, and holds that the exclusion of this prospective juror does not implicate the "interest of justice," such that Honken should receive a new trial. *See* FED. R.CRIM.P. 33(a) (providing for a new trial "if the interest of justice so requires"). No "miscarriage of justice will occur," if the jury's verdict is allowed to stand, despite the exclusion of Prospective Juror 538 from the panel. *See Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a)). Therefore, Honken's motion for new trial on this ground will also be denied.

**iii. Prospective Juror 813.** Unlike Prospective Juror 538, Prospective Juror 813 did aver that she would be fair and impartial to the defendant and give him the full benefit of the presumption of innocence. Nevertheless, the court concludes that her averment, although doubtless offered in good faith, cannot be fully credited in light of her repeated statements that she would have to be "very, very sure" or that she would impose a standard higher than reasonable doubt, if she were to vote to impose the death penalty. *Nelson*, 347 F.3d at 712 (the court may resolve ambiguities about a prospective juror's ability to

be fair and impartial and equivocal responses provide sufficient support for a court's decision to strike a juror for cause). Indeed, on the basis of her *voir dire*, the court finds that this juror would have imposed a higher standard than reasonable doubt to the imposition of the death penalty, and thus, could not follow the court's instructions. *Id.* at 710 (a juror may be challenged for cause if his or her views would prevent or substantially impair the performance of the juror's duties in accordance with the juror's instructions and oath).[12]

Although defense counsel has again characterized this prospective juror as a "residual doubt" juror, the court does not agree. Indeed, the controversy concerning this prospective juror highlights the difference of opinion between the court and defense counsel over what constitutes a "residual doubt" juror. In the court's view, such a juror is *not* one who will, like Prospective Juror 538, impose a death penalty only pursuant to a higher standard of proof than proof beyond a reasonable doubt, but one who is willing to consider any "residual" or "lingering" doubts about the defendant's guilt or involvement in the offense *as a mitigating factor* in deciding whether or not to impose the death penalty, notwithstanding that those doubts do not rise to the level of "reasonable doubts." *See, e.g., Franklin v. Lynaugh*, 487 U.S.

164, 172–75, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (so defining "residual doubt," but holding that the Eighth Amendment to the United States Constitution does not require an instruction on "residual doubt" at the penalty phase).

Thus, as to Prospective Juror 813, the court once again concludes that it properly granted the government's motion to strike for cause. Because the exclusion of this prospective juror does not implicate the "interest of justice," no new trial is required. *See* FED.R.CRIM.P. 33(a) (providing for a new trial "if the interest of justice so requires"). No "miscarriage of justice will occur," if the jury's verdict is allowed to stand, despite the exclusion of Prospective Juror 813 from the panel. *See Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a)). Therefore, Honken's motion for new trial on this ground will also be denied.

### E. Alleged Errors During Trial

Honken also asserts that his trial was riddled with erroneous evidentiary rulings, fatally flawed by denial of a motion for mistrial, and compromised by errors in the "penalty phase" jury instructions. The court will consider each asserted trial error or category of errors in turn.

**12.** To the extent that Honken is also arguing that the court acted improperly in chastising this prospective juror about having an opinion on the outcome of the O.J. Simpson case when she had not attended every day of trial or had access to the complete trial transcript and all of the evidence, the court rejects that argument. The court does not believe that a juror could be qualified for service in this death-penalty case, or any other case, if the juror would not fairly consider all of the evidence or would decide the case on the basis of emotions and impressions, not the evidence. *See Wright*, 340 F.3d at 733 (the test for impartiality of a prospective juror is

whether the juror is capable of " 'lay[ing] aside [her] impression or opinion and render[ing] a verdict based on the evidence presented in court' ") (quoting *Johnson*, 906 F.2d at 1288, with internal quotation marks omitted). The court believes that Prospective Juror 813 was such an unqualified juror. Moreover, as explained in the body of this decision, the court actually granted the prosecution's motion to strike this prospective juror for cause on the ground that she would have imposed a higher standard than proof beyond a reasonable doubt to determination of the appropriate penalty.

#### 1. Hearsay and Confrontation Clause errors

In this part of his motion, Honken first contends that the court erroneously admitted several pieces of testimony and several items of documentary evidence over his objections that they were hearsay, thereby violating his right to confront and cross-examine witnesses against him. Although his own identification of some of the evidence he is attempting to challenge in this portion of his motion is vague, the government has categorized the evidence in question as statements of Greg Nicholson and Terry DeGeus, as recounted by others at trial; statements, a letter, and maps attributed to Angela Johnson; a statement made by "Dustin's girlfriend" in a telephone conversation with Rick Held; and testimony by Agent Mizell regarding Angela Johnson's appearance before a grand jury. The court concurs in the government's identification of the challenged evidence, based on the court's own reading of Honken's brief, and will address each category of challenged evidence separately.

#### a. Statements of Nicholson and De- Geus

Honken reurges post-trial his pre-trial objections to the admission of statements by murder victims Nicholson and DeGeus. He contends that the court misapplied the Confrontation Clause standards for hearsay articulated in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), in admitting this evidence. He asserts that the "forfeiture by wrongdoing" exception to the hearsay rule under which the court conditionally admitted these "testimonial" hearsay statements did not obviate his Confrontation Clause objections to their admission. The government urges the court to reaffirm its pre-trial and trial rulings admitting this evidence, because the government presented sufficient evidence that Honken killed Nicholson and DeGeus, forfeiting by such wrongdoing any right to assert hearsay objections to testimony by others about their statements on the basis of their unavailability.

■ The court addressed in some detail the reasons for conditionally admitting the challenged statements of Nicholson and DeGeus in its July 16, 2004, ruling on the "second series" of pre-trial motions by the parties (docket no. 323), *United States v. Honken*, 378 F.Supp.2d 970 (N.D.Iowa 2004). The court finds it unnecessary to reiterate the details of that ruling, which expressly addresses and refutes the contentions Honken reiterates concerning violation of his Confrontation Clause rights- among them Honken's untenable contention that the statements in question are "testimonial." Moreover, as the government contends, more than sufficient evidence was presented at trial that Honken is responsible for the unavailability of Nicholson and DeGeus. Therefore, the court properly ruled that the government had satisfied the conditions for admitting such statements under the "forfeiture by wrongdoing" hearsay exception embodied in Rule 804(b)(6) of the Federal Rules of Evidence.

■ Even if Honken could show that the court abused its discretion in admitting or conditionally admitting this evidence pursuant to the "forfeiture by wrongdoing" exception, *see United States v. Gray*, 405 F.3d 227, 243 (4th Cir.2005) (deciding whether the trial court abused its discretion by admitting hearsay testimony pursuant to the Rule 804(b)(6) "forfeiture by wrongdoing" hearsay exception, and finding that the trial court did not, where there was sufficient evidence to warrant application of the rule); *but see United States v. Thompson*, 286 F.3d 950, 961 (7th Cir.2002) (reviewing the application of Rule 804(b)(6) for abuse of discretion, but a ruling on a Confrontation

Clause challenge *de novo* ), *cert. denied,* 537 U.S. 1134, 123 S.Ct. 918, 154 L.Ed.2d 824 (2003), the court concludes that the error was harmless. *United States v. Mack,* 343 F.3d 929, 935 (8th Cir.2003) (" 'Even where we find that the district court has abused its discretion with respect to an evidentiary ruling, we will not reverse the conviction if the error was harmless.' ") (quoting *United States v. Oleson,* 310 F.3d 1085, 1091 (8th Cir.2002), *cert. denied,* 538 U.S. 1048, 123 S.Ct. 2113, 155 L.Ed.2d 1090 (2003)), *cert. denied,* 540 U.S. 1226, 124 S.Ct. 1524, 158 L.Ed.2d 167 (2004). As the Eighth Circuit Court of Appeals recently explained, "An evidentiary error is harmless 'if, after reviewing the entire record, we determine that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict.' " *United States v. Crenshaw,* 359 F.3d 977, 1003–04 (8th Cir.2004) (quoting *United States v. Carroll,* 207 F.3d 465, 470 (8th Cir.2000), *cert. denied,* 531 U.S. 849, 121 S.Ct. 124, 148 L.Ed.2d 78 (2000)). Here, because there was other, overwhelming evidence of Honken's guilt, the admission of Nicholson's and DeGeus's statements, even if in error, was harmless, in that those statements could have had no influence, or at most only slight influence, on the verdict. *Id.*

Thus, Honken's renewed challenge to the admissibility of this evidence does not implicate the "interest of justice" or show that a "miscarriage of justice" will occur if the verdicts from a trial in which this evidence was admitted are allowed to stand. *See* FED.R.CRIM.P. 33(a) (providing for a new trial "if the interest of justice so requires"); *Campos,* 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a) to require a showing of a "miscarriage of justice"). Therefore, Honken's motion for new trial based on admission of this evidence will be denied.

**b. Co-conspirator hearsay**

**i. Angela Johnson's writings and maps.** Honken also contends that he is entitled to a new trial, because the court erroneously admitted hearsay evidence under the "co-conspirator hearsay" exception in Rule 801(d)(2)(E). The evidence to which he points is statements and writings attributed to Angela Johnson and a telephone call to Rick Held from someone who identified herself as "Dustin's girlfriend." Honken contends that the "co-conspirator hearsay" exception cannot overcome his Confrontation Clause rights as to "testimonial" hearsay. This argument fails, however, because the court has previously ruled that the "co-conspirator hearsay" at issue in this portion of Honken's motion was *not* "testimonial," *Crawford v. Washington,* 541 U.S. 36, 50–53, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (giving examples of "testimonial" hearsay, but not expressly defining the term), and the court has already explained its reasons for holding that the maps made by Johnson are admissible. *See* June 7, 2004, Order (docket no. 272), *United States v. Honken,* 378 F.Supp.2d 928 (N.D.Iowa 2004) (ruling on the government's pre-trial motions). Honken has not demonstrated that the prior rulings were in error. Thus, Honken's renewed contentions that "testimonial" hearsay was improperly admitted are simply not persuasive.

■■■ Honken also contends that there was no sufficient foundation for the evidence in question to be admissible under the "co-conspirator hearsay" exception, because the government failed to prove that statements and maps that Angela Johnson made or gave to the jailhouse informant, Robert McNeese, or a letter with her return address that she purportedly authored were in furtherance of her conspiracy with Honken. These arguments also fail. The court reaffirms its ruling during

trial that the letter was admissible pursuant to the "co-conspirator hearsay" exception, and thus, its admission did not violate the Confrontation Clause. The court also believes that adequate foundation was laid to admit the maps under the "co-conspirator hearsay" exception.

 Yet, even if the court were now to conclude that it had abused its discretion in applying the "co-conspirator hearsay" exception to this evidence, *see, e.g., United States v. Womack*, 191 F.3d 879, 883 (8th Cir.1999) (admission of evidence pursuant to the "co-conspirator hearsay" exception is reviewed for abuse of discretion), the court finds that the error was harmless, again owing to other, overwhelming evidence of Honken's guilt on the charged offenses, so that erroneous admission of the evidence could have had no influence or only a slight influence on the verdict. *See Mack*, 343 F.3d at 935 (evidentiary rulings that are an abuse of discretion will not require reversal of the conviction if the error was harmless); *Crenshaw*, 359 F.3d at 1003–04 ("An evidentiary error is harmless 'if, after reviewing the entire record, we determine that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict.' ") (quoting *Carroll*, 207 F.3d at 470).

 Also in the alternative, the court notes that it had previously concluded that the maps also fell within another deeply-rooted hearsay exception, "statements against penal interest," *see* FED.R.EVID. 804(b)(3), and that their admission pursuant to this exception would not violate the Confrontation Clause. *See* June 7, 2004, Order (docket no. 272), *United States v. Honken*, 378 F.Supp.2d 928 (N.D.Iowa 2004) (ruling on the government's pre-trial motions). Honken has presented nothing to convince the court that this alternative ruling was in error—indeed, he has not even attempted to address it.

***ii. The telephone call to Rick Held.*** The next piece of evidence in this category is evidence of the telephone call to Rick Held, attributed to Angela Johnson, in which a female caller purportedly identified herself as "Dustin's girlfriend" and told Held that "Dustin does not need that pub any more," apparently referring to a handgun that Honken had asked Held to acquire for him. The court admitted the evidence under the "co-conspirator hearsay" exception. The court reiterated above its conclusion that admission of "non-testimonial" "co-conspirator hearsay," such as this, does not violate the Confrontation Clause.

Honken contends, however, that there is insufficient showing that the caller was Angela Johnson or that the statements in the call were in furtherance of any conspiracy between Honken and anyone else. Honken contends that there were at least two other women, besides Johnson, who could reasonably have been identified as "Dustin's girlfriend" at the time, Kathy Rick and Tim Cutkomp's ex-wife. He contends that findings that the caller was Johnson depend upon the "truth" of the statement that the caller was "Dustin's girlfriend," and from that flows the only basis for finding that the call was in furtherance of a conspiracy involving Honken. The government contends that there was plenty of evidence submitted at trial that the caller was Johnson. However, the government also contends that, whether or not the caller was Johnson, there was plenty of evidence that the statements made by the caller were made in furtherance of a conspiracy involving Honken, or in the alternative, that the statements in the call were not hearsay at all, because they were not offered for the truth of whether Honken wanted the handgun or not, but to show Honken's connection to the handgun.

■ The court finds, first, that there was sufficient evidence to find that the caller was Angela Johnson, for the reasons stated on the record. The court also finds that, whoever the caller was, the evidence at trial was sufficient to support the admission of this evidence either as "co-conspirator hearsay" statements in furtherance of the conspiracy, or as statements not offered for their truth, and thus, not hearsay.

■ Again, even if that ruling was an abuse of discretion, where there was other, overwhelming evidence of Honken's guilt on the charges against him, the admission of this evidence under the "co-conspirator hearsay" exception was also harmless, because it could have had no influence or only a slight influence on the verdict. *Womack,* 191 F.3d at 883 (admission of evidence pursuant to the "co-conspirator hearsay" exception is reviewed for abuse of discretion); *Mack,* 343 F.3d at 935 (evidentiary rulings that are an abuse of discretion will not require reversal of the conviction if the error was harmless); *Crenshaw,* 359 F.3d at 1003–04 ("An evidentiary error is harmless 'if, after reviewing the entire record, we determine that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict.' ") (quoting *Carroll,* 207 F.3d at 470).

#### c. *Agent Mizell's testimony*

*i. The evidence in question.* Johnson also contends that the court erroneously admitted Agent Mizell's testimony about what Angela Johnson was asked during her grand jury testimony. The testimony in question consists of the following, including Honken's objection at trial:

Q [by the prosecutor]. I want to direct your attention to October 27 of 1993. Was Angela Johnson subpoenaed to testify before the federal grand jury at that time?

A. Yes.

Q. And when she was questioned in the grand jury, was she questioned about the drug connection between the defendant and Mr. DeGeus?

[DEFENSE COUNSEL]: You Honor, I'm going to object on hearsay grounds.

THE COURT: Sustained.

[THE PROSECUTOR]: It's not being introduced for the truth of the matter asserted, Your Honor; just was she questioned about the connection.

THE COURT: Okay. You may answer.

A. She was questioned, yes.

Q. About the connection, drug connection, between Greg Nichol—I'm sorry, Terry DeGeus and the defendant, Dustin Honken?

A. Yes.

Trial Transcript, Vol. 1, September 9, 2004, at p. 124, *ll.* 4–22.

*ii. Arguments of the parties.* Honken contends that Agent Mizell's testimony about what Angela Johnson was asked involved inadmissible hearsay and violated the Confrontation Clause. Honken contends that this evidence was admitted with no discernable basis. More specifically, he argues that the statements were offered for their truth, that is, that Angela Johnson was asked certain questions during her grand jury testimony. He also contends that Agent Mizell's testimony was hearsay, because he "obviously" was not present during Johnson's grand jury testimony, so that he could only recount what someone else told him about the questions Johnson was asked. The government agrees that it offered Agent Mizell's challenged testimony for the purpose of proving that Johnson was asked questions about the drug rela-

tionship between Honken and DeGeus, not for the purpose of presenting her answers to those questions. However, the government argues that questions themselves—the only part of Agent Mizell's testimony that refers to what an out-of-court declarant said—are not "statements" within the meaning of the hearsay rules. The government also contends that the questions were not offered for the truth of the matter purportedly asserted therein, *i.e.*, that Honken and DeGeus actually had a drug-trafficking relationship. The government adds that this evidence was relevant to show the timing of DeGeus's murder, and hence, Honken's motive for killing him, because DeGeus was killed shortly after Johnson was questioned about his relationship with Honken.

 ***iii. Analysis.*** The government is correct that a witness's testimony about what a declarant asked is not hearsay, either because the question was not offered for its "truth," or because the declarant's question was not intended as an assertion. *See, e.g., United States v. Wilson*, 665 F.2d 825, 830 (8th Cir.1981) (a corrections officer's testimony about what questions FBI agents asked an inmate were "not hearsay because the remarks were not offered to prove the truth of the matter asserted"); *United States v. Wright*, 343 F.3d 849, 865 (6th Cir.2003) (a witness's testimony that the defendant's girlfriend asked the witness where the witness's husband was was not hearsay, because "a question is typically not hearsay because it does not assert the truth or falsity of a fact. A question merely seeks answers and usually has no factual content.") (citing cases), *cert. denied*, 541 U.S. 990, 124 S.Ct. 2016, 158 L.Ed.2d 496 (2004); *United States v. Jackson*, 88 F.3d 845, 847–48 (10th Cir.1996) (a police officer's testimony that the declarant asked, "Is this Kenny?" when the police officer called a telephone number displayed on a pager found in a stolen car was not hear-

say, because "[t]he question, 'Is this Kenny?' cannot reasonably be construed to be an intended assertion, either express or implied"); *United States v. Oguns*, 921 F.2d 442, 448–49 (2d Cir.1990) (an agent's testimony that an unidentified caller asked, "Have the apples arrived?" was not hearsay, because " 'An inquiry is not an 'assertion,' and accordingly is not and cannot be a hearsay statement.' ") (quoting *Inc. Pub. Corp. v. Manhattan Magazine, Inc.*, 616 F.Supp. 370, 388 (S.D.N.Y.1985), *aff'd*, 788 F.2d 3 (2d Cir.1986)); *United States v. Long*, 905 F.2d 1572, 1580 (D.C.Cir.1990) (questions by an unidentified caller were "non-assertive," and therefore, not hearsay); *United States v. Lewis*, 902 F.2d 1176, 1179 (5th Cir.) (the question, "Did you get the stuff?" by a person who answered the phone when a police officer called a number on a pager was not a statement within the meaning of the hearsay rule, because it was not intended to assert anything), *cert. denied*, 498 U.S. 948, 111 S.Ct. 365, 112 L.Ed.2d 328 (1990).

 In each of the cases just cited, the witness testified as to a question that the witness was *actually asked* or that the witness *actually heard another ask*. On the other hand, Honken contends that Agent Mizell "obviously" was not present during Angela Johnson's grand jury testimony, and consequently, must have learned what questions Johnson was asked from the statements of another who was present. In other words, he contends that Agent Mizell's report of the statement of some unknown declarant about what that declarant did (*i.e.*, asked Johnson certain questions) was hearsay, offered for the truth of the declarant's statement that the declarant had asked those questions. However, Honken failed to frame his "hearsay" objection at trial in this way and failed to elicit any testimony at trial—either by requesting the opportunity to

*voir dire* Agent Mizell at the time of the objection or in cross-examination—concerning whether or not Agent Mizell actually heard the questions that Angela Johnson was asked. Therefore, on the record as it stands, Agent Mizell's testimony about what appears to be his first-hand observation of whether or not Angela Johnson was asked about the drug connection between Honken and DeGeus was admissible, because the question to Johnson was not a hearsay statement. The challenged testimony was properly admitted, and as such, there is no "interest of justice" or "miscarriage of justice" that requires a new trial because of the admission of that testimony. *See* FED.R.CRIM.P. 33(a) (providing for a new trial "if the interest of justice so requires"); *Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a) to require a showing of a "miscarriage of justice").

■ Moreover, even if the court were to infer that Agent Mizell only knew what questions Johnson was asked from statements by another declarant about what that declarant had asked Johnson, such that Agent Mizell's testimony about what Johnson was asked might be hearsay (*i.e.,* an out-of-court statement about what the declarant did, ask a certain question, offered for the truth of the statement that the declarant did ask that question), there would be no "miscarriage of justice," requiring a new trial, arising from admitting Agent Mizell's testimony that the question was asked. *See id.* (providing for a new trial "if the interest of justice so requires"); *Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a) to require a showing of a "miscarriage of justice"). Honken has not shown—nor even attempted to explain—how admission of this evidence prejudiced him. The court can find no such prejudice. The challenged evidence was only a tiny bit of *additional,* circumstantial evidence that Honken (and John-

son) were concerned that DeGeus might provide information or evidence to authorities about Honken's drug-trafficking activities. For the same reason, even if the court abused its discretion in admitting this testimony, the error was harmless, because admission of the evidence had no influence, or only a slight influence, on the verdict. *See Mack*, 343 F.3d at 935 (evidentiary rulings that are an abuse of discretion will not require reversal of the conviction if the error was harmless); *Crenshaw*, 359 F.3d at 1003–04 ("An evidentiary error is harmless 'if, after reviewing the entire record, we determine that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict.' ") (quoting *Carroll*, 207 F.3d at 470).

There is no basis for a new trial, even if the challenged evidence concerning what Agent Mizell said Johnson was asked during her grand jury testimony was erroneously admitted.

### 2. Restrictions on cross-examination of Timothy Cutkomp

Next, Honken contends that, during the trial, the court erroneously restricted his cross-examination of witness Timothy Cutkomp by preventing him from asking about repeated incidents of indecent exposure by Cutkomp that Cutkomp had related to Honken. In a pre-trial ruling on this issue, the court granted the government's motion to exclude evidence of Cutkomp's instances of indecent exposure to the extent that the parties, counsel, and witnesses were precluded from making any reference to, asking questions concerning, or introducing evidence of Cutkomp's past behavior of indecent exposure, but they were allowed to refer to these instances as "a misdemeanor conviction" and "acts constituting misdemeanor violations of the

law" that caused Cutkomp to see a psychiatrist or that Cutkomp may have failed to disclose fully to law enforcement officers. *See* Order of July 16, 2004 (docket no. 323), *United States v. Honken,* 378 F.Supp.2d 970 (N.D.Iowa 2004) (ruling on a "second series" of pre-trial motions).

Honken now reiterates that the evidence at trial demonstrated the critical nature of Cutkomp's conduct of indecent exposure to Honken's perception that Cutkomp was "cracking up," and explained the extent to which Honken went to reassure Cutkomp during tape-recorded conversations. Honken contends that, by allowing Cutkomp to testify about the conversations, and permitting the jury to listen to the recordings, but precluding Honken from establishing through Cutkomp the reason that Honken said the things that he said on the recordings, the court prevented Honken from adequately and effectively confronting the evidence against him, in violation of the Sixth Amendment. Like Honken, the government reiterates its previous arguments on the issue. However, the government also asserts that the court provided Honken with an adequate opportunity at trial to explain Honken's statements on the recordings and to impeach Cutkomp by allowing Honken and the government to refer to Cutkomp's incidents of "misdemeanor offenses."

The court provided a detailed analysis of the admissibility of the evidence in question here in its pre-trial ruling. That analysis addressed the question of admissibility of the evidence pursuant to Rules 401, 402, 403, 608, and 609 of the Federal Rules of Evidence as well as Honken's Confrontation Clause concerns for this mental condition evidence. Honken said nothing during trial and has said nothing in his post-trial briefing of the issue that convinces the court that its pre-trial ruling was in error or that the restrictions placed on Honken's examination or cross-examination of Cutkomp about his mental condition violated Honken's Confrontation Clause rights. The court finds, therefore, that evidence of Cutkomp's mental condition and conduct were properly admitted to the extent permitted by the court.

Again, the court also finds that admission of this evidence, even if it was an abuse of discretion, was harmless, where there was other, overwhelming evidence of Honken's guilt, because the evidence allegedly improperly admitted had no influence, or only a slight influence, on the verdict. *See Mack,* 343 F.3d at 935 (evidentiary rulings that are an abuse of discretion will not require reversal of the conviction if the error was harmless); *Crenshaw,* 359 F.3d at 1003–04 ("An evidentiary error is harmless 'if, after reviewing the entire record, we determine that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict.' ") (quoting *Carroll,* 207 F.3d at 470).

Therefore, Honken suffered no "miscarriage of justice" at trial because of the court's restrictions on the cross-examination and impeachment of Timothy Cutkomp, so that a new trial is not required on this ground. *See* FED.R.CRIM.P. 33(a) (providing for a new trial "if the interest of justice so requires"); *Campos,* 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a) to require a showing of a "miscarriage of justice").

### 3. Denial of the motion for mistrial based on Scott Gahn's testimony

Next, Honken contends that the court improperly denied his motion for mistrial when witness Scott Gahn evaded an evidentiary ruling by the court by stating that Honken had been using cocaine on two occasions. The government resists relief on this ground, as well.

### a. The testimony in question

Mr. Gahn testified that he and Honken had "talked about" drugs and that Honken had *distributed* cocaine upon occasion, between about 1989 and 1991. *Id.* at p. 187, *l.* 16, to p. 193, *l.* 25. Moreover, the trial transcript reflects that Honken moved for a mistrial in the course of a sidebar concerning that testimony, some of which the court had already admonished the jury to disregard, *see id.* at p. 189, *l.* 24, to p. 190, *l.* 14, but the court denied that motion. *See id.* at p. 194, *l.* 5, to p. 195, *l.* 14 (sidebar). Assuming, as has the government, that this is the evidence and these are the incidents to which this part of Honken's motion for a new trial refers, the court will survey them briefly.

In the course of his testimony, which was riddled with objections, Mr. Gahn testified that he had conversations with Honken about drugs while they were both working at Wellborn in approximately 1989, including a conversation in which Honken asked Gahn if he knew anybody who could get rid of some cocaine for him, *id.* at p. 188, *ll.* 2–9, and that he had subsequently become involved in "business acquaintances" with both Honken and Nicholson in which he had delivered money and drugs between Nicholson and Honken prior to 1991. *Id.* at p. 191, *l.* 2, to p. 192, *l.* 12. In the course of explaining that he had been the one who introduced Nicholson to Honken, Mr. Gahn also testified that Honken had been fired from his job at Wellborn.

Honken moved to strike the testimony that he had been fired, which prompted an extended conference without the jury present. *Id.* at p. 195, *l.* 16, to p. 196, *l.* 3 (testimony and motion to strike); *id.* at p. 196, *l.* 4, to p. 204, *l.* 1 (conference outside the presence of the jury). During that conference, the court pointed out that it had sustained Honken's objection to testimony about some of the incidents of Honk-

en's drug activities prior to 1991, *see id.* at p. 197, *ll.* 13–19; *id.* at p. 200, *ll.* 17–22, but noted that drug activities within the scope of the 1993 indictment were probative of issues in this case. *See id.* at p. 199, *ll.* 20–22. The court ruled, further, that the prosecution was entitled to show the context in which the relationship between and among Mr. Gahn, Nicholson, and Honken arose. *Id.* at 203, *ll.* 15–16. At the end of this conference, Honken only requested a curative instruction that the jury should disregard testimony about Honken losing his job at Wellborn, and the court gave such a curative instruction. *Id.* at p. 203, *ll.* 7, to p. 205, *l.* 2.

Considerably later, on redirect examination, Mr. Gahn testified that Honken had made him very "nervous" on two occasions, once when he told Mr. Gahn to pay him for the cocaine he had used, and once when he came looking for Greg Nicholson shortly after Nicholson had visited Gahn. *Id.* at p. 225, *l.* 24, to p. 226, *l.* 6. In that portion of his testimony, however, Mr. Gahn also made no reference to Honken's use of cocaine. Although Mr. Gahn was recalled as a defense witness on October 6, 2004, he did not testify about any cocaine use by Honken at that time, either. *See* Trial Transcript, October 6, 2004, p. 2989, *l.* 7, to p. 2995, *l.* 19.

### b. Arguments of the parties

Honken contends that the court sustained his objections to Mr. Gahn's first attempts to blurt out information that Honken purportedly "used" cocaine on two occasions, but immediately thereafter, Mr. Gahn succeeded in stating that Honken had used cocaine on those occasions. Honken contends that the irreparable damage of the prosecution's misuse of evidence to show that he used cocaine was designed to appeal to the passions and prejudices of the jury, in defiance of the

court's initial ruling, and as such, required a mistrial and now requires a new trial.

The government, however, contends that evidence of Honken's cocaine *distribution* was admissible as intrinsic evidence of the conspiracy with which Honken was charged and also provided information about the context in which Honken, Gahn, and Nicholson became acquainted. The government contends that the evidence of uncharged cocaine distribution was inextricably intertwined with charged conduct, and was thus admissible without regard to Rule 404(b) of the Federal Rules of Evidence. In the alternative, the government contends that evidence of Honken's cocaine distribution before 1993 was admissible pursuant to Rule 404(b), because it was relevant to prove the context of the relationship between Honken, Gahn, and one of the murder victims, Greg Nicholson, and to prove that Honken intentionally entered into a conspiracy to distribute and manufacture methamphetamine. The government also contends that the evidence was not more prejudicial than probative, in the context of the crimes charged and other unchallenged evidence of Honken's drug trafficking. Finally, even if the evidence of Honken's cocaine distribution was improperly admitted, the government contends that the error was harmless in the context of all of the evidence against Honken.

### c. Analysis

Honken's motion for new trial on this ground is deeply flawed. Honken cites no portion of the transcript in support of his contentions that Mr. Gahn testified that Honken *used* cocaine. Moreover, the court has read and reread the transcript of Mr. Gahn's testimony, and can find no incident during Mr. Gahn's testimony matching Honken's description and, indeed, absolutely no reference by Mr. Gahn to Honken's *use* of cocaine. In fact, Mr. Gahn testified, "I didn't know Dustin to

use drugs. He had access to them, but I never seen him—in fact, I don't think I ever seen him drink alcohol, and I never saw him use drugs." Trial Transcript, Vol. 1, September 9, 2004, at p. 187, *ll.* 12–15. Thus, Honken's contention that the court admitted any testimony by Mr. Gahn that Honken *used* cocaine is simply wrong.

 The court also finds no "miscarriage of justice" in the admission of any of Mr. Gahn's actual testimony. *See* FED. R.CRIM.P. 33(a) (providing for a new trial "if the interest of justice so requires"); *Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a) to require a showing of a "miscarriage of justice"). There is absolutely no evidence that the government ever misused testimony from Mr. Gahn to appeal to the passions and prejudices of the jury, in defiance of any ruling by the court. To the extent that the court admitted evidence of Honken's drug dealing prior to 1993 to put in context the relationship between and among Honken, Gahn, and Nicholson, that evidence was plainly admissible. *See, e.g., United States v. Holliman*, 291 F.3d 498, 502 (8th Cir.2002) (evidence of a prior bad act may be admissible as intrinsic evidence to show the full context of the crime charged), *cert. denied*, 537 U.S. 1137, 123 S.Ct. 927, 154 L.Ed.2d 831 (2003); *United States v. Carroll*, 207 F.3d at 465, 468 (8th Cir.2000) (same). Moreover, the court sustained Honken's objections to some of Gahn's testimony about Honken's drug activity prior to 1991, which the court found was not probative to show the context of the relationship between Honken and Nicholson. Although Honken's counsel expressed concern during trial that there was a problem with the "cumulative effect" of Mr. Gahn's testimony about Honken's drug activities prior to 1993, even where the court had sustained objections to some of that testimony, the

court cannot find that Honken suffered any unfair prejudice from Mr. Gahn's testimony, where there was also voluminous evidence of Honken's drug activities before and after 1993.

 Finally, there was overwhelming evidence from multiple witnesses and exhibits concerning Honken's methamphetamine manufacturing and distribution. Thus, admitting testimony that Honken used or distributed cocaine would clearly be harmless error. *See Mack,* 343 F.3d at 935 (evidentiary rulings that are an abuse of discretion will not require reversal of the conviction if the error was harmless); *Crenshaw,* 359 F.3d at 1003–04 ("An evidentiary error is harmless 'if, after reviewing the entire record, we determine that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict.'") (quoting *Carroll,* 207 F.3d at 470).

Therefore, Honken's motion for new trial on this ground will also be denied.

### 4. Cumulative effect of erroneous evidentiary rulings

 Honken has asserted numerous allegedly erroneous evidentiary rulings. However, even if the court were to conclude that it abused its discretion in admitting all of the evidence to which Honken reiterates his challenges, the court would still conclude that, even in its totality, admission of the challenged evidence was harmless, because it had no influence, or at most, only slight influence, on the verdict, where there was overwhelming, unchallenged evidence of Honken's guilt on the charged offenses. *See Mack,* 343 F.3d at 935 (evidentiary rulings that are an abuse of discretion will not require reversal of the conviction if the error was harmless); *Crenshaw,* 359 F.3d at 1003–04 ("An evidentiary error is harmless 'if, after reviewing the entire record, we determine that

the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict.'") (quoting *Carroll,* 207 F.3d at 470). Therefore, Honken is not entitled to a new trial on the basis of the cumulative effect of all of the allegedly erroneous evidentiary rulings.

### 5. Alleged errors in "penalty phase" jury instructions

### a. Arguments of the parties

Honken contends that the court made two errors in its "penalty phase" jury instructions. First, he contends that the court erred by instructing the jury to weigh as an "aggravating factor" whichever "mental state" factor set forth in 21 U.S.C. § 848(n)(1) the jury found in the first stage of the "penalty phase." He asserts that this was error, because the "mental state" factors merely replicated the culpable mental states necessary to find the defendant eligible for the death penalty. Honken contends that telling the jury to weigh these factors again in their determination of what penalty to impose placed an impermissible "thumb" on the death side of the scale and led to an arbitrary and capricious imposition of death sentences on Honken, in violation of the Eighth Amendment to the United States Constitution. Second, Honken contends that the court erred in submitting, over his objection, the government's second "nonstatutory aggravating factor," obstruction of justice by eliminating witnesses. Honken asserts that this was error, because this "aggravating factor" merely reiterated the jury's finding on the merits of Counts 1 through 5, which charged "witness tampering." Honken contends that, at the time of the offenses in this case, the murder of a federal witness to prevent such witness's cooperation or testimony was not a capital offense. He argues that, because Con-

gress had determined that such an offense did not warrant imposition of the death penalty, it was improper to use such conduct as a "non-statutory aggravating factor" that might justify imposing the death penalty.

In response to Honken's first claim of error in the "penalty phase" jury instructions, the government points out that 21 U.S.C. § 848(k) unambiguously provides that the jury may weigh in its determination of what penalty to impose *all* aggravating factors, including the aggravating mental state factor in 21 U.S.C. § 848(n)(1) that the jury found as a prerequisite to further consideration of the death penalty. The government also points out that the Supreme Court has recognized that a "highly culpable mental state" is properly considered in a capital sentencing decision, and that several lower courts have rejected the argument that Honken now makes. Furthermore, the government contends that the court in this case repeatedly advised the jury that it was to make a qualitative, not a quantitative, determination of the aggravating and mitigating factors, weigh them all, and reminded the jurors that, regardless of the weighing of the factors, they were never required to impose the death penalty. Therefore, the government contends that there was no impermissible "thumb" on the death side of the scales. In response to Honken's second claim of error in the "penalty phase" jury instructions, the government contends that whether or not the defendant had obstructed justice by eliminating witnesses did narrow the class of individuals for whom the death penalty may be appropriate and individualized the consideration of the death penalty, thus satisfying constitutional standards. The government also contends that the death penalty was unavailable for the murder of witnesses only by virtue of the prohibition on *ex post facto* laws, but that Congress quite clearly contemplated the death pen-

alty for murdering witnesses. The government also contends that it relied on the nature of the murders, not a prior conviction for killing a witness, as the basis for this "non-statutory aggravating factor."

### b. Analysis

 *i. Improper weighing of mental state as an aggravating factor.* The court had previously rejected both of Honken's arguments concerning jury instructions in the course of the many conferences on and drafts of jury instructions used in this case. As the court explained at the time, the court was persuaded by *United States v. McCullah,* 76 F.3d 1087, 1108–10 (10th Cir.1996), *cert. denied,* 520 U.S. 1213, 117 S.Ct. 1699, 137 L.Ed.2d 825 (1997), that the § 848(n)(1) factors *can* be weighed at the final stage of the jury's "penalty phase" deliberations. In *McCullah,* the court rejected the defendant's contention, like Honken's here, that Congress did not intend that the § 848(n)(1) factors be weighed in the penalty selection process, because they are merely eligibility factors. *McCullah,* 76 F.3d at 1108. In *McCullah,* the court rejected this argument succinctly, noting that "[t]he clear language of the statute refutes this contention." *Id.; see also id.* at 1109 ("The plain language of § 848(k) clearly contemplates the weighing of (n)(1) factors as aggravating factors and is unambiguous as to this point."); *see also United States v. Nguyen,* 928 F.Supp. 1525, 1539–41 (D.Kan.1996) (comparing § 848(n)(1) "aggravating factors" with § 3593(a) "gateway" factors); *United States v. DesAnges,* 921 F.Supp. 349, 356–57 (W.D.Va.1996) (rejecting the argument that § 848(n)(1) factors improperly duplicate the *mens rea* for the underlying offense as well as the defendant's argument that it was improper to allow the jury to weigh the § 848(n)(1) factors in the determination of whether to impose the

death penalty). This court reaffirms its reliance on the reasoning in *McCullah*.

As this court also noted when Honken first raised this contention, one of the Supreme Court decisions on which he relies, *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), stands for the proposition that a "highly culpable mental state" is a proper consideration at the penalty phase in a capital case. *See Tison*, 481 U.S. at 157–58, 107 S.Ct. 1676 ("[A] highly culpable mental state ... may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result."). Moreover, as the government points out, the jurors were repeatedly reminded to weigh *all* aggravating factors unanimously found and any mitigating factor found by any juror in making the determination of what sentence to impose, and were specifically instructed that they were never required to impose the death penalty, regardless of a finding that the aggravating factors outweighed any mitigating factors.

Under the circumstances, the court does not believe that the jury instructions placed any impermissible "thumb" on the death side of the scale, and hence, there was no "miscarriage of justice" in instructions to the jury that permitted them to consider the § 848(n)(1) factor they found as an "eligibility" aggravating factor in their determination of what sentence to impose. *See* FED.R.CRIM.P. 33(a) (providing for a new trial "if the interest of justice so requires"); *Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a) to require a showing of a "miscarriage of justice").

*ii. Improper consideration of obstruction of justice as an aggravating factor.* Similarly, the court rejected during trial Honken's contention, now reiterated, that it was impermissible to submit the government's second "non-statutory aggravating factor," obstruction of justice by eliminating witnesses. The court now reaffirms its rejection of Honken's objections.

▅▅▅▅ As the court noted in its response to this contention during trial, the Eighth Circuit Court of Appeals has twice held that the prosecutor's authority under the Federal Death Penalty Act to define non-statutory aggravating factors is a constitutional delegation of Congress's power, because (1) the prosecutor's discretion is properly constrained by several factors listed below, and (2) the non-statutory factors do not make the defendant eligible for the death penalty, so that non-statutory aggravating factors do not alter the definition of the crime or increase the potential punishment. *United States v. Allen*, 247 F.3d 741, 758–59 (8th Cir.2001), *cert. granted and judgment vacated on other grounds*, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002); *United States v. Paul*, 217 F.3d 989, 1003 (8th Cir.2000). The court finds that such delegation in the death-penalty provisions of the Continuing Criminal Enterprise statute is likewise constitutional, as is the prosecutor's inclusion of obstruction of justice as a "non-statutory aggravating factor" here.

In *Allen*, the Eighth Circuit Court of Appeals identified the factors that "constrain" the prosecutor's discretion as the following:

A jury must find the existence of at least one statutory aggravating factor before it can even consider proposed nonstatutory factors, a prosecutor can only argue those nonstatutory aggravating factors for which the defendant has been given prior notice, a nonstatutory aggravating factor itself must conform with due process jurisprudence, and a district judge is required to screen out any irrelevant and unduly prejudicial information a prosecutor may try to introduce to the

jury in order to prove a nonstatutory aggravating factor.

*Allen,* 247 F.3d at 758–59 (citing *United States v. Jones,* 132 F.3d 232, 240 (5th Cir.1998), *aff'd,* 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999)). The court finds that these "constraints" are satisfied as to the non-statutory aggravating factor of obstruction of justice in this case, because Honken was given notice that obstruction of justice would be asserted as a "non-statutory aggravating factor," use of that factor conformed to due process, and no irrelevant or unduly prejudicial information was admitted in support of the factor.

Although Honken contends that congressional intent, and presumably, due process, were violated by consideration of such a "non-statutory aggravating factor," when obstruction of justice by tampering with witnesses was defined by 18 U.S.C. § 1512 as a *non-capital* offense, the court does not agree. First, the obstruction of justice factor was not unconstitutionally vague, where the nature of the obstruction in question was adequately defined in the pertinent instruction. *See Paul,* 217 F.3d at 1001. Second, numerous courts have held that obstruction of justice is a valid "non-statutory aggravating factor" in a capital case, particularly where that obstruction is related directly to the capital offense at issue. *See, e.g., United States v. Higgs,* 353 F.3d 281, 322–23 (4th Cir. 2003) (defendant's uncharged and unadjudicated offense of obstruction of justice was properly considered as a "non-statutory aggravating factor," because such conduct constituted "highly relevant aggravating circumstances which were properly submitted to the jury for its consideration in making the requisite individualized determination" of whether or not to impose the death penalty), *cert. denied,* —— U.S. ——, 125 S.Ct. 627, 160 L.Ed.2d 456 (2004); *United States v. Cisneros,* 363 F.Supp.2d 827, 842 (E.D.Va.2005) ("[O]b-

struction of justice with respect to the underlying offense is a proper non-statutory aggravating factor."); *United States v. Grande,* 353 F.Supp.2d 623, 641 (E.D.Va. 2005) ("obstruction of justice" as a "non-statutory aggravating factor" was not "unconstitutionally vague" or "far removed from the purpose of non-statutory aggravating factors," because "the language has a common sense core of meaning and because obstruction of justice with respect to the underlying offense has frequently been deemed a proper non-statutory aggravating factor," and the obstructive conduct in that case was "intimately tied to the underlying offense and is almost, if not equally, as serious"); *United States v. Friend,* 92 F.Supp.2d 534, 543–44 (E.D.Va. 2000) (threats to witnesses satisfied constitutional standards of relevance and heightened reliability to be considered as a non-statutory aggravating factor); *United States v. Cooper,* 91 F.Supp.2d 90, 108 (D.D.C.2000) (past criminal behavior, including obstruction of justice allegations, may be used as both aggravating factors in and of themselves and also as indicators of future dangerousness); *cf. United States v. Edelin,* 134 F.Supp.2d 59, 77 (D.D.C.2001) (the use of evidence of obstruction of justice by threatening witnesses related to the case was relevant to support non-statutory aggravating factors at sentencing, and was constitutionally permissible, even where obstruction of justice was not asserted as a separate non-statutory aggravating factor, because it allowed for individualized sentencing). Third, although the witness tampering charges on which Honken was also convicted were not capital offenses at the time that Honken committed them, inclusion of obstruction of justice in the form of witness tampering as a "non-statutory aggravating factor" did not alter the definition of the *capital* crimes with which Honken was charged and did not increase

the punishment for those *capital* crimes. *See Allen,* 247 F.3d at 759. This third point requires some further explanation.

Where commission of the charged *capital* crimes involved obstruction of justice, consideration of that obstruction of justice as a non-statutory aggravating factor "clearly directed the jury to the individual circumstances of the case and [that factor] therefore d[id] not offend the Constitution on the basis of being overbroad." *Id.* at 787 n. 21 (citing *Jones v. United States,* 527 U.S. 373, 401–02, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999), in which Justice Thomas, writing for four justices, observed, "We have not, however, specifically considered what it means for a [nonstatutory] factor to be overbroad when it is important only for selection purposes.... So long as [nonstatutory aggravating factors] are used to direct the jury to the individual circumstances of the case ... we do not think that they [are] overbroad in a way that offend[s] the Constitution."). Here, there was no violation of congressional intent as to the definition of witness tampering as a non-capital offense (at the time), and no *ex post facto* imposition of the death penalty for witness tampering in violation of 18 U.S.C. § 1512, because the death penalty was only considered by the jury *for the capital offenses* of "conspiracy murder" and "CCE murder" defined by 21 U.S.C. § 848(e)(1)(A), and the circumstances of witness tampering or obstruction of justice *in the commission of the capital offenses* were considered as non-statutory aggravating factors in the determination of the penalty for those *capital offenses.* This simply is not a case of using a prior conviction for a non-capital offense as an aggravating factor for determination of what penalty to impose for a capital offense, but a case in which the circumstances of the capital offense included conduct otherwise defined as a non-capital offense. *Compare United States v. Peoples,* 74 F.Supp.2d 930, 931–32

(W.D.Mo.1999) (rejecting non-capital prior offenses as aggravating factors where they were not expressly listed as prior offenses constituting aggravating factors for a capital offense under provisions of the Federal Death Penalty Act, 18 U.S.C. § 3592(c)).

In short, there was no "miscarriage of justice" in instructions to the jury that permitted them to consider obstruction of justice by witness tampering as a "non-statutory aggravating factor" in their determination of what sentence to impose for the capital offenses of "conspiracy murder" and "CCE murder." *See* FED.R.CRIM.P. 33(a) (providing for a new trial "if the interest of justice so requires"); *Campos,* 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a) to require a showing of a "miscarriage of justice").

Honken's motion for new trial on the basis of errors in "penalty phase" jury instructions will be denied.

### F. Alleged Insufficiency Of The Evidence

In a part of his post-trial motion that clearly seeks judgment of acquittal, and may only seek a new trial in the alternative, Honken contends that the government adduced insufficient evidence to convict him for *any* offense charged in the Indictment. Although Honken then specifically argues only the insufficiency of the evidence in support of the capital offenses, he asserts that he does not intend thereby to waive any objection to the sufficiency of the evidence to support any other charges.

### 1. Non-capital offenses

The court summarily denies Honken's motion for judgment of acquittal or new trial on the non-capital charges, on the basis of insufficiency of the evidence. For the reasons previously stated on the record, the court finds that there was overwhelming evidence to support the jury's guilty verdict on each of those charges.

### 2. Capital offenses

Honken devotes more attention to the sufficiency of the evidence on the capital offenses of "conspiracy murder" and "CCE murder." The court will, therefore, consider in more detail Honken's contentions that the evidence was insufficient to support his convictions on the charges of "conspiracy murder" and "CCE murder."

#### a. Alleged insufficiency of the circumstantial case

At the oral arguments on his motion for judgment of acquittal or new trial, Honken reasserted, if only in passing, the theme of his opening statement to the jury: that the government's case was entirely circumstantial, because no physical evidence linked Honken to the killings. He asked the court to consider this fact in weighing the sufficiency of the evidence supporting the capital offenses. The court will here respond only that "[s]ome circumstantial evidence is very strong, as when you find a trout in the milk." HENRY DAVID THOREAU, THE JOURNAL (from the entry for November 11, 1850) (reprinted in THE HEART OF THOREAU'S JOURNALS 40 (O. Shepard ed., Dover Pub.1961)). In this case, there were *many* "trout in the milk," making the overwhelming "smell" of the circumstantial evidence far more than sufficient to sustain Honken's convictions on the capital offenses.

#### b. Alleged insufficiency of the evidence on specific Counts

Honken also makes more specific challenges to the sufficiency of the evidence supporting the charges of "conspiracy murder" and "CCE murder." The court will consider these challenges in somewhat more detail.

#### i. Insufficiency of the evidence on the "conspiracy murder" counts. In support

of his challenge to the sufficiency of the evidence to support his convictions for "conspiracy murder," Honken contends that the government's evidence shows that, by the time of the killings that were allegedly committed while Honken was engaging in a drug-trafficking conspiracy, the conspiracy was already over. Honken contends that the evidence shows that the drug-trafficking conspiracy ended shortly after Honken, Nicholson, and others were arrested in March 1993. He contends that there may have been a separate conspiracy to manufacture methamphetamine in 1995 or 1996, but that the second conspiracy was not a continuation of the earlier conspiracy pertinent to the "conspiracy murder" charges, because it involved a new agreement among different people. While acknowledging that whether or not the government has proved a single conspiracy or multiple conspiracies is ordinarily a question of fact for the jury, Honken contends that there was simply no evidence in this case from which the jury could have found a single conspiracy continuing after March 1993. Thus, he contends that he must be acquitted of Counts 8 through 12.

The government disagrees vehemently, contending that it adduced overwhelming evidence of Honken's guilt of the "conspiracy murders" and, specifically, abundant evidence that Honken's drug conspiracy did not end with his arrest in 1993, but instead continued well after the murders at issue here, even if the conspiracy was temporarily slowed or driven into a period of dormancy by his arrest in 1993. Moreover, the government contends that, even if active attempts to manufacture and distribute methamphetamine ended with Honken's arrest in 1993, the murders were still in furtherance of the underlying conspiracy, which continued to exist into a concealment phase, which involved, *inter alia,* killing witnesses to Honken's drug-trafficking.

 As explained in more detail above, the test on a motion for judgment of acquittal is an objective one, "whether 'a reasonable fact finder could have found guilt beyond a reasonable doubt.'" *Pardue,* 983 F.2d at 847 (quoting *Garrett,* 948 F.2d at 476). The court finds that a reasonable fact finder in this case could easily have found guilt beyond a reasonable doubt, because of the overwhelming avalanche of evidence supporting Honken's conviction on the "conspiracy murder" charges. This is so, notwithstanding Honken's key contention, that the evidence shows that the underlying conspiracy ceased to exist after his arrest in March 1993, so that there were two or more conspiracies, not one, as the government alleges, during the period alleged in the "conspiracy murder" counts of the Indictment.

 As the Eighth Circuit Court of Appeals very recently explained, whether one or more conspiracies existed must be determined in "the totality of the circumstances, 'including the nature of the activities involved, the location where the alleged events of the conspiracy took place, the identity of the conspirators involved, and the time frame in which the acts occurred.'" *United States v. Ellerman,* 411 F.3d 941, 945 (8th Cir.2005) (quoting *United States v. McCarthy,* 97 F.3d 1562, 1571 (8th Cir.1996)). The circumstances may also distinguish between co-conspirators acting at a later time to keep drug-trafficking a secret, *i.e.,* a separate conspiracy to conceal the drug-trafficking crimes, and affirmatively attempting to conceal evidence of the drug-trafficking, as a continuing aspect of the drug-trafficking conspiracy. *United States v. Smith,* 32 F.3d 1291,

1294 (8th Cir.1994). Where the co-conspirators "'intended from the first to exert strenuous efforts to prevent discovery of the crime and of their involvement in it,'" those efforts, "taken contemporaneously with the drug transaction itself, were a part of the original conspiracy and may properly be considered in assessing the sufficiency of the evidence." *Id.* (quoting *United States v. Masters,* 924 F.2d 1362, 1368 (7th Cir.), *cert. denied,* 508 U.S. 906, 113 S.Ct. 2333, 124 L.Ed.2d 245 (1993)); *accord United States v. Manfre,* 368 F.3d 832, 839 (8th Cir.2004) ("'[E]fforts to conceal an ongoing conspiracy ... can further the conspiracy by assuring that the conspirators will not be revealed and the conspiracy brought to an end.'") (quoting *United States v. Phillips,* 219 F.3d 404, 419 (5th Cir.2000)); *United States v. Williams,* 87 F.3d 249, 254 (8th Cir.1996) ("A conspiracy is ongoing where 'acts of concealment were undertaken to preserve the conspiracy and foil attempts at detection.' [*United States v. Lewis,* 759 F.2d 1316, 1342 (8th Cir.), *cert. denied sub nom. Milburn v. United States,* 474 U.S. 994, 106 S.Ct. 406, 407, 88 L.Ed.2d 357 (1985).] Such a case generally exists where the conspiracy is a continuing arrangement with a series of objectives, and concealment is essential to and in furtherance of the survival of its operation."), *cert. denied,* 525 U.S. 850, 119 S.Ct. 124, 142 L.Ed.2d 100 (1998).

 The question of whether single or multiple conspiracies existed is a fact question for the jury. *Ellerman,* 411 F.3d at 945–46. At Honken's request, the court instructed the jury, consistent with prevailing case law, on the manner in which they were to make the necessary determination of whether single or multiple conspiracies existed.[13]

---

**13.** The pertinent portion of the instruction on "Nature Of The Conspiracies" stated the following:

> *Single or multiple conspiracies.* Each of the charges involving a "conspiracy" charges that the defendant was a member

In its resistance to this part of Honken's post-trial motion, the government has identified evidence that it argues demonstrates that there was a single, overarching conspiracy, including concealment efforts. The court cannot say, based on its own review of the evidence that no reasonable fact finder could have found that a single, overarching conspiracy charged in Counts 8 through 12 of the Indictment existed and that the killings were committed while Honken was engaging in that conspiracy. The court has reviewed both evidence cited by the government and other evidence, which in its totality shows nearly continuous manufacturing and distribution of methamphetamine, or attempts to do so, as well as attempts to conceal those activities, involving many of the same people. A reasonable fact finder could likewise have rejected Honken's efforts to separate or compartmentalize this evidence into separate conspiracies.

Therefore, Honken is not entitled to judgment of acquittal. *Pardue*, 983 F.2d at 847 (the test for a judgment of acquittal is "whether 'a reasonable fact finder could have found guilt beyond a reasonable doubt.'") (quoting *Garrett*, 948 F.2d at 476). Nor was there any "miscarriage of justice" in the jury's finding that the killings were committed while Honken was engaged in the charged conspiracy. *See* Fed.R.Crim.P. 33(a) (providing for a new trial "if the interest of justice so requires"); *Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a) to require a showing of a "miscarriage of justice"). Honken's motion for judgment of acquittal or new trial based on insufficiency of the evidence to support the "conspiracy murder" charges in Counts 8 through 12 will be denied.

***ii. Insufficiency of the evidence on the "CCE murder" counts.*** Honken also asserts that there was insufficient evidence to support his convictions on the "CCE murder" charges in Counts 9 through 17. In support of this contention, Honken not only reasserts his arguments concerning single and multiple conspiracies, which was refuted above, but also asserts that even if

of a single conspiracy to commit several offenses over several years. One of the issues that you must decide for each of these counts is whether there was only a single conspiracy or whether there were really two or more separate conspiracies, each involving some individuals to commit a certain crime or crimes. The prosecution must convince you beyond a reasonable doubt that the defendant was a member of the single conspiracy at issue in the particular count in question. If the prosecution fails to prove this requirement, then you must find the defendant not guilty of the "conspiracy" charge in question, even if you find that the defendant was a member of some other conspiracy. Proof that the defendant was a member of some other conspiracy is not enough to convict him of any of the charges in the Indictment involving a "conspiracy." On the other hand, proof that the defendant was a member of some other conspiracy would not prevent you from returning a guilty verdict on a charge involving a "conspiracy," if the prosecution has *also* proved that he was a member of the conspiracy charged in the particular Count of the Indictment in question.

A single conspiracy may have existed even if all the members did not know each other, or never met together, or did not know what roles all the other members played. A single conspiracy may also have existed even if different members joined at different times, or the membership of the group changed. Similarly, just because there were different subgroups operating in different places, or many different criminal acts committed over a long period of time, does not necessarily mean that there was more than one conspiracy. However, these are factors that you may consider in determining whether more than one conspiracy existed.

Final "Merits" Jury Instructions (docket no. 512), Final Jury Instruction No. 6–Nature Of The Conspiracies; *and compare* 8th Cir. Model 5.06G.

he had been a member of a CCE before his arrest in March 1993, that CCE had ended well before July 25, 1993. Somewhat more specifically, he argues that the government presented no evidence from which a reasonable jury could find beyond a reasonable doubt that Honken was a member of a CCE, because DeGeus and Johnson, who were two of the necessary five members of Honken's CCE, were not organized, supervised, or managed by Honken. Rather, he contends that the evidence shows only that DeGeus and Johnson were customers of Honken's drug-trafficking enterprise. He contends, further, that there is no evidence that Dustin Honken ever organized, supervised, or managed Jeff Honken. To the contrary, Dustin Honken argues that Jeff supervised him. Dustin Honken also argues that none of the other alleged members of the CCE could possibly be found to be the organizer, supervisor, or manager of the purported CCE, and some of the alleged members did not even know each other.

The government also rejects this argument. First, the government argues that the evidence certainly was sufficient to show that Honken organized the CCE, even if he did not manage it, because Jeff Honken and Tim Cutkomp testified that Honken decided to manufacture methamphetamine; how to do so, including what process and chemicals to use; how much methamphetamine to make; who should sell the methamphetamine and to whom, and for how much; and how to get methamphetamine to Nicholson and DeGeus so that they could distribute it. The government also contends that Honken organized the activities of his two main customers and dealers, Nicholson and DeGeus; recruited members of the enterprise, including Jeff Honken and Tim Cutkomp; and kept parts of the organization, such as manufacturers in Arizona and dealers in Iowa, insulated from each other. The government also contends that the evidence

shows that Johnson was not just a customer, but a dealer, who obtained her supply directly from Honken, bypassing DeGeus and Nicholson. The government also contends that Honken actually managed the enterprise, because he fronted drugs to his dealers and kept them in his debt; managed the activities by Johnson that facilitated the murders; and managed Cutkomp's activities in Arizona and trips to and from Iowa. Moreover, the government contends that the evidence shows that Dustin Honken managed Jeff Honken, because Dustin exploited Jeff's financial hardship to convince Jeff to invest in Dustin's drug-trafficking operation, then determined how much money Jeff needed to put into the enterprise, and controlled the flow of the proceeds back to Jeff.

 Honken is correct, of course, that to prove "CCE murder," the government must also prove the existence of the underlying CCE. *See, e.g., United States v. Honken,* 271 F.Supp.2d 1097, 1116 (N.D.Iowa 2003). Honken is also correct that, to prove the existence of the underlying CCE, the government was required to prove that Honken—as the only organizer, supervisor, or manager identified by the government—organized, supervised, or managed five or more other persons with whom he acted in concert. *See, e.g., United States v. Johnson,* 225 F.Supp.2d 1009, 1019–20 (N.D.Iowa 2002); 21 U.S.C. § 848(c). However, the court finds Honken's arguments about insufficiency of the evidence to support his convictions for "CCE murder" as unpersuasive as his arguments concerning "conspiracy murder."

 Where Honken goes astray is in his contention that the government cannot prove either sufficient members or Honken's leadership role over them. The court agrees with the government that more than sufficient evidence was presented at trial from which a reasonable fact finder

could find that Jeff Honken, Tim Cutkomp, Angela Johnson, Greg Nicholson, and Terry DeGeus were all members of the CCE, not merely customers of some drug-trafficking enterprise involving Honken, and that Honken organized, supervised, or managed each of them. *See Pardue,* 983 F.2d at 847 (the test for a judgment of acquittal is "whether 'a reasonable fact finder could have found guilt beyond a reasonable doubt.' ") (quoting *Garrett,* 948 F.2d at 476). As to Honken's alternative contention that he is entitled to a new trial, the court also finds that there would be no "miscarriage of justice" if Honken's conviction is allowed to stand on the evidence presented. *See* FED.R.CRIM.P. 33(a) (providing for a new trial "if the interest of justice so requires"); *Campos,* 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a) to require a showing of a "miscarriage of justice").

Therefore, Honken's motion for judgment of acquittal or new trial on the "CCE murder" charges in Counts 13 through 17 will also be denied.

### G. Alleged Jury Misconduct Revealed By Johnson Juror 16

In a separate post-trial motion, Honken alleges juror misconduct by a person identified as a "Honken juror" in the juror questionnaire of Prospective Johnson Juror 16. Consequently, he seeks the questionnaire of that Prospective Johnson Juror. The court concludes that this separate motion may properly be considered here, as the first of two "juror taint" issues asserted by Honken post-trial.

#### 1. Factual and procedural background

As the court explained in brief above, in the discussion of the background to the present ruling, the court notified the parties in this case that Prospective Johnson Juror 16 had indicated in a juror questionnaire that the juror had heard someone talk about the Honken case. Specifically, Prospective Juror 16 stated, "Yes. I believe this is the case that the cleaning guy @ work told he was on the jury (for Dustin Honken) & that the guy was guilty. I knew he should not be talking about the case so I just left the room." Honken initially filed an unresisted motion to obtain the questionnaire of the prospective juror in *Johnson.* *See* Defendant's May 2, 2005, Unresisted Application To Obtain Juror Questionnaire Of Potential Juror # 16 (docket no. 655). However, the court ordered further briefing, and in a separate order, filed a week later, required the parties to address the impact of the recent decision of the Eighth Circuit Court of Appeals in *United States v. Gianakos,* 404 F.3d 1065 (8th Cir.2005). When Honken filed no timely brief in response to the court's orders, the court denied Honken's request for the juror questionnaire by order dated June 16, 2005, on the alternative grounds that Honken had waived the issue, Honken had failed to comply with court orders for briefing in support of his motion, and his motion failed on the merits. When Honken claimed that his failure to respond to the orders for briefing was inadvertent, the court granted Honken leave to brief the merits of the issue as well as the merits of his motion to reconsider the June 16, 2005, ruling.

#### 2. Arguments of the parties

In support of his request for reconsideration, Honken asserts that counsel responsible for litigating the juror questionnaire issue assigned the task of briefing the issue to a law clerk. However, the law clerk subsequently graduated from law school, prepared to take the Iowa bar, became very ill, and had to take several weeks off work. Consequently, counsel claims that he believed that the brief was filed, when inadvertently, it was not. Honken also contends that the court has

the inherent authority to reconsider its prior rulings, *inter alia*, to prevent manifest injustice. He contends that there would be a manifest injustice if he is not permitted to review the juror questionnaire, or at a minimum, to argue the merits of obtaining the juror questionnaire, and that this potential injustice outweighs any prejudice arising from his untimely briefing of the underlying issue of juror misconduct.

As to the merits of the juror misconduct issue, Honken relies on the dissenting opinion by Judge Bright in *Gianakos* to argue that the court has a duty to investigate serious, credible allegations of juror misconduct. He then asserts that there will be a miscarriage of justice if he was subjected to a juror's premature determination on the merits, particularly if he is not allowed to determine the context of the juror's comment and foreclosed from investigating the extent of the juror's misconduct. He also contends that there is no basis for assuming that the jurors in his case followed instructions not to engage in premature deliberations when he has elsewhere cited evidence that those jurors failed to follow the court's admonitions.

In response to Honken's argument on the merits, the government contends that the reasoning of the court's decision denying Honken relief on the merits is sound, where there is no basis for concluding that the juror to whom Prospective Johnson Juror 16 referred based any belief that Honken was guilty on anything other than the evidence presented in Honken's trial. The government contends that Honken's entire argument is speculative, at best. The government also contends that its review of the questionnaires of the Honken jurors has not revealed any juror who could even plausibly match the description given by Prospective Johnson Juror 16. The government takes no position on whether or not Honken has shown grounds

for reconsideration of the court's June 16, 2005, ruling.

### 3. Analysis

■ The court has no doubt that it has the inherent authority to reconsider, in its discretion, its ruling on the Prospective Johnson Juror 16 issue, where the interest of justice would be served, even though no rule or statute expressly permits such reconsideration. *See, e.g., United States v. LoRusso,* 695 F.2d 45, 53 (2d Cir.1982) ("[W]hether the case *sub judice* be civil or criminal[,] so long as the district court has jurisdiction over the case, it possesses inherent power over interlocutory orders, and can reconsider them when it is consonant with justice to do so.") (internal quotation marks omitted), *cert. denied,* 460 U.S. 1070, 103 S.Ct. 1525, 75 L.Ed.2d 948 (1983); *accord United States v. Aguirre,* 214 F.3d 1122, 1124 (9th Cir.2000) ("[D]istrict courts generally have 'inherent authority' to decide motions for reconsideration and rehearing of orders in criminal proceedings," but 18 U.S.C. § 3582 expressly limits the court's authority to reconsider sentencing decisions), *cert. denied,* 531 U.S. 970, 121 S.Ct. 408, 148 L.Ed.2d 315 (2000); *United States v. Barragan–Mendoza,* 174 F.3d 1024, 1028 (9th Cir.1999) ("We agree that generally district courts do have 'inherent authority' to decide motions for reconsideration or rehearing of orders in criminal proceedings, even when there is no statute authorizing such motions."); *United States v. Breit,* 754 F.2d 526, 530 (4th Cir.1985) ("The general rule at common law in both civil and criminal cases was that a court could modify, vacate, or set aside orders previously entered by that court through mistake or inadvertence provided, however, such reconsideration occurred in the term of court during which the orders were made. A more recent interpretation of this general common-law rule in the crimi-

nal context provides that despite the non-existence of a specific rule in the Federal Rules of Criminal Procedure, a district court has the inherent power, and thus jurisdiction, to reconsider interlocutory orders prior to entry of judgment on such orders.") (citations omitted).

■ While Honken focuses on the supposed "injustice" of refusing to reconsider the June 16, 2005, order, the court believes that both "justice" and the court's discretion to reconsider interlocutory orders permit the court to impose upon defense counsel the obligation to provide some reasonably adequate explanation for the failure to brief the issues involved as directed by prior court order. *Cf.* FED.R.CIV.P. 60(b) (a party may seek relief from an order for reasons including "mistake, inadvertence, surprise, or excusable neglect"). Here, Honken has provided no such reasonably adequate explanation. The court entered two separate orders, a week apart, requiring briefing of the issues involved in Honken's motion to obtain the juror questionnaire. Delegation of the briefing to a law clerk may have been permissible, and the law clerk's subsequent problems might have constituted "inadvertence" or "excusable neglect" for the failure to file the brief *had the law clerk actually been responsible for the filing of the document in question.* However, the law clerk clearly had no independent authority to file anything in this court and the assigning attorney, who was the only one who could *actually be responsible,* failed to follow up on the filing of a pleading that necessarily required the assigning attorney's review and signature. The court simply finds no adequate explanation for the failure *of counsel* to file a timely response to the court's orders for briefing.

■ Moreover, Honken's belated briefs seeking relief from the June 16, 2005, order on the grounds of "justice" and the "merits" are simply not persuasive. As the court explained in its June 16, 2005, ruling, in *United States v. Gianakos,* 404 F.3d 1065 (8th Cir.2005), the defendant contended that the trial court erred by not permitting further investigation and by not granting relief after an incident in which one juror allegedly silently mouthed to another juror that the defendant was guilty while the government was still presenting its evidence. *Gianakos,* 404 F.3d at 1073. The court in *Gianakos* found that the trial court had acted within its broad discretion in finding that the juror's alleged misconduct was insufficient to merit further investigation, where there was no reason to doubt that the jury based its ultimate decision in the defendant's case only on evidence formally presented at trial. *Id.* at 1074. This was so, the appellate court concluded, because the jury had been instructed after the incident was brought to the court's attention not to engage in premature deliberations, and the trial court was in the best position to assess the effectiveness of such a cautionary instruction. *Id.* The court held, further, that the defendant's right to a fair trial had not been violated by the trial court's failure to remove the juror who had mouthed the comment, because the communication was not necessarily prejudicial to the defendant. The court found that there was no evidence that the juror held any prior bias against the defendant, the comment did not convey any extrajudicial information, and there is nothing wrong with trial jurors being influenced by testimony presented during the trial. *Id.* at 1074–75.

Here, *assuming that the person Prospective Johnson Juror 16 overheard was actually a trial juror in Honken's case,* the report of a potential juror in a companion case that the potential juror had heard someone who was purportedly a juror in Honken's case state that Honken was guilty also does not warrant further investigation. Here, as in *Gianakos,* the pur-

ported comment does not suggest that the juror in Honken's case held any prior bias against Honken, the comment did not indicate that the juror in Honken's case had or had acted upon any extrajudicial information, and there was nothing wrong with the juror in Honken's case being influenced by the evidence presented during Honken's trial. *Cf. id.* Furthermore, even if the purported comments of the Honken juror suggested that the Honken juror had engaged in premature deliberations about Honken's guilt, there is no reason to doubt that the jury based its ultimate decision in Honken's case only on evidence formally presented at trial. *Id.* at 1074. Honken's jury, like the jury in *Gianakos,* was repeatedly admonished to decide the case based solely on the evidence presented and to wait to make a determination about Honken's guilt or innocence until all of the evidence had been presented and the members of the jury had had the opportunity to discuss the evidence among themselves. *Cf. id.* (the trial judge reminded the jurors not to engage in premature deliberations). These circumstances simply do not warrant any further investigation. *Cf. id.* Additionally, there was overwhelming evidence of Honken's guilt, and not a single juror indicated any "residual doubt" about Honken's guilt. Under such circumstances, there is no reason to believe that, even if the person identified by Prospective Johnson Juror 16 was a Honken trial juror, the trial juror based his decision on anything other than the overwhelming evidence against Honken. Justice simply will not be served by further investigation into the matter.

Therefore, the court denies Honken's June 28, 2005, request for reconsideration (docket no. 685), and reaffirms its denial of Honken's May 2, 2005, Unresisted Application To Obtain Juror Questionnaire Of Potential Juror # 16 (docket no. 655).

### H. Alleged Jury "Taint" Relating To Honken Juror 523

The court comes, at last, to the issue that appears to be Honken's primary ground for a new trial, because it is not only the one to which he has addressed the most attention in his post-trial briefing, but the only one to which he devoted any significant attention in his oral arguments on his post-trial motion for judgment of acquittal or new trial. That issue is an allegation that his jury was "tainted," which focuses on circumstances brought to the court's attention by Juror 523. The court will begin its analysis of the "jury taint" issue with a review, in some detail, of the rather complex factual background to that issue.

### 1. Factual background

### a. Proceedings on October 21, 2004

As explained above, the "penalty phase" of Honken's trial was submitted to the jury before noon on October 21, 2004. The jurors soon thereafter notified the court that they had chosen to end their "penalty phase" deliberations early that day and that they would not be deliberating on Friday, October 22, 2004.[14] After consultation with the parties, the court provided the jurors with copies of Supplemental Instruction A, concerning conduct of jurors, which reiterated that, if the jurors left before reaching a verdict, they were not to talk about, read about, or research anything about the case, and that they were to report to the court if anyone attempted to talk with them about the case.[15]

---

**14.** Honken's trial did not ordinarily run on Fridays, so several jurors opted to return to work on those days, as well as other days when trial was not held or ended early. Therefore, the jury's decision not to deliberate on Friday, October 22, 2004, was not a break from the routine established during trial.

**15.** The text of Supplemental Instruction A, in its entirety, was as follows:

Before the jurors were escorted back to their dispersal site, one of the jurors, Juror 523, asked a Deputy Clerk of Court for an excuse from work for the remainder of the day and the following day, even though the jury had voted not to deliberate at those times, because she alleged that her boss had been making inappropriate comments to her about the trial. The Deputy Clerk brought the matter to the attention of the court's secretary, and the court's secretary, in turn, notified the court. The undersigned told the secretary not to tell him anything further, but to reassemble the lawyers, who were in the process of leaving the courthouse, for an immediate hearing.

At the hearing, which followed shortly, the court's secretary represented to the court and the parties that she had been told by the Deputy Clerk responsible for dealing with jurors that a juror had asked for an excuse from work for the next day, because her boss had purportedly said two things to her, "guilty" and "fry him." The court then asked the Deputy Clerk to explain what had occurred. The Deputy Clerk said that she had been contacted by the juror for an excuse from work, because the juror said that her boss was walking past her desk and saying things like "killer, killer, killer," or "fry him, fry him, fry him," in a kind of whisper. The Deputy Clerk explained that the juror did not

want to make a big deal of it, and did not want the matter broadcast to the papers, but did want an excuse from work. The Deputy Clerk added that the juror became teary-eyed and asked, "Can you come through for me on this one?" The Deputy Clerk then notified the court's secretary of the issue.

After considerable discussion with the parties concerning the appropriate procedures to use and the pertinent questions to ask, the court questioned Juror 523, who had been identified as the juror requesting the excuse from work, in a hearing closed to the public. In response to the court's inquiry about what the situation was, Juror 523 stated the following:

> I have a boss at work that likes to make comments as he walks by my desk, and I've put up with him a few days now, and he works on Friday with me, and he'll walk by and say things like "guilty, guilty, guilty," and "when are you gonna burn him" and other comments that I would just like not to have to listen to. I would love to come in and do my job. And he's the only one that makes the comments. Nobody else talks to me about it. And he doesn't really stop and talk to me about it. He just says it as he's walking by. But the comments are still made, and I just don't want to listen to him.

> If you leave today, or any other day, without reaching a verdict, please remember the following:
>
> *First*, except during deliberations, do not talk with anyone about this case, or about anyone involved with it, until you have been discharged as jurors.
>
> *Second*, do not let anyone tell you anything about the case, or about anyone involved with it, until your verdict has been accepted by me. If someone should try to talk to you about the case before you are discharged, please report it to me.
>
> *Third*, do not read any local newspaper, and do not read any news stories or articles

> about the case, or about anyone involved with it, in any national newspaper. Also, do not listen to any local radio or television news programs, and do not listen to any radio or television news reports about the case, or about anyone involved with it, on a national news program.
>
> *Fourth*, do not do any research—on the Internet, in libraries, in the newspapers, or in any other way—or make any investigation about this case on your own. You must decide this case based on the evidence presented in court.

Order, October 25, 2004 (docket no. 534), Supplemental Instruction A.

Trial Transcript, October 21, 2004, p. 3967, *ll.* 10–19. Juror 523 identified her "boss" more specifically as "the top dog" and the "chief executive officer" of the company for which she worked. *Id.* at p. 3967, *l.* 25 to p. 3968, *l.* 3. The court then attempted to clarify when the "boss" had made the comments:

> THE COURT: Okay. Now, I need to know a few more things. When did your boss first make a comment to you?
>
> JUROR 523: Monday.
>
> THE COURT: Would that be Monday of this week?
>
> JUROR 523: Yeah. He said the "guilty, guilty, guilty" before I even started my service. And then he said it a few more times just in passing by, but then the other comment he made just Monday.

*Id.* at p. 3968, *ll.* 17–24.

When pressed for a more specific indication of the time of the first comment, Juror 523 explained that she first heard a comment from her boss "[r]ight after I found out I was picked," apparently referring to qualifying for the "qualified pool" of 75 jurors. *Id.* at p. 3969, *l.* 2 to p. 3971, *l.* 1. She opined that she believed that "they," meaning the company hierarchy, were trying all along to tell her to get out of jury service, but that she "wasn't going to let that stop [her]." *Id.* at 3969, *ll.* 16–20. As an example of the basis for her belief, she said that her boss "[t]old me I should have stood up in court and said hang him." *Id.* at 3970, *ll.* 5–6.

The court then questioned Juror 523 about what other comments her boss had made, in the following exchange:

> THE COURT: Okay. So then you come back on the big day where we have 76 or so jurors here, and you wind up getting selected.
>
> JUROR 523: Uh-huh.
>
> THE COURT: And then that date would have been [September 8].

* * *

> THE COURT: Okay. And then on that day you would have learned that you were picked as a juror, right?
>
> JUROR 523: Uh-huh.
>
> THE COURT: Okay. Then when was the next comment made by your boss if you can recall?
>
> JUROR 523: You know, he said the "guilty, guilty, guilty" in there at one point, but I'm not—and he said it several times, but I'm not—you know, I just kind of blew it off and ignored him. No comment was made back to me. So I don't remember when.
>
> THE COURT: Okay. Between when you started on or about September 7 [sic; September 8] and this past Monday, how often did your boss make any comments to you about this case?
>
> JUROR 523: At least twice.
>
> THE COURT: And do you remember approximately when they were in that time period?
>
> JUROR 523: I can say one was on Monday. He wasn't there on Tuesday when I went to work.
>
> THE COURT: One was on Monday of this week?
>
> JUROR 523: Yes. That's when he asked me when I was going to fry him, how long's it gonna take? And I just ignored him.
>
> THE COURT: You didn't respond in any way?
>
> JUROR 523: Not at all.
>
> THE COURT: Did you ever respond in any way to any of the comments your boss made?
>
> JUROR 523: Nope. He does it as he's walking by my desk to the bathroom, so I just ignore him. Most of them will say to me—most of the guys will say to him, You can't make any comments to her and—but he still does.

THE COURT: Okay. Now, are there any other comments that your boss made to you other than what you've told us about?

JUROR 523: No.

*Id.* at p. 3971, *l.* 5, to p. 3973, *l.* 3. Juror 523 was then excused to the jury room while the court consulted with the parties.

The parties and the court agreed not to question the juror further at that time, but agreed that she should be recalled for further questioning the following day. Juror 523 was then notified that some members of the media had been present prior to her questioning during the discussion of the issue, so that there might be some media coverage of the matter, but that she was still subject to the court's admonitions not to listen to any news reports about the case, and that she would be recalled the following day. *Id.* at p. 3977, *l.* 10, to p. 3979, *l.* 12. The court agreed to meet with the parties the following morning.

### b. Proceedings on October 22, 2004

The court held a further hearing on October 22, 2004, on the matter, including some further questioning of Juror 523. When Juror 523 returned to the courtroom for further questioning, the primary focus was what, if anything, she had said to other jurors about her boss's comments. Because this issue might be key to disposition of Honken's motion, the court will provide the pertinent exchanges in their entirety:

THE COURT: At any time did you tell any other jurors, including any alternate jurors, about the comments your boss made to you or mention in passing that comments of any kind had been made to you by your boss?

JUROR 523: Yesterday I—I voiced concern about not meeting today because I said that, you know, it's hard for me to go back to work. And a lot of the other jurors, they don't go back to work.

You know, you've got a lot that drive in or whatever. They go back to the motel, and they can do what they want, go to a movie. But a couple of us, three of us, have to go back to work. So my concern was I want to get this done. I want to get my life back. So I said to 'em—I said to 'em yesterday that yeah, he had made comments about the "guilty, guilty, guilty." So yes, I did say that to them, so they were aware of it. But, you know, we were—we voted, and I was in a minority. So we didn't get to deliberate today.

THE COURT: Okay.

JUROR 523: So I'm frustrated by this because they don't—you know, like when we get off at two, my boss has told me, It's my time now; you get to work. And so, you know, you come in here, and you work hard all morning, and then you have to shut this off, and then you have to turn another gear and go back to work and turn that on. And it is—it's getting more difficult as the trial goes on which is why I asked not to go to work today because it just is. I mean, I want to get this done and over with, and I really wish we would have deliberated today.

THE COURT: Now, what exactly do you recall telling the other jurors?

JUROR 523: Just that my boss had said that and that—you know, that he's made comments walking by my desk. That's—that's—I think that's all I said.

THE COURT: Now, was this to the entire group of jurors?

JUROR 523: I don't think so. I think the first time I said it was in the van going in or going back on one of the times when we got off like at two is when I said it the first time, that it's really tough and that most of those guys don't go back to work, and I made the comment that they just don't realize how

tough it is to go back, you know, when you have a boss that says things. I'm not even sure if I said that at that time.

THE COURT: Okay. And do you remember when that first time might have been?

JUROR 523: Probably in the last week.

THE COURT: Can you think real hard about that? Was it before the verdict on the merits of the case?

JUROR 523: No.

THE COURT: Was it after the verdict on the merits case?

JUROR 523: It was after that and while we were doing this.

THE COURT: When you say this, you mean the penalty phase?

JUROR 523: Yes.

THE COURT: Are you sure about that?

JUROR 523: I think it was, but, you know, this is really nervous—making me nervous, I mean. I don't remember.

THE COURT: And let's—I just want to try and jog your memory a little bit. In that first time in the van, do you recall how many jurors were with you?

JUROR 523: Six.

THE COURT: And can you recall as precisely as you can recollect what it is you said?

JUROR 523: I just said—I'm positive that I said it's tough going back to work because it's hard to turn this off and turn on your gears for work. And I'm not even gonna say a hundred percent sure that I said to them things that he had said. I'm not. I'm not a hundred percent sure I said it in there.

THE COURT: In the van.

JUROR 523: Yeah.

THE COURT: Okay.

JUROR 523: I know I voiced my concern about how easy it is for those guys to just go and go—go home, you know, but I don't have that opportunity.

THE COURT: And now yesterday why don't you try and recall for us as precisely as you can what it is that you said yesterday.

JUROR 523: Well, yesterday—and I'm not even sure if I said what he said. I just kind of commented that my boss can be a jerk and that it isn't as easy for me just to go back to work and be there all day. If I could just go to work and do my job, it'd be great. And that was when they said, well, then, maybe you should say something to Suzanne [the Deputy Clerk] so . . . . [ellipses in the original].

THE COURT: Now, was that in front of the entire group of jurors?

JUROR 523: No. There was four—three of us, three others.

THE COURT: Had some already left for the day?

JUROR 523: No. We were all down there. But we—you know, we had talked—we discussed about doing the verdict—or doing—

THE COURT: Well, I don't want to get into actually what you discussed.

JUROR 523: Well, but we discussed whether we were going to meet today. That's all I'm going to say.

THE COURT: Okay.

JUROR 523: We were discussing that, and then, you know, a few people voiced their reasons why they didn't want to, and then a few people voiced why they wanted to, and those that didn't won out. So then we went on and deliberated.

Then we were finishing for the day, and we were out in the hallway waiting for the vans, and I had just kinda said, you know, it's really gonna be tough going back to work, and a couple others

voiced the same thing. And so it was just in that group outside the bathroom in the hallway there. So it wasn't the whole jury.

THE COURT: And do you recall what you said to that smaller group of jurors?

JUROR 523: Just that I really didn't want to go to work today, that it's just tough meeting the public and to talk to people. It just—it's getting tougher and tougher. And two others said the same thing.

THE COURT: And do you have a recollection of whether you mentioned your boss's comments?

JUROR 523: I don't. I don't think I said anything about 'em yesterday.

Trial Transcript, October 22, 2004, p. 4057, l. 4, to p. 4061, l. 21.

The parties were then offered the opportunity to ask any follow-up questions. The government availed itself of that opportunity by asking if Juror 523 knew the numbers of the jurors she had spoken with the day before, when she made her comments in the hallway, and Juror 523 identified Jurors 902 and 38. *Id.* at p. 4061, l. 24, to p. 4062, l. 11. The prosecutor then asked if Juror 523 ever recalled at any point passing on to any of the other jurors the comments that her boss had made to her, to which Juror 523 responded as follows:

JUROR 523: You know, I might have said it, but I don't recall. I—I—I might have said it in the van. I just—I don't recall saying it in front of the whole group. You know, most of the time I sat in the other room all by myself so— or with just a few of them. I didn't sit with the main group. So I didn't really socialize with the whole group. Kind of there was five of us in one room, and the majority of them were in the other room. So I didn't really talk with them all.

*Id.* at p. 4062, *ll.* 17–24. None of Honken's defense lawyers asked Juror 523 any follow-up questions. After some discussion with counsel, Juror 523 was advised that she was not discharged, because she might be recalled for further questioning, but that she would not deliberate further in the case. Juror 523 was instructed to respond to any questions about the case by saying that she could not talk about it.

The parties and court also agreed that the remaining jurors and alternates would be questioned individually concerning what, if anything, they had heard about Juror 523's boss's comments, before they resumed their deliberations on October 25, 2004.

#### c. Proceedings on October 25, 2004

*i. Instructions to trial jurors.* The next step in the investigation of the alleged jury-tampering and misconduct issue was to interview the other jurors and alternates when they returned on October 25, 2004. Between October 22, 2004, and October 25, 2004, the court provided the parties, for their comment, with proposed supplemental instructions for the jurors prohibiting further deliberations and advising them of the procedures that would be used to investigate the matters raised by Juror 523. Thus, when the trial jurors were picked up at the collection point, the Marshal's Deputies provided them with Supplemental Instruction B from the court, which stated the following:

You are instructed not to continue your deliberations this morning until such time as I inform you that you may do so. You are not to discuss this instruction or anything else about this case with anyone, including other jurors, or to speculate on the reasons for this instruction. We will be bringing you up to the courtroom for further instructions

shortly after your arrival at the courthouse.

Order, October 25, 2004 (docket no. 534), Supplemental Instruction B—Deliberations. Upon their arrival at the courthouse, before they were allowed to begin any deliberations, the trial jurors were brought into the courtroom as a group, and the court read them Supplemental Instruction C, which stated the following:

> It has become necessary for me to interview each of you individually, in turn, here in the courtroom. While you are waiting for your individual interview, you are not to discuss anything about this case or your deliberations with anyone, including other jurors. You are also not to speculate on the reasons for individual interviews. After you have been interviewed individually, you are not to disclose to other jurors or anyone else the questions asked of you or your answers to those questions.

*Id.*, Supplemental Instruction C–Special Conduct Instruction.

*ii. Questioning of trial jurors.* Each of the jurors was then brought to the courtroom for individual questioning. Each juror was asked, at a minimum, the following questions:

> (1) At any time, did Juror 523 tell you or did you hear her tell any other juror or anyone else about any comments her boss may have made to her about this case, including any statements about what the outcome should be?
>
> (2) Since you began your penalty phase deliberations, have you been exposed to any media accounts of this case?
>
> (3) Since you began your penalty phase deliberations, have you heard any non-juror express an opinion about the appropriate punishment of the defendant?

Follow-up questions were asked if necessary, based on a juror's answer to one or more of these questions. The follow-up questions included such matters as inquiries about the nature of the comment from Juror 523 that the juror had heard or the nature of the media report or comment that the juror had heard or read. Almost without fail, each juror who answered yes to one or more of the primary questions was asked whether the report or comment would affect the juror's ability to be fair and impartial in the "penalty phase" deliberations.[16]

Review of the trial transcript for October 25, 2004, reveals that only one trial juror, Juror 857, professed no knowledge of Juror 523 telling anyone about comments made by her boss. Of the other ten jurors, Jurors 902, 204, 636, 855, 806, 38, 646, and 963, could not recall what the boss's comments had purportedly been, and several of these jurors (specifically, Jurors 902, 636, 855, 38, and 646) thought that the boss had been giving Juror 523 a "hard time," or words to that effect, about serving on the jury, rather than about the outcome of the trial. Juror 646 also shared Juror 523's view that it was hard to return to work. Of the other jurors who were aware that Juror 523's boss had made comments to her about the case itself, Jurors 204 and 806 did not recall the nature of the comments, and Juror 963 understood that the comments had made Juror 523 "uncomfortable," but did not know what the nature of the comments was.

Only two jurors remembered specific comments, Jurors 513 and 498. Juror 513 stated that she first heard Juror 523 state that her boss had been making comments to her on October 21, 2004, and that the comments from the boss were "remarks such as 'fry him' and stuff," but Juror 513

---

**16.** Juror 902 was not asked this question.

could not recall any other specific comments. Trial Transcript, October 25, 2004, at p. 4113, *ll.* 8–9. Trial Juror 498 recalled that Juror 523 said on October 21, 2004, that her boss was making comments when he walked by her desk. Although Juror 498 initially could not recall what the boss's comments reportedly were, Juror 498 later stated, "I think she said like 'hang him' or something like that or 'guilty, guilty, guilty.' " *Id.* at p. 4132, *ll.* 2–7.

With one exception, no trial juror identified an incident prior to October 21, 2004, in which Juror 523 had mentioned comments by her boss. That exception was Juror 855, who indicated that Juror 523 had said, once or twice a week beginning two or three weeks after the start of trial, that her boss was giving her a hard time. *Id.* at p. 4110, *l.* 11, to p. 4111, *l.* 12. Also, almost all of the jurors who were asked specifically to identify when on October 21, 2004, they had heard Juror 523's comments about her boss stated that it had been after the end of their deliberations for the day, while they were waiting for transportation back to the dispersal point. Juror 513, however, stated a belief that Juror 523's comments had been made about half an hour before deliberations ended for the day. *Id.* at p. 4116, *ll.* 4–15. All of the jurors who had heard the comments confirmed that they were not made to the entire group of jurors. No juror could identify specifically any other jurors who might have been present when Juror 523 stated that her boss was making comments, although all thought that other jurors were present when they heard Juror 523 mention that her boss was making comments.

Every single juror who was aware that Juror 523 said that her boss was making comments stated that nothing about those comments would affect that juror's ability to be fair and impartial in the "penalty phase" deliberations.

Most of the trial jurors indicated that they had not seen any media reports and had not been subjected to comments by non-jurors about the case. The exception was Juror 204, who said that people at the juror's place of work had made references to news reports about what the jurors had eaten and when they had quit deliberations for the day. However, Juror 204 had responded with a request that they not talk about the case, and averred that such comments would have no effect on that juror's ability to be fair and impartial. *Id.* at p. 4107, *ll.* 1–7.

After each trial juror was questioned, he or she was sent to a different room from jurors who had not yet been questioned. After all of the trial jurors were questioned, the court brought them all back to the courtroom and again cautioned them not to conduct any deliberations until the court had instructed them on what would happen next.

***iii. Instruction to alternate jurors.*** Later in the morning, after the questioning of the trial jurors had concluded, the alternate jurors arrived. The alternate jurors, who were placed in a separate room after their arrival at the courthouse, were also given a special instruction, Supplemental Instruction E, which stated the following:

> We will be bringing you up to the courtroom for further instructions shortly after your arrival at the courthouse. You are not to discuss this instruction or anything else about this case with anyone, including other jurors, or speculate on the reasons for this instruction.

*Id.,* Supplemental Instruction E—Special Instruction For Alternate Jurors. The three remaining alternate jurors were then brought to the courtroom in turn for individual questioning.

#### iv. *Questioning of alternate jurors.*

Each alternate juror was asked the same three questions put to the trial jurors, as well as any follow-up questions, where the court and parties deemed such questions necessary. Alternate Juror 425 answered no to all three of the key questions and was not asked any follow-up questions. Alternate Juror 280 had not heard Juror 523 mention comments by her boss, but had heard "indirect" comments about the case from non-jurors, consisting of comments from people who knew that the juror was serving in the case suggesting that the juror might be "going back to Sioux City," and what the juror described as "insinuations," such as "we'll get him now," from "hometown people" after the "merits" verdict. *Id.* at p. 4140, *l.* 17, to p. 4142, *l.* 20. However, Alternate Juror 280 stated that such comments would not have any effect on the juror's ability to be fair and impartial in the "penalty phase" deliberations, if the juror was required to serve as a trial juror. *Id.* at p. 4142, *l.* 23, to p. 4143, *l.* 8. Alternate Juror 914 recalled no news reports or comments from non-jurors, but did recall that, probably a few weeks earlier, Juror 523 had mentioned that her boss was making comments. Alternate Juror 914 did not recall what those comments were, or if the comments were mentioned before or after the "merits" verdict. Alternate Juror 914 likewise asserted that the comments would have no effect on the juror's ability to be fair and impartial in "penalty phase" deliberations, if required to serve as a trial juror. *Id.* at p. 4137, *l.* 2, to p. 4140, *l.* 3.

#### v. *Post-questioning proceedings.*

After the questioning of jurors and alternates concluded, the court reserved ruling on Honken's motion for mistrial based on alleged jury-tampering and misconduct, which effectively denied the motion at that time. Then, because Juror 523 had been excused from further deliberations, the court gave Honken a choice of continuing the "penalty phase" deliberations with eleven jurors or seating one of the alternate jurors. Without waiving any objections to continuing deliberations at all, Honken's counsel opted for replacing Juror 523 with an alternate, rather than continuing with eleven jurors. After consultations among Honken, his counsel, and his jury consultant, Honken requested that Alternate Juror 425 replace Juror 523, because in the defense's estimation, Alternate Juror 425 was the only "untainted" alternate. Although the government did not concede that any juror was tainted, the government stated that it had no objection to seating Alternate Juror 425 to replace Juror 523. Therefore, the court replaced Juror 523 with Alternate Juror 425.

The reconstituted jury was then given the following Supplemental Instruction regarding beginning their deliberations anew:

> Juror 523 has now been replaced with an alternate juror, Juror 425. You should not speculate on the reasons that Juror 523 has been replaced. You are instructed to begin anew your "penalty phase" deliberations and to provide Juror 425 a full opportunity to participate in your discussions and determinations.

> You must now begin anew your deliberations to determine whether imposition of a sentence of death is called for in this case, or whether the defendant should instead be sentenced to life imprisonment without the possibility of release, for commission of the crimes in **Counts 8 through 17.** Beginning your deliberations "anew" means that you cannot consider any opinion previously expressed by any juror, including Juror 523, but must instead begin your discussions and deliberations concerning the "penalty phase" from the very beginning.

The decision of what sentence to impose is left exclusively to you, the jury. I must remind you again that your decisions must be based only on evidence that was presented during the "merits phase" and "penalty phase" in this case, not on any information or opinions that you may have heard from any other source. Therefore, you must disregard the opinions of anyone, except for your fellow jurors, about the appropriate penalty in this case. Also, nothing that I have said in any of my instructions—and nothing that I have said or done during either the "merits phase" or the "penalty phase" of the trial—has been said or done to suggest to you what I think your decision should be. I have no opinion about what your decision should be.

To assist you in beginning your deliberations anew, I am giving you new copies of the "penalty phase" verdict form in this case. The Court Security Officer will collect and destroy your original copies.

*Id.,* Supplemental Instruction F—Deliberations. The remaining alternate jurors were instructed separately that they were still under oath and were still required to follow the court's admonitions not to watch news reports about the case or to listen to or to make comments about the case, but they were allowed to leave the courthouse.

The reconstituted jury returned its "penalty phase" verdict on October 27, 2004, recommending that Honken receive the death penalty for the murders of Kandi and Amber Duncan, but that he be sentenced to life imprisonment for the murders of Greg Nicholson, Lori Duncan, and Terry DeGeus.

### d. Proceedings on December 16, 2004

The final phase of the investigation of the alleged jury-tampering and misconduct issues relating to Juror 523 occurred at a post-trial evidentiary hearing on December 16, 2004. Although the hearing was open to the public, and the trial was over, the parties agreed to continue to refer to Juror 523 only by number to try to preserve her anonymity. At the hearing, the government called six persons identified as officers or managers of the company at which Juror 523 was employed. Another officer or manager of the company was subsequently deposed by the parties. Each officer or manager was represented by counsel. Honken also called Juror 523 to testify again. Before the examination of witnesses began, the court indicated its intention to take all testimony subject to any Rule 606(b) objections, unless a question was clearly impermissible.

*i. Questioning of officers and managers.* Of the managers and officers of the company called to testify, some denied ever making or overhearing any comments to Juror 523 regarding her duties as a juror in Honken's trial. Those officers or managers were James Hawthorne, who identified himself as the safety and human resources manager at the company, Transcript Of Hearing, December 16, 2004 (docket no. 603), p. 12, *l.* 23, to p. 13, *l.* 1; Mark Robert Jensen, who identified himself as a member of the board and part owner of the company, and a "first cousin once removed" of Juror 523, *id.* at p. 41, *l.* 1, to p. 46, *l.* 18; Irving Jensen, III, who described himself as part owner of a related company and "second cousin" of Juror 523, *id.* at p. 47, *l.* 13, to p. 52, *l.* 17; and Colin "Chres" Jensen, who identified himself as the president of the construction companies in the group and "second cousin" of Juror 523. Deposition of Colin "Chres" Jensen, December 29, 2004, p. 15, *l.* 15, to p. 16, *l.* 24. Other officers or managers, however, did acknowledge making some sort of comment to Juror 523 about her jury service.

Specifically, William Schoonover, who identified himself as the vice president of the company for which Juror 523 works, acknowledged that, on October 19, 2004, when Juror 523 had been absent from the office all morning, then was suddenly there, he had asked her if everything was over, and she had explained that some witnesses had not shown up, so they were done for the day. However, he denied ever discussing with Juror 523 what she was doing in the case or anything else relating to her jury service. Transcript Of Hearing, December 16, 2004 (docket no. 603), p. 8, *l.* 3, to p. 10, *l.* 6.

Similarly, on direct examination by the government, Keith George, who identified himself as the chief financial officer and the person who "administered" Juror 523's employment, testified that Juror 523 told him that she was up for jury duty in a "big trial" and kept him informed about the days that she could and could not work. However, he denied ever making any comments to Juror 523 about whether or not she should attempt to get out of jury duty, and denied ever making or overhearing any comment to her about what the verdict should be, although he admitted making "general [comments] that she was on jury duty" himself and hearing such comments from others. Mr. George identified Mr. Schoonover as the only other person with supervisory authority over Juror 523, but stated that he had never heard Mr. Schoonover make any comments to Juror 523 regarding her jury duty. *Id.* at p. 14, *l.* 2, to p. 16, *l.* 10. On cross-examination, Mr. George testified that he had made the arrangements to accommodate Juror 523's work schedule with the trial schedule and to arrange to pay her her normal pay while on jury duty, that he was not aware of any complaints about her work schedule or anyone refusing to make necessary adjustments, and that her work was kept up to date by other employees while she was absent. *Id.* at p. 16, *l.* 15, to p. 18, *l.* 7.

The most extensive questioning in the hearing was put to Alden "Corky" Bailey. On direct examination by the government, Mr. Bailey identified himself as the CEO of four related companies, one of which directly employed Juror 523. *Id.* at p. 19, *ll.* 20–24. He explained that he worked two or three days a week in the office where Juror 523 also worked. *Id.* at p. 20, *ll.* 5–10.

As to comments to Juror 523 about her jury service, Mr. Bailey admitted to the following incident on direct examination by the government:

> A. In—after Juror 523 had come back one day—and frankly, I don't know which day it was—and groused a little bit about being picked for jury panel, in a humorous context—and I don't remember the exact words—I said, You should have stood up and said something outrageous and again in a humorous context, that would have been—thrown you off the jury, but that was it.
>
> Q. Any response or reaction to your comment from her?
>
> A. No.
>
> Q. Did she do or say anything to indicate to you whether she took your comment either seriously or humorously?
>
> A. She should have taken it humorously.

*Id.* at p. 20, *ll.* 13–24. Mr. Bailey explained that he did not recall that anyone else was present, that it was a quick conversation, that Juror 523 should have understood the comment was intended to be humorous, because he was smiling, and that Juror 523 should have taken it as a humorous response to her apparent annoyance at having to do jury service. *Id.* at p. 23, *l.* 23, to p. 24, *l.* 21.

Mr. Bailey professed to having only limited contact with Juror 523 on a regular

basis, because she did not report to him, and he denied ever making any other comments or hearing any comments to Juror 523 about her jury service after making his own "humorous" comment. *Id.* at p. 20, *l.* 25, to p. 21, *l.* 23; *see also id.* at p. 23, *ll.* 11–17 (reiterating that he had no direct supervisory responsibility for Juror 523, but Bill Schoonover and Keith George did); *id.* at p. 30, *l.* 14, to p. 31, *l.* 8 (explaining, on cross-examination by the defense, that his office was eighty to one-hundred feet from Juror 523's desk, that none of his work would go to her desk, except outgoing mail, and that he did not socialize with Juror 523); *id.* at p. 26, *l.* 25, p. 28, *l.* 14 (on cross-examination by the defense, testifying that he was only Juror 523's indirect supervisor, although he would have direct authority to dismiss her, and that he reported only to the board of directors, but that he was often the last person to know who was hired and who was fired).

On cross-examination, Mr. Bailey reiterated that he could not remember precisely what "humorous" or "outrageous" comment he had suggested would have gotten Juror 523 off the jury, but that he doubted that he would have said, "hang him," and was more likely to have suggested, "I'm an expert in the law, enjoy law, he's guilty or something of that nature." *Id.* at p. 32, *l.* 1, to p. 33, *l.* 18. He also testified that he doubted that he would have made any other comment to Juror 523 about the case, other than to ask if she was still on jury duty when he returned to the office after being out of town. *Id.* at p. 34, *ll.* 2–25 (also indicating that he was out of town August 8 to 24 and September 8 to 18, 2004); *id.* at p. 37, *ll.* 9–14 (again denying, on cross-examination, ever making other comments to Juror 523 about being on jury duty or talking to anyone on the board about it). However, Mr. Bailey denied ever attempting to get Juror 523 off jury duty or talking to Mr. George or Mr. Keith about getting her off jury duty. *Id.*

at p. 37, *ll.* 3–8 (on cross-examination by the defendant).

As to certain specific comments that Juror 523 had repeated to others, Mr. Bailey testified, on direct examination by the government, as follows:

Q. And specifically, sir, did you ever make any comments, whether directly to her or within her hearing, such as "killer" or "fry him"?

A. Not that I remember.

Q. Pardon me?

A. No.

Q. I thought you said not that I recall?

A. Well, no, not that I remember. I'm saying I don't remember ever talking about her trial.

Q. When you first indicated not that you recall, is it possible you may have made that and then simply not made any—have any recollection of it?

A. No.

Q. Pardon me?

A. No.

Q. So you're quite sure you did not do so.

A. I'm quite sure I did not.

Q. Did you ever say anything in her presence or do anything which would cause her to believe that you were making such suggestions to her?

A. No.

Q. To your knowledge.

A. No.

*Id.* at p. 21, *l.* 24, to p. 22, *l.* 21; *see also id.* at p. 36, *ll.* 12–19 (on cross-examination, again denying ever saying "fry him"). Mr. Bailey also opined that he could not "envision anybody having that much interest in the process" to say anything like "fry him" or "guilty, guilty, guilty" while walking by Juror 523's desk and that he was not aware of anyone doing so, but that he had

done no "in-company investigation" of the matter. *Id.* at p. 37, *l.* 23, to p. 38, *l.* 23.

Mr. Bailey also denied "following" Honken's case, because he had been "on the road" a lot during August and September of 2004, and because the case had "no interest" for him. He also testified that he did not read anything about the case, although he might have seen some headline. Indeed, he could not recall a single detail about the case, except that it was a "drug case." *Id.* at p. 28, *l.* 15, to p. 30, *l.* 2. He also testified that, "[a]t the beginning," he did not know that the case involved deaths or killings. *Id.* at p. 30, *ll.* 3–7; *see also id.* at p. 39, *l.* 19, to 40, *l.* 1 (on questioning by the court, explaining that he did not know what jury Juror 523 was on or what the charges against Honken were, because "I didn't pay any attention to the process," and that he did not even know what penalties Honken might face). Mr. Bailey testified that he was unaware that there was any issue concerning Juror 523's jury service until he was served with a subpoena to appear for the December 16, 2004, hearing. *Id.* at p. 39, *ll.* 2–11.

***ii. Further questioning of Juror 523.*** Honken then called Juror 523. As to general matters, on direct examination, Juror 523 first reaffirmed that her statements to the Deputy Clerk on October 21, 2004, were true, even if the Deputy Clerk's testimony about what Juror 523 had told her was not precisely true, and that her own statements during the hearing on October 22, 2004, were also true. *Id.* at p. 54, *ll.* 1–19. On cross-examination by the government, Juror 523 clarified that the Deputy Clerk had incorrectly stated that Juror 523 had told her that her boss said "killer, killer, killer," when Juror 523 believed that she had actually told the Deputy Clerk that her boss's statement was "guilty, guilty, guilty." *Id.* at p. 56, *ll.* 14–20. However, Juror 523 averred that she was not herself mistaken about what comments her boss had made. *Id.* at p. 56, *l.* 25, to p.

57, *l.* 3. On the other hand, Juror 523 subsequently testified, on redirect examination by the defense, that she could not say whether she had recounted her boss's comments accurately to other jurors, because she was not even sure that she had ever told the other jurors what her boss had said, although she did aver that she was not "making up" her boss's comments. *Id.* at p. 67, *l.* 16, to p. 68, *l.* 13. On cross-examination by the government, Juror 523 also testified that she liked and felt secure in her job, that she had a good relationship with her immediate supervisor, Mr. Schoonover, that nobody had taken any adverse employment action against her as a result of her jury service, and that she had never had any fear that anybody might do so. *Id.* at p. 58, *l.* 1, to p. 59, *l.* 1; *see also id.* at p. 64, *ll.* 3–13 (suggesting that her impression that "they" did not want her to do jury duty might have been based on the impression that "they" do not like to lose people from demanding jobs).

Turning to more specific matters, for the first time, Juror 523 specifically identified the person who had made comments to her as Alden "Corky" Bailey, adding that no other members of the company had made any comments to her. *Id.* at p. 54, *l.* 20, to p. 55, *l.* 12; *see also id.* at p. 63, *l.* 23, to p. 64, *l.* 2 (stating, on cross-examination, that no other employees made any comments to her and that she did not recall any other employees telling Mr. Bailey that he shouldn't make comments to her). She also explained that she had only occasional contact with Mr. Bailey, in passing, involving little more than exchanges of greetings. *Id.* at p. 59, *l.* 2, to p. 61, *l.* 5.

For the first time in any proceedings, Juror 523 suggested during the December 16, 2004, hearing that Mr. Bailey's comments might not actually have been made to her:

Q. Okay. You're convinced he said "guilty, guilty, guilty" to you.

A. Abs—well, he said it walking out of the coffee—the conference room back to his desk. You know, he could have been referring to somebody else in some other office I suppose, but I'm sitting out there, and I guess I took it that that's what it meant, but I didn't talk to him about it. I didn't look at him. I just kept doing my work.

*Id.* at p. 57, *ll.* 4–11.

On cross-examination by the government, Juror 523 testified more specifically about what and how many comments Mr. Bailey had made to her, as follows:

Q. Now, I think you've indicated before that there was maybe a number of comments that Mr. Bailey made to you but your recall wasn't real good about maybe when he said it or even exactly what he said other than you recall "guilty, guilty, guilty." Was there more than that comment that you recall he made to you?

A. There was two comments made.

Q. Okay.

A. The first one was the "guilty, guilty, guilty," and the second one was "how long is it gonna take you to fry him?"

Q. All right.

A. Those are the only two comments that he made.

Q. And never made any more comments than that.

A. No.

Q. And the first comment that you recall he made, as I recall looking through the transcript, that was before you actually even got on the jury.

A. I think it was.

Q. And was that in the context of him saying what you ought to say—what you should have said to get out of jury service, that you should have said

"guilty, guilty, guilty," and you would have gotten out of it?

A. It could have been, but I just didn't pay any attention to it. I just—I just ignored it.

*Id.* at p. 61, *l.* 22, to p. 62, *l.* 19.

Notwithstanding that Mr. Bailey had admitted to offering a "humorous" suggestion for how Juror 523 could have gotten out of jury duty, and notwithstanding her prior testimony that nobody but Mr. Bailey had ever made a comment to her about her jury service, Juror 523 was not as categorical that the "humorous" suggestion had actually come from Mr. Bailey. Rather, she testified that her impression that "they" did not want her to do jury duty could have arisen from "humorous" suggestions, probably by persons *other* than Mr. Bailey, about ways to get out of jury duty. The pertinent testimony was as follows:

Q. And when you say they, they implied, who are the "they" you're talking about?

A. Well, I don't know that it was Corky. It might have been Chres Jensen that said it, you know, but, I mean, you know, they all come by and give you goofy answers, you can say this to get out of it or whatever. But I just didn't pay attention to what they said.

Q. Okay. And so who—do you think somebody else may have said something to you about what you could have said to get out of it?

A. Yeah, it wasn't Corky that said that.

Q. Okay. And who was that do you think?

A. I think it was Chres, but I think he was just joking. Chres is a real big jokester, and I just—with him you really blow everything off because he's just being a jokester.

Q. And you took it that way, as a joke?

A. Oh, yeah.

*Id.* at p. 64, *l.* 14, to p. 65, *l.* 5.

On cross-examination by the government, Juror 523 also testified extensively about what impact, if any, the comments had upon her, over occasional Rule 606(b) objections by the defense. Juror 523 reiterated that she did not have any "reaction" to the "guilty, guilty, guilty" comment and that it had no "impact" upon her whatsoever. *Id.* at p. 57, *ll.* 12–21. Over objections from the defense that the question exceeded the scope of direct examination and was irrelevant, Juror 523 also averred that she would not let anybody else's opinion influence her decision in an important matter. *Id.* at p. 61, *ll.* 6–21. She also testified as follows:

Q. And what was your emotional reaction to any—either of those comments that—

[DEFENSE COUNSEL]: Your Honor, before the witness answers, I object that this is beyond the scope of the 606(b) inquiry and the inquiry intended in this proceeding, so I object.

THE COURT: I'll take the answer subject to the objection.

BY [THE PROSECUTOR]:

Q. What was your emotional reaction to either of the comments he made to you?

A. I ignored him. He had no bearing—we were told that we had to listen to the evidence and then do—follow the instructions. I wasn't letting anybody's opinions make my judgments for me. I mean, we looked at the evidence and followed the instructions. That's what I was doing. They had no effect.

Q. When he made comments to you, what—do you remember the tone of voice he had or the expression on his face?

A. I didn't look at him. I was filing when he said the "fry him" comment.

Q. Okay.

A. I had my back to him. I was in the files. And I didn't turn around and look at him. I just heard the comment and ignored it.

Q. All right. And what about the prior one? Do you remember what his tone of voice was or expression at all?

A. No, because I didn't look at him again. I was busy working on work, so I didn't look at him.

*Id.* at p. 62, *l.* 20, to p. 63, *l.* 22. Subsequently, a similar exchange took place:

Q. The—when these comments were made to you by Mr. Bailey, did it affect your ability to concentrate on your job as a juror?

A. I don't think so.

[DEFENSE COUNSEL]: Same objection, Your Honor.

THE COURT: I'll take it subject to the objection.

A. Can I answer it?

THE COURT: Yes.

Q. Yes, ma'am.

A. Will you rephrase it again?

Q. Sure. Did the comments, either comment that Mr. Bailey made to you, did it affect your ability to concentrate on your duties as a juror?

A. No.

Q. Did it affect your ability to listen to the evidence?

A. No.

Q. Did it affect your ability to weigh the evidence?

A. No.

Q. Did it affect your ability to be a fair and impartial juror?

A. No.

[DEFENSE COUNSEL]: Same objection, Your Honor, as to this inquiry.

THE COURT: I'll take it subject to the objection.

BY [THE PROSECUTOR]:

Q. And just so we have a good record, your answer to that question was?

A. No.

Q. You receive a lot of instructions in this case, a lot of written instructions from the judge. I'm sure you recall all those. One of the instructions that you received indicated that if anybody talked to you about this case you were supposed to report it to the judge. Did you understand that that included if somebody made a passing comment like what Mr. Bailey did, or did you understand that to be something about the facts of the case or something?

[DEFENSE COUNSEL]: Your Honor, I'm going to object to the inquiry as to the juror's understanding of the instructions again on the same grounds, 606(b).

THE COURT: You may answer subject to the objection.

A. Rephrase it, please.

Q. Sure. One of the instructions said something to the effect—I'm paraphrasing—that if somebody talks to you about this case you're supposed to report it to the judge. And my question is did you understand that to include a passing comment like what Mr. Bailey made to you, or did you understand that to be if somebody talked to you about the facts of the case or something like that?

A. It's probably more the facts of the case. I mean, that passing comment just meant nothing, so I—like I said, it didn't have any more impact than that woman in the back of the courtroom standing up and saying that about looking into her son's eyes and [she] knew he was guilty. It just didn't mean anything.

Q. Didn't affect your ability to be fair and impartial at all.

A. None whatsoever.

*Id.* at p. 65, *l.* 6, to p. 67, *l.* 11.

### 2. *Findings of fact*

There is no denying that there are inconsistencies in Juror 523's testimony regarding comments by her boss and even more significant inconsistencies between Juror 523's testimony and that of other jurors and the officers and managers at Juror 523's company. However, based on the court's determination of credibility, the court finds as follows.

### a. *Comments to Juror 523*

First, and perhaps most critically, the court finds that only one comment was ever made to Juror 523 by the "top dog" or "chief executive officer" of her company, Alden "Corky" Bailey, to whom she originally attributed at least three distinct comments. The only comment that the court finds is ultimately supported by the record is the comment by Mr. Bailey that Juror 523 should have said something "outrageous" to get out of jury duty. The court finds, further, that the comment was made in jest and was so taken by Juror 523, when Juror 523 appeared to be disappointed to have been selected for the "qualified" pool. First, Mr. Bailey admits to making such a comment, *see* Hearing Transcript, December 16, 2004, p. 20, *ll.* 13–24, and notwithstanding Juror 523's testimony on December 16, 2004, that she thought that the comment had, perhaps, been made instead by Colin "Chres" Jensen, rather than Mr. Bailey, *see id.* at p. 64, *l.* 14, to p. 65, *l.* 5; *and contrast id.* p. 63, *l.* 23, to p. 64, *l.* 2 (stating that no employees other than Mr. Bailey had made any comments to her), the court finds Chres Jensen's denial of ever making such a comment to be credible. Deposition of Colin "Chres"

Jensen, December 29, 2004, p. 15, *l.* 15, to p. 16, *l.* 24.

The court cannot, however, make a determination of precisely what the comment actually was that was made, in jest, before Juror 523 was ever seated on the trial jury. The nominees appear to be "guilty, guilty, guilty," which is what Juror 523 initially said the comment was that had been made "before [she] even started [her] service," *see* Trial Transcript, October 21, 2004, p. 3968, *ll.* 17–24; or "hang him," which was Juror 523's second version of the "outrageous" comment during the same October 21, 2004, hearing, *id.* at 3970, *ll.* 5–6.; or "I'm an expert in the law, enjoy law, he's guilty or something of that nature," which is Mr. Bailey's description of his "humorous" suggestion, *see* Hearing Transcript, December 16, 2004, p. 32, *l.* 1, to p. 33, *l.* 18. The court finds, however, that precisely which comment was made is of little moment, because none of the formulations is fact-specific, all are sufficiently consistent in tone, *i.e.,* "outrageousness," to fit the "humorous" purpose for which the court finds that the comment was made, and the testimony of one juror suggests that Juror 523 mentioned *both* of her formulations to other jurors. *See* Trial Transcript, October 25, 2004 (Questioning of Juror 498), p. 4132, *ll.* 2–7 (although Juror 498 initially could not recall what the boss's comments reportedly were, the juror later stated, "I think she said like 'hang him' or something like that or 'guilty, guilty, guilty.' ").

The court simply cannot find that any other comment was actually made to Juror 523 by Mr. Bailey or any other officer, manager, or employee of her company. While the court can see why a chief executive officer of a substantial company or group of companies, such as Mr. Bailey, would be hesitant to admit to anything as stupid and juvenile as making comments like, "guilty, guilty, guilty," or "fry him," or "when are you going to fry him" to an employee who was serving on a jury in a capital case, the court finds Mr. Bailey's denial of ever making any such comments to be credible. *See* Hearing Transcript, December 16, 2004, p. 34, *ll.* 2–25; p. 37, *ll.* 9–14; p. 21, *l.* 24, to p. 22, *l.* 21; p. 36, *ll.* 12–19. The court finds equally credible Mr. Bailey's testimony that he did not know what trial Juror 523 was hearing; did not follow the Honken trial; did not know what that trial was about, apart from "drugs"; did not know that the case was a death penalty case, until after the trial was in progress; and that he did not pay attention to the process. *See id.* at p. 28, *l.* 15, to p. 30, *l.* 7; p. 39, *l.* 2, to p. 40, *l.* 1.

Juror 523's varying testimony about other comments, when they were made, and how many there were, was simply too inconsistent to be credible. For example, as noted above, Juror 523 gave two versions of the "outrageous" comment Mr. Bailey suggested would have gotten her out of jury service, but also testified that one of those versions, the "guilty, guilty, guilty" one, had been made on several other occasions, *see* Trial Transcript, October 21, 2004, p. 3967, *ll.* 10–19, then appeared to recant to the extent that she testified that there had only ever been two comments, one before she started her service, and one a few days before the matter was brought to the Deputy Clerk's attention on October 21, 2004. *See, e.g., id.* at 3971, *l.* 5, to p. 3973, *l.* 3 (stating both that the "guilty, guilty, guilty" comment was made "several times" and only "at least twice"); *and compare* Hearing Transcript, December 16, 2004, p. 61, *l.* 22, to p. 62, *l.* 19 (Juror 523 heard only two comments, "guilty, guilty, guilty" and "fry him"). Indeed, she later suggested that the later comment might have been the "guilty, guilty, guilty" comment, and that it might not even have been directed at her. *Id.* at p. 57, *ll.* 4–11.

What is clear from the record is that Juror 523 was troubled and upset by October 21, 2004, but the court finds that she was not troubled and upset by the comments that her boss was purportedly making, but by the stress of the duties of a juror in a capital case, coupled with the stress of changing "gears" to return to work when she was not in trial, and the fact that she had to go to work while other jurors did not, all of which manifested in a desire to finish deliberations as quickly as possible and to "get her life back." *See, e.g.,* Trial Transcript, October 22, 2004, p. 4057, *l.* 4, to p. 4061, *l.* 21 (repeatedly commenting on the difficulties of returning to work when not in trial or deliberations, which Juror 523 did not think many of the other jurors had to deal with). The court is well aware of the stress that can be produced by involvement in a capital case. The court finds that, by October 21, 2004, Juror 523 had simply had enough and was not prepared to continue. Honken contends that relief of the stress that Juror 523 was suffering, as a result of removing her from the jury, coupled with the realization that she might be in trouble with her employer for laying the burden of the stress in part on her boss, explains her subsequent minimization and backpedaling. The court, however, finds that it was the stress of involvement in the trial that caused Juror 523 to magnify (and indeed, multiply) the single incident of an innocuous comment from her boss into the reason for seeking an excuse from work on October 21, 2004.

To reiterate, the court finds that the only comment made to Juror 523 by her "boss," *i.e.,* Alden Bailey, or any other officer or manager of the company, was a "humorous" suggestion of a comment that would have gotten Juror 523 excused from jury service. This comment was made after Juror 523 had been selected for the "qualified" pool of 75 jurors and before she was actually selected as a trial juror.

However, the court cannot find that any other comment was made to Juror 523 subsequently about her jury service, involvement in the case, or the appropriate verdict or penalty, whether "guilty, guilty, guilty," "when are you going to burn him," or "when or you going to fry him." The court will not speculate about whether Juror 523 intentionally fabricated the additional comments or was subject to a mistaken belief that some comments, out of context, were directed at her, because of her heightened state of stress caused by involvement as a juror in a capital case. It is sufficient to find that the record does not support Juror 523's testimony that additional statements were made to her.

As to the comment that the court finds was actually made, the court finds that Juror 523 herself considered it so unimportant that she did not report it during *voir dire* of the "qualified" pool on September 8, 2004, as might have been required by the spirit, if not the letter, of the questions posed during that *voir dire.*

### b. Comments repeated to other jurors

On the other hand, the record does support the conclusion that Juror 523 reported comments attributed to her boss to other jurors on one and possibly two or more occasions. First, there is more than adequate support, from Juror 523's testimony and the corroborating statements of other jurors during the October 25, 2004, hearing, that on October 21, 2004, Juror 523 told a group of jurors that she did not want to return to work, because of comments from her boss. As noted above, ten trial jurors remembered Juror 523 making some statement that day about comments from her boss, but several thought the comments were only to the effect that her boss was giving Juror 523 a "hard time" about returning to work when not in trial or deliberations. *See* Trial Transcript, Oc-

tober 25, 2004 (questioning of individual jurors), *passim*. Only two jurors recalled that Juror 523 stated the specific content of her boss's contents. *See id.* at p. 4113, *ll.* 8–9 (Juror 513 recalled that the boss had purportedly said "fry him and stuff"); *id.* at 4132, *ll.* 2–7 (Juror 498 eventually recalled that the boss had purportedly said "like 'hang him' or something like that or 'guilty, guilty, guilty'"). Thus, the court finds that Juror 523 reported comments that she attributed to her boss to other jurors on October 21, 2004, although all but two of the jurors found the report so insignificant that they could not recall the contents of the boss's purported comments, and the two who could recall the contents of the boss's purported comments were equally unaffected by those comments.

Support for statements by Juror 523 to other jurors or alternates about comments that she attributed to her boss on any earlier occasion—for example, while in the van being transported to or from the courthouse—is more tenuous. Nevertheless, the court finds that Juror 855 heard some complaints from Juror 523 that her boss was giving her a hard time, on more than one occasion, beginning about two or three weeks before October 21, 2004, but was wholly unaffected by the comments, and that Alternate Juror 914 heard Juror 523 complain, possibly a week or two earlier than October 21, 2004, that her boss was making comments, but that Juror did not recall what the boss's comments were, and was also wholly unaffected by the comments. *Id.* at p. 4137, *l.* 2, to p. 4140, *l.* 3.

In short, the court finds that no juror considered Juror 523's report of comments that she attributed to her boss to be of any importance to the juror's ability to be fair and impartial and to decide the case on the evidence and the instructions of the court. The court finds that the jurors' failure to

report hearing such comments from Juror 523 was based, at worst, on a mistaken belief that the comments were so trivial and irrelevant that they did not require reporting.

### 3. Arguments of the parties

### a. Honken's opening argument

Honken asserts that his Sixth Amendment right to an impartial jury was violated by the "taint" to Juror 523 and by her comments to other jurors. First, he contends that there is a presumption of prejudice that arises from any private communication, contact, or tampering, whether directly or indirectly, with a juror during a trial that is pending before the juror. The presumption arises here, he contends, because the comments made to Juror 523 were targeted specifically at the ultimate issues of the case, whether or not Honken was guilty and what the ultimate punishment should be once he was found guilty. Honken contends, further, that those comments subjected Juror 523 to intense emotional pressure. Honken also contends that Juror 523's deliberate decision not to report the improper comments to the court, and instead to share them with other jurors in violation of the court's instructions, deprived him of a fair trial. Honken contends that the prejudice involved is sufficient to warrant a new trial, even if only Juror 523 was affected, but he contends that other jurors were also tainted by Juror 523's recital of her boss's comments.

Honken also contends that, because Juror 523 failed to reveal the comments of her boss during *voir dire* of the "qualified" jury pool, he was subjected to concealed juror bias. He argues that Juror 523 answered questions dishonestly, not just inaccurately, she was motivated by partiality, and the true facts, if known, would have supported striking her for cause.

More specifically, Honken contends that Juror 523, with the rest of the pool of "qualified" jurors, was asked the following questions: (1) Since we talked with you individually [in *voir dire* of the daily panels], have any of you experienced any changes in your health, employment, or family situations that may substantially affect your ability or willingness to serve as a juror in this case? (2) Since we talked with you individually, have any of you been approached by or conversed with anyone concerning your potential service as a juror in this case? and (3) Since we talked with you individually, have any of you heard someone else express an opinion concerning the guilt or innocence of the defendant or the appropriate punishment of the defendant in the event of a guilty verdict? However, Juror 523 did not explain then, as she did post-trial, that her boss had said "guilty, guilty, guilty" even before she started her service, and had suggested that she should have made an outrageous comment to avoid being selected for the "qualified" pool. Honken contends that the motive for concealing the comments she had heard was obvious: Juror 523 was concerned about her job, as evidenced by her request for an excuse from work on October 22, 2004, and her concern that the excuse not indicate what she had told the court.

Next, Honken argues that there is inconsistent testimony regarding jury tampering and misconduct. For example, he contends that Juror 523's December 16, 2004, testimony is almost wholly inconsistent with her earlier statements to other jurors and with her statements in the October 21 and 22 hearings. He argues that her later testimony shows a tendency to minimize and backpedal. Thus, he contends that her more contemporaneous testimony from the earlier hearings is more credible. He also contends that Mr. Bailey's testimony also shows a tendency on his part to deny and minimize his comments to Juror 523, thus flatly contradicting Juror 523 on several points, so that his testimony is not credible. Indeed, during oral arguments, Honken took the position that Mr. Bailey's very denial of the comments suggested that the comments were actually made.

Honken contends that the improper conduct of the jury extends beyond Juror 523 to the other members of the jury who did not report either Juror 523's comments or other comments they described in the October 25, 2004, questioning. He points out that eleven of the fourteen jurors and alternates testified that they had heard comments made by Juror 523. Even though the jury instructions reiterated that the jurors were not to let anyone tell them anything about the case or anyone involved in it until the trial was over and to report to the court if someone tried to talk to them about the case during trial, neither Juror 523 nor any other juror reported outside comments to the court. But for the alert conduct of court personnel, Honken contends, the serious and critical abuses of the judicial process by the jurors would never have been discovered.

Ultimately, Honken argues that the interest of justice requires a new trial in his case, because overwhelming evidence shows that Juror 523 was tampered with by her boss, Alden Bailey, and that both Juror 523 and Mr. Bailey subsequently tried to minimize the contacts in question after those comments were brought to the court's attention. Under the circumstances, he contends that it is impossible to have full confidence in the verdict, where one or more of the jurors were improperly influenced or disturbed in the exercise of their judgments. Thus, he contends that, to avoid a miscarriage of justice, the court must grant him a new trial.

### b. The government's response

The government does not agree with any of Honken's arguments. The government contends that Honken cannot establish actual prejudice from passing comments made to Juror 523, where she ignored those comments. The government also contends that Honken bears the burden of proving that the verdict in his case was the result of bias and that he is not entitled to any presumption of prejudice. Under Rule 606(b), the government contends that the jurors, including Juror 523, were properly asked whether the comments that they had heard would affect their ability to be fair and impartial, but all denied that there would be any effect. The government contends that the presumption of prejudice upon which Honken relies only arises where the outside contact introduced facts to the jury that were not presented at trial, and only where those facts are introduced to the jury through a third party, which is not the case here.

The government also argues that the presumption of prejudice has been overruled by changes in statutory and case law that make it virtually impossible to obtain the evidence that might rebut the presumption, because the questions necessary to rebut the presumption cannot be asked of jurors. The government also contends that the presumption has been called into question by decisions of the Supreme Court that mandate a hearing as the means for the defendant to prove actual bias.

The government contends that the evidence shows that Honken cannot prove actual bias, where all of the jurors testified unequivocally that any comments they heard had no effect on their ability to be fair and impartial, and the jurors' evident lack of concern about the comments and the minimal nature of the comments support their assertions. Where the evidence shows that Juror 523 heard only one comment prior to the "merits" verdict and was removed from the jury before the "penalty" verdict, the government contends that there is no showing that Honken was prejudiced. The government also contends that the court should presume that the jurors followed their instructions to decide the case only on the evidence presented in court and the court's instructions.

The government next argues that Juror 523's various inconsistencies about the comments suggest that she initially exaggerated the comments in an effort to avoid having to go back to work on October 22, 2004. Also contrary to Honken's contentions, the government contends that Mr. Bailey's testimony is credible, because he had no motive to interfere with Juror 523's service and had no interest in the case—indeed, he was barely aware of the case and did not know what it was about.

The government also contends that any third-party contact with Juror 523 was harmless. The government asserts that there was no extrinsic *evidence* introduced to the jury. Moreover, the government contends that the *opinion* of Juror 523's boss was only available to the other jurors during the guilt phase. The government also asserts that the comments were not reasonably likely to affect the verdict, considering the strength of the government's case against Honken, and the fact that not a single juror indicated any residual doubt about Honken's guilt.

The government also rejects Honken's contention that Juror 523 concealed any bias. The government contends that there could be any number of reasons, other than dishonesty, for Juror 523's failure to mention her boss's comment during *voir dire* of the "qualified" pool, including her belief that her boss's comment about how to get out of jury service was a joke, so that the comment was neither a comment

about her potential service, nor an opinion concerning the guilt or innocence of or the appropriate punishment for the defendant. In the government's view, Honken's failure to ask Juror 523 the questions necessary to expose bias constituted waiver of any objection to the juror. Moreover, the government contends that Honken failed to demonstrate that Juror 523's failure to answer questions by bringing up her boss's comments was motivated by prejudice, when the evidence is clear that she had ignored the comments and that the comments had no impact upon her. The government also contends that Honken cannot show that he would have had grounds to strike Juror 523 for cause, if the comments of her boss had been revealed, because he could not make a showing that the comments had any effect on Juror 523's ability to be fair and impartial.

The government likewise rejects Honken's contention that either Juror 523 or the other jurors engaged in misconduct by failing to disclose Juror 523's statements about her boss's comments. The comments in question simply had nothing to do with the facts or evidence in the case, such that they could reasonably have been understood by the jurors to fall outside the court's admonitions, and the comments simply had no impact upon either Juror 523 or any other juror.

### c. Honken's reply

In his reply brief, Honken argues that there is plainly evidence of tampering and misconduct here, notwithstanding Juror 523's attempts to minimize and backpedal about the comments from her boss in the much later December 16, 2004, hearing. He contends that the record shows minimization and backpedaling, as predicted by his counsel, even in the October 22, 2004, hearing. He also contends that he is entitled to a presumption of prejudice, under the circumstances of this case, because that presumption is not limited to extrane-

ous facts or third-party contacts. He also contends that the government has failed to prove that the tampering was harmless, because contrary to Juror 523's representations, her conduct reveals that she was troubled and disturbed by her boss's comments, and more disturbed that her boss would find out that she had come forward. Honken also contends that the evidence that the government relies on to show that Juror 523 suffered no impact because of her boss's comments is barred by Rule 606(b). Indeed, he contended at oral arguments that the changes from October to December show precisely why Rule 606(b) should bar any evidence concerning the effect of the comments upon Juror 523. He reiterates that Juror 523's failure to reveal her boss's comments constituted misconduct and the concealment of bias.

In his supplemental reply brief, filed after oral arguments on his post-trial motion, Honken asserted that Rule 606(b) does not alter the *Remmer* presumption of prejudice, nor have subsequent decisions of the Supreme Court in *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), and *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), negated or diluted the *Remmer* presumption. He also asserts that Rule 606(b) makes not distinction, as the government had purportedly argued, between questions about the effects of extraneous information and the effects of outside influences. Finally, he argues that the court should not consider the weight of the evidence in considering his claims that his jury was "tainted."

### 4. Analysis

The court must first determine the need for and appropriate scope of an inquiry into allegations that a jury has been "tainted" that are discovered during the jury's deliberations and whether the inquiry in

this case exceeded the appropriate scope. The court must then determine whether Honken is entitled to a new trial on the basis of the appropriate considerations, which the court finds requires the application of several alternative analyses.

### a. The need for an inquiry

In *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954) (*Remmer I*), the Supreme Court stated, *inter alia,* that, where there has been "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury . . . the burden rests heavily upon the Government to establish, *after notice to and hearing of the defendant,* that such contact with the juror was harmless to the defendant." *Remmer I,* 347 U.S. at 229, 74 S.Ct. 450 (citing *Mattox v. United States,* 146 U.S. 140, 148–150, 13 S.Ct. 50, 36 L.Ed. 917 (1892); *Wheaton v. United States,* 133 F.2d 522, 527 (8th Cir.1943)) (emphasis added). Thus, *Remmer I* can be read to require notice to the parties and a hearing as essential to the investigation of the effect, if any, of extraneous contacts with jurors.

When the *Remmer* case returned to the Supreme Court after remand, the Court addressed more specifically the scope of the required hearing, explaining that "[i]t was our intention that the entire picture should be explored." *Remmer v. United States,* 350 U.S. 377, 379, 76 S.Ct. 425, 100 L.Ed. 435 (1956) (*Remmer II*). The Court explained that, when the case first reached the Supreme Court, it was "the paucity of information relating to the entire situation coupled with the presumption which attaches to the kind of facts alleged by petitioner which, in our view, made manifest the need for a full hearing." *Remmer II,* 350 U.S. at 379–80, 76 S.Ct. 425. On its second consideration of the case, however, the Court was able to make a determination of the effect of the alleged

jury tampering on the basis of "evidence, covering the total picture." *Id.* at 381, 76 S.Ct. 425. Subsequently, the Supreme Court reiterated that it "has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias," *Smith v. Phillips,* 455 U.S. 209, 215, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (citing *Remmer I,* 347 U.S. at 227, 74 S.Ct. 450), and it is clear that the Court considered that such a hearing must "cover the total picture." *Remmer II,* 350 U.S. at 379–81, 76 S.Ct. 425.

The lower courts have since read *Remmer I* and *II* to require an investigation when there is *a colorable claim* of extraneous contacts with or influences on a jury, and to require that the investigation be tailored to the circumstances of the case and the degree of the intrusion. For example, the Eighth Circuit Court of Appeals has explained that the district court has discretion "in deciding how to handle allegations of intrusions on the jury," but "if a party shows that outside contact with the jury presents a reasonable possibility of prejudice to the verdict, he is entitled to a hearing on the matter." *United States v. Tucker,* 137 F.3d 1016, 1030 (8th Cir. 1998) (citing *Remmer I,* 347 U.S. at 230, 74 S.Ct. 450). In such a hearing, "the depth of the investigation required depends on both the gravity of the alleged misconduct and the substantiality of the movant's showing of misconduct," *i.e.,* how serious the misconduct was, and how certain it is that the misconduct actually occurred. *Id.* at 1031. In the course of the hearing, the court may properly focus on "whether the contamination has spread throughout the jury," but must not thereby "foreclose[ ] a thorough inquiry into the existence and effect of the alleged communication to [the juror in question]." *Id.* The court ultimately concluded "that a defendant who makes an allegation of serious misconduct

by a juror, supported by evidentiary materials with significant indicia of reliability, is entitled to a more thorough investigation of his complaint than merely asking the juror whether he committed the misconduct." *Id.* at 1032. Therefore, *Tucker* stands for the proposition that the investigation of any improper contacts can neither start nor stop with the juror who was allegedly subjected to the improper contacts, nor can it focus entirely on whether the rest of the jurors were contaminated by the improper contact. *Accord Remmer*, 350 U.S. at 381–82, 76 S.Ct. 425 (granting a new trial on the basis that one juror had been improperly contacted); *United States v. Cheek*, 94 F.3d 136, 143 (4th Cir.1996) ("The district court properly admitted testimony, including that of [the juror subjected to the contact], regarding the factual circumstances of [the juror's] encounter with [the person making the contact] and [the defendant] and his consultation with [a law enforcement officer]. In this situation such a 'probing factual inquiry' was not only permissible but necessary.").

■ While *Remmer* and *Tucker* involved *post*-verdict discovery of alleged improper contacts with or misconduct by a juror, in *United States v. Bradshaw*, 281 F.3d 278 (1st Cir.2002), *cert. denied*, 537 U.S. 1049, 123 S.Ct. 660, 154 L.Ed.2d 524 (2002), the First Circuit Court of Appeals also expressly recognized that "[w]here, as here, a colorable claim of jury taint surfaces *during jury deliberations*, the trial court has a duty to investigate the allegation promptly." *Bradshaw*, 281 F.3d at 289 (emphasis added). In these circumstances, the First Circuit Court of Appeals also required the same twofold inquiry required under *Tucker*, that is, "to ascertain whether some taint-producing event actually occurred, and if so, to assess the magnitude of the event and the extent of any resultant prejudice." *Id.; and compare Tucker*, 137 F.3d at 1031 (in the situation

where the alleged taint is discovered post-trial, "the depth of the investigation required depends on both the gravity of the alleged misconduct and the substantiality of the movant's showing of misconduct," *i.e.*, how serious the misconduct was, and how certain it is that the misconduct actually occurred). Thus, the court finds that it properly conducted an immediate inquiry into the alleged improper contacts with Juror 523, and Juror 523's report of those alleged contacts to other jurors, after these matters were discovered in the course of the jury's "penalty phase" deliberations.

The *Bradshaw* case also indicates the appropriate procedures for conducting the necessary inquiry when allegations of improper contacts with jurors arise during deliberations. In *Bradshaw*, the First Circuit Court of Appeals found that the district court had properly conducted an investigation consisting of the following steps: (1) assembling the jurors, informing them of the need for an inquiry, and instructing them not to discuss the matter amongst themselves; (2) conducting a first round of *voir dire* examination of the jurors, in which the court inquired about the circumstances of the incident in question (which, in *Bradshaw*, consisted of discovery in the jury room of an unredacted copy of the indictment that contained counts that had been severed); (3) reassembling the jurors and instructing them that it was their duty to decide the case based on "evaluation only of the evidence that's presented to you here in trial and not by consideration of other extraneous matters," and concluding with "a strongly-worded curative instruction"; (4) conducting a second round of *voir dire* "focusing on each individual juror's ability to put out of [his or her] mind[ ] entirely the facts and circumstances of the extraneous document so that he or she might decide the case solely on the evidence introduced at

trial"; and (5) considering the parties challenges to the jurors and dismissal of the one juror who could not "function in that pristine fashion and satisfy the court of [his or her] ability to do so." *Id.* at 290–91; *see id.* at 291 (describing the process as "methodologically sound"); *id.* at 292–23 (concluding that "the lower court handled its investigation into the 'jury taint' question with consummate care," made "fully supportable" conclusions that the alleged taint "caused no ineradicable prejudice," and otherwise properly resolved the matter).

This court used a process comparable to the one used in *Bradshaw* to investigate the allegations of improper contacts with the jurors in this case. Specifically, as explained in more detail above, this court took the following steps: (1) questioning of the juror who had allegedly suffered the direct contacts to determine the nature of those contacts; (2) questioning that juror to determine what, if anything, the juror had said to other jurors about the allegedly improper contacts to determine the extent of any potential "taint"; (3) reassembling the trial jurors, with instructions cautioning that they were not to continue deliberations until further order of the court and explaining the investigatory process; (4) conducting *voir dire* of the jurors to determine the circumstances of the secondhand contacts through Juror 523, the effect, if any, of those secondhand contacts upon the jurors, and the jurors' ability to be fair and impartial and to decide the case despite any such secondhand contacts; and (5) determining the effectiveness of curative procedures and implementing those procedures found to be required, which in this case, required removal of the affected juror and substitution of an unaffected alternate. No party objected, at the time or post-trial, to the steps in the court's investigative process. Indeed, the court was careful to consult with the lawyers for both parties every step of the way before proceeding with its investigation.

### b. The permissible scope of the inquiry

While the parties here do not challenge the propriety of holding hearings immediately to determine the scope of the alleged contacts with Juror 523 and whether any other jurors were potentially "tainted" by those contacts, the parties do dispute the permissible scope of the inquiry. The court finds the law in this area disconcertingly unsettled.

*i. Rule 606(b).* The focus of the uncertainty is the effect of Rule 606(b) of the Federal Rules of Evidence. That rule provides as follows:

> **(b) Inquiry into validity of verdict or indictment.** Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

FED.R.EVID. 606(b). Thus, "Federal Rule of Evidence 606(b) prohibits any inquiry into internal jury deliberations." *United States v. Moses,* 15 F.3d 774, 778 (8th Cir.), *cert. denied,* 512 U.S. 1212, 114 S.Ct. 2691, 129 L.Ed.2d 822 (1994).

The Rule "is grounded in the common-law rule against admission of jury testimony to impeach a verdict and the exception for juror testimony relating to extraneous influences." *Tanner v. United States,* 483 U.S. 107, 121, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). The Supreme Court explained the rationale of the rule as follows:

> There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it. Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process. Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct.

*Tanner,* 483 U.S. at 121–22, 107 S.Ct. 2739 (citations omitted).

***ii. Tension between the Rule and the need for inquiry.*** The limitations in and rationale for the rule appear to be in tension with the need to investigate alleged improper contacts with jurors. *Compare id., with Phillips,* 455 U.S. at 215, 102 S.Ct. 940 (the Supreme Court "has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias") (citing *Remmer I,* 347 U.S. at 227, 74 S.Ct. 450); *see also United States v. Henley,* 238 F.3d 1111, 1117–18 (9th Cir.2001) (recognizing "the tension between the government's burden of rebutting the presumption of prejudice and the constraints of Rule 606(b)"). This is so, because the Rule appears to limit the permissible inquiry to the first concern of an investigation of juror contacts, whether the contacts occurred, but to preclude inquiry into the second concern, which is the effect of such contacts. *See, e.g., Tucker,* 137 F.3d at 1030–31 (the purpose of an investigation of juror contacts is to determine whether the contacts occurred and whether or not the contacts, if they occurred, were prejudicial to the defendant); *see also Remmer I,* 347 U.S. at 229, 74 S.Ct. 450 (the prosecution must show that the defendant was not prejudiced by the extraneous contacts to avoid a new trial).

The lower courts have been cognizant of this tension, but have not settled on the appropriate resolution of it. For example, the Fourth Circuit Court of Appeals has held that the prohibition in Rule 606(b) on "all inquiry into a juror's mental process in connection with the verdict" meant that it was improper for the prosecutor to ask a juror who had been subjected to improper contacts, " '[D]id you listen to all of the evidence that was put forth by both sides and consider it in reaching your own personal verdict?' " *United States v. Cheek,* 94 F.3d 136, 143 (4th Cir.1996) (quoting the trial transcript). The court held, "By asking [the juror] whether he had listened to and considered all the evidence, the government was delving into [the juror's] mental processes about the sufficiency of the evidence in reaching his personal verdict. Such an inquiry exceeded the strict limits imposed by Rule 606(b)." *Id.*

On the other hand, the Ninth Circuit Court of Appeals has "rejected the argument that 'juror testimony about the effect of extraneous information or improper contacts on a juror's state of mind is prohibited.' " *United States v. Elias,* 269 F.3d 1003, 1020 (9th Cir.2001) (quoting *United States v. Henley,* 238 F.3d 1111, 1117 (9th Cir.2001)), *cert. denied,* 537 U.S. 812, 123 S.Ct. 72, 154 L.Ed.2d 14 (2002). Thus, that court has "distinguished between tes-

timony regarding the affected juror's mental processes in reaching the verdict—which is barred by Rule 606(b)—and testimony regarding a juror's more general fear and anxiety following a tampering incident, which is admissible for the purposes of determining whether there is a 'reasonable possibility that the extraneous contact affected the verdict.' " *Id.* (again quoting *Henley,* 238 F.3d at 1118, in turn quoting *United States v. Cheek,* 94 F.3d 136, 144 (4th Cir.1996)). "Under this rationale, it [is] proper for the district court to question the jurors regarding their thoughts about the alleged tampering by [the defendant]." *Id.* (holding that there was no violation of Rule 606(b), where jurors testified that the allegations of tampering "did not preoccupy them at the time, frighten them, or distract them from focusing on the evidence"). Similarly, in a prior case, the Ninth Circuit Court of Appeals held that it was permissible to ask a juror who had allegedly been tampered with "about his state of mind in general following the bribery attempt," but "not [to] ask [the juror] whether, for example, he relied on the evidence introduced at trial in reaching his verdict." *Henley,* 238 F.3d at 1118.

Summarizing its prior holdings in *Henley, Elias,* and similar cases, the Ninth Circuit Court of Appeals recently explained that, "[a]lthough the line that courts have drawn between the forms of juror testimony that are admissible [under Rule 606(b)] and even inadmissible to show juror bias is imprecise—and although some may consider it artificial—we have made it clear that a court may not, under Rule 606(b), consider testimony 'regarding the affected juror's mental processes in *reaching the verdict.*' " *United States v. Rutherford,* 371 F.3d 634, 644 (9th Cir. 2004) (quoting *Elias,* 269 F.3d at 1020, with emphasis supplied in *Rutherford* ). The court, therefore, identified *permissible* inquiries to be questions about " 'the effect

of extraneous information or improper contacts on a juror's state of mind' "; "a juror's 'general fear and anxiety following' ... an incident [of improper contacts]," including a fear of retaliation for voting a certain way; and a " 'juror's abilities to fairly and impartially receive the evidence, listen to the testimony presented, and follow the judge's instructions.' " *Id.* (quoting *Elias,* 269 F.3d at 1020; and also citing *United States v. Dutkel,* 192 F.3d 893, 898 (9th Cir.1999)). However, the court identified *impermissible* inquiries to be questions about "whether an outside influence *caused* [a juror] to change his vote from innocent to guilty." *Id.* (emphasis in the original).

***iii. Applicability of the Rule in preverdict inquiries.*** The cases discussed just above all attempted to draw the line between the inquiries that Rule 606(b) permits and those that the Rule forbids in the context of *post*-verdict inquiries into alleged juror contacts or misconduct. However, the present case involves the question of what inquiries were permissible when the court was apprised of allegedly improper contacts with jurors *after* the verdict on the "merits," but *before* any verdict in "penalty phase" in Honken's case. Even so, the court finds that it is not wholly without guidance in the *pre*verdict circumstances.

First, the Fifth Circuit Court of Appeals has held that, where "the problem was brought to the court's attention prior to verdict, [Rule] 606(b) does not impact the availability of juror testimony in resolving the factual issue raised." *United States v. Sotelo,* 97 F.3d 782, 797 (5th Cir.1996), *cert. denied,* 519 U.S. 1135, 117 S.Ct. 1002, 136 L.Ed.2d 881 (1997). Similarly, in another case in which alleged "taint" apparently came to light *during* deliberations, the Ninth Circuit Court of Appeals held that the trial court "could interview jurors

to determine the effect of extrinsic evidence," although the jurors' answers might not be enough to prove that the extrinsic evidence was not prejudicial. *United States v. Mills*, 280 F.3d 915, 922 (9th Cir.), *cert. denied*, 535 U.S. 1120, 122 S.Ct. 2347, 153 L.Ed.2d 174 (2002). Thus, the trial court in that case had properly interviewed jurors to determine exactly what had occurred "and whether the jurors could ignore [a juror's extrinsic statements about the defendant's appearance prior to his arrest] in deciding the case." *Id.* at 921–22. Similarly, in *Bradshaw*, the First Circuit Court of Appeals held that the trial court had properly conducted *voir dire* questioning of all of the jurors that included questions "focusing on each individual juror's ability to put out of [his or her] mind[ ] entirely the facts and circumstances of the [allegedly tainting incident] so that he or she might decide the case solely on the evidence introduced at trial." *Bradshaw*, 281 F.3d at 291.

■ In light of the precedents discussed just above, which address circumstances more nearly on point with the circumstances in this case, this court now reiterates the conclusion it reached at the time that the issue arose concerning the propriety of certain inquiries made to the jurors on October 21, 22, and 25, 2004. Specifically, the court concludes that it was proper to inquire into the jurors' ability to be fair and impartial *in the "penalty phase" deliberations*, notwithstanding whatever they had heard from Juror 523 about comments from her boss, and also to pose like questions to Juror 523 about her ability to be fair and impartial in the "penalty phase" if she continued deliberating. These inquiries were permissible—and likely necessary—to ascertain the extent of any "taint" and the effectiveness of any curative procedures. *See Bradshaw*, 281 F.3d at 289–90 (in the investigation *pre-verdict* of potential "taint" to a jury, "If the court finds both a taint-producing

event and a significant potential for prejudice, the court must then consider the extent to which prophylactic measures (such as the discharge of particular jurors or the pronouncement of curative instructions) will suffice to alleviate that prejudice."). Moreover, Rule 606(b) was simply inapplicable to the October inquiries into the jurors' ability to be fair and impartial notwithstanding whatever extrinsic comments they had heard. Such inquires did not violate the plain language of Rule 606(b), because they did not constitute "inquiry into the validity of a ['penalty phase'] verdict," *where no such verdict had been rendered at the time*. *See* Fed.R.Evid. 606(b) ("Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith[.]"). Rather, the inquiry was comparable to the clearly permissible pre-trial inquiry during jury selection into whether potential jurors could put aside anything they had heard, read, or been told about the case, be fair and impartial, and decide the case solely on the evidence presented and the court's instructions.

■ Similarly, even if Rule 606(b) was applicable to the investigation *during the "penalty phase" deliberations*, the inquiries made by the court in this case concerning the effect of the alleged contacts on the jurors' ability to be fair and impartial still were not improper. Those inquiries did not relate to "the effect of anything upon that or any other juror's mind or emotions *as influencing the juror to assent to or dissent from the verdict . . .* or concerning the juror's mental processes *in*

*connection therewith,"* FED.R.EVID. 606(b) (emphasis added), but only to the more general issue of each juror's abilities to keep an open mind. *Cf. Rutherford,* 371 F.3d at 644 (identifying as *permissible* inquiries about "the effect of extraneous information or improper contacts on a juror's state of mind," "a juror's general fear and anxiety following . . . an incident [of improper contacts]," including a fear of retaliation for voting a certain way, and a juror's ability to fairly and impartially receive the evidence, listen to the testimony presented, and follow the judge's instructions) (internal quotation marks and citations omitted); *but see Cheek,* 94 F.3d at 143 (the question, " '[D]id you listen to all of the evidence that was put forth by both sides and consider it in reaching your own personal verdict?' " violated Rule 606(b) in a *post*-verdict investigation).

For this same reason, the court is not convinced that it would have been improper to ask any juror who had knowledge of Juror 523's boss's comments before the "merits" verdict whether those comments affected the juror's ability to be fair and impartial in the "merits phase," because such inquiries would have been permissible questions about the jurors' general state of mind, not inquiries into their mental processes in connection with the "merits" verdict or any influence upon that verdict. *See id.* Only the testimony of Juror 523 and Juror 855 can be construed to suggest that they had or may have had knowledge of Juror 523's boss's comments prior to the "merits" verdict. However, Juror 855 was never asked whether that knowledge had an impact on that juror's ability to be fair and impartial in the "merits phase," and such inquiries to Juror 523 would have been permissible. *See id.*

Thus, the court finds that no improper questions were asked of the jurors in the course of the inquiry into potential "taint" of the jury on October 21, 22, or 25, 2004.

*iv. Applicability of the rule to post-verdict inquiries to Juror 523.* One of Honken's attorneys specifically argued during oral arguments on his motion for new trial that the post-verdict inquiries to Juror 523, in the December 16, 2004, hearing about her state of mind and the effect of any comments by her boss upon her were barred by Rule 606(b). Indeed, he argued that those inquiries and the answers received demonstrated the reason for the Rule, because of the minimization and backpedaling that appeared in the juror's post-verdict testimony.

 Juror 523 was removed from the jury during "penalty phase" deliberations, and the reconstituted jury was instructed to begin their deliberations anew. Under these circumstances, the court concludes that any post-verdict inquiries to Juror 523 could not have been for the purpose of an inquiry into the validity of the "penalty phase" verdict in which Juror 523 ultimately had no part. *See* FED. R.EVID. 606(b) (limiting inquiries into the validity of a verdict). Moreover, to the extent that any such inquiries related to the "merits phase" verdict, in which Juror 523 did participate, the inquiries were within the scope of permissible inquiries set out in *Rutherford* and its antecedents. *Rutherford,* 371 F.3d at 644 (identifying as *permissible* inquiries about "the effect of extraneous information or improper contacts on a juror's state of mind," "a juror's general fear and anxiety following . . . an incident [of improper contacts]," including a fear of retaliation for voting a certain way, and a juror's abilities to fairly and impartially receive the evidence, listen to the testimony presented, and follow the judge's instructions) (internal quotation marks and citations omitted); *Elias,* 269 F.3d at 1020 (same); *Henley,* 238 F.3d at 1118 (same).

With the issue of the scope of permissible inquires decided, the court turns to the question of what standards must be applied to determine whether Honken is entitled to a new trial on the basis of improper contacts with the jurors.

### c. Standards for relief

■ Implicit in the question of what standards the court must apply to Honken's "tainted jury" claims is the hotly-contested question of whether or not Honken is entitled to a presumption of prejudice, and if so, what the government must prove to rebut that presumption. Because the law appears to be unsettled, the court concludes that, to give full and fair consideration to Honken's claims that his jury was "tainted," the court must consider the effect of the extraneous contact here under four alternative standards: (1) the "cure of prejudice" standard, which may apply when the alleged "taint" is discovered during deliberations, as outlined in *Bradshaw*, 281 F.3d at 289–90; (2) the "no *Remmer* presumption of prejudice" standard, which applies when the extraneous contact does not relate to factual evidence not developed at trial, as outlined in *United States v. Wallingford*, 82 F.3d 278, 281 (8th Cir.1996); (3) the "*Remmer* presumption of prejudice" standard, which applies to all other extrinsic contacts, as outlined in *Remmer II*, 350 U.S. at 381–82, 76 S.Ct. 425, *Tucker*, 137 F.3d at 1030–32, and *United States v. Scull*, 321 F.3d 1270, 1280 (10th Cir.2003), *cert. denied sub nom. Bono v. United States*, 540 U.S. 864, 124 S.Ct. 175, 157 L.Ed.2d 116 (2003); and (4) the "concealment of bias" standard, as outlined in *Tucker*, 137 F.3d at 1026–29, which Honken claims applies to failure to Juror 523 (and possibly other jurors) to reveal outside influences.

However, before applying these standards, the court must first determine what kind of "prejudice" must be presumed, proved, rebutted, or cured. In *Tucker*, the Eighth Circuit Court of Appeals explained,

The question of prejudice depends on whether "there is any reasonable chance that the jury would have been deadlocked or would have reached a different verdict but for the fact that *even one reasonable juror* was exposed to prejudicial extraneous matter." *United States v. Hall*, 116 F.3d 1253, 1255 (8th Cir.1997) (emphasis added), *cert. denied*, 522 U.S. 1140, 118 S.Ct. 1106, 140 L.Ed.2d 159 (1998). Therefore, prejudice is possible even if [the juror contacted] was the only juror to be contaminated.

*Tucker*, 137 F.3d at 1031–32.

### d. The effect of the extraneous contact

■ *i. Application of the "cure of prejudice" standard.* This case involves alleged "taint" of the jury by extraneous contacts discovered during deliberations in the "penalty phase." As such, the court finds that the most appropriate standard for disposition of Honken's claim of "taint" to the jury is set forth in *Bradshaw*, 281 F.3d at 289–90, which also involved alleged jury "taint" that was discovered pre-verdict. The focus under this standard is not whether prejudice can or must be presumed, but whether the prejudice arising or potentially arising from improper contacts with the jurors can be "cured." Hence, the court refers to this standard as the "cure of prejudice" standard.

As mentioned above, in *Bradshaw*, the First Circuit Court of Appeals explained that, when confronted with a "colorable claim of jury taint [that] surfaces during jury deliberations," the court must conduct a prompt investigation of the allegations. *Bradshaw*, 281 F.3d at 289. "The purpose of the inquiry is twofold: to ascertain whether some taint-producing event actu-

ally occurred, and if so, to assess the magnitude of the event and the extent of any resultant prejudice." *Id.* This court conducted such an inquiry. Thus, the critical issue now is the rest of the analytical process, which the court in *Bradshaw* explained as follows:

> If the court finds both a taint-producing event and a significant potential for prejudice, *the court must then consider the extent to which prophylactic measures (such as the discharge of particular jurors or the pronouncement of curative instructions) will suffice to alleviate that prejudice. See [United States v.] Gomes,* 177 F.3d [76,] 82 [ (1st Cir.1999) ]. In some instances, a likelihood of residual prejudice may remain despite the court's best efforts. In that event, the court must grant a timely motion for a mistrial (if one is made). *The objective of this painstaking process is to ensure that the parties "receive[ ] the trial by an unbiased jury to which the Constitution entitles them." United States v. Anello,* 765 F.2d 253, 258 (1st Cir.1985).

*Bradshaw,* 281 F.3d at 289–90 (emphasis added).

In Honken's case, this court treated the information about Juror 523's allegations of improper comments by her boss as involving a "colorable claim of jury taint [that had] surface[d] during jury deliberations" and performed the twofold inquiry required by *Bradshaw. Id.* at 289. As to the first prong of the inquiry under *Bradshaw,* as this court found in subsection 2 of this section, Juror 523 was actually subjected to only *one* potentially taint-producing event, her boss's humorous comment about things she could have said to get off jury duty, which comment was made after Juror 523 was advanced to the "qualified" pool of jurors, but before she was selected as a trial juror. *See id.* (the first inquiry in the investigation of pre-verdict jury "taint" is "whether some taint-producing

event actually occurred"). As to the second prong of the inquiry, this court also found above that this single event was of slight "magnitude" and had no prejudicial effect upon Juror 523, because the court found Juror 523's statements that she "ignored" the comment to be credible, particularly in light of the nature and circumstances of the comment. *Id.* (the second inquiry is "to assess the magnitude of the event and the extent of any resultant prejudice"). Again, the court concludes that it may properly consider such denials of any effect on the juror's general state of mind and ability to be fair and impartial without violating Rule 606(b). *See Rutherford,* 371 F.3d at 644; *Elias,* 269 F.3d at 1020; *Henley,* 238 F.3d at 1118. While Honken contends that the record shows that Juror 523 was deeply troubled and upset by the comment, and feared consequences at work, the court reiterates that it finds, instead, that Juror 523 was deeply troubled by *service on a jury in a capital case* and *the stress of changing gears between work and jury duty,* and that Juror 523 credibly denied any fear of consequences at work from continuing to serve on the jury. Indeed, there is simply no credible evidence that anyone at Juror 523's company did anything but generously accommodate her jury service. In short, the court finds no reasonable chance that the jury would have been deadlocked or would have reached a different "merits" verdict but for the fact that Juror 523 was exposed to extraneous comments by her boss, and no such reasonable chance had Juror 523 stayed on the "penalty" jury. *See Tucker,* 137 F.3d at 1031–32 (so defining the pertinent "prejudice").

Assuming, nevertheless, that there might have been some patina of prejudice to Juror 523 from hearing the lone humorous comment, the court finds adequate prophylactic measures were sufficient to alleviate that prejudice. *See Bradshaw,*

281 F.3d at 289 ("If the court finds both a taint-producing event and a significant potential for prejudice, the court must then consider the extent to which prophylactic measures (such as the discharge of particular jurors or the pronouncement of curative instructions) will suffice to alleviate that prejudice."). First, as to the "merits phase," Juror 523, like the other jurors, was repeatedly instructed that she must decide the case based on the evidence presented and the court's instructions, and there is no evidence that she did otherwise, considering the off-hand nature of the "humorous" comment. *Id.* (considering the effectiveness of curative instructions). Second, Juror 523 was removed from the jury for the "penalty phase," and the remaining jurors and newly-seated alternate were instructed to begin their deliberations anew, so that any "taint" to Juror 523 was removed. *Id.* (also considering the effectiveness of removing particular jurors).

Therefore, as to Juror 523 herself, the court finds that the "painstaking process" of investigating and evaluating the contact—the lone comment that the court finds was actually made to Juror 523 by her boss—and the measures taken in response to disclosure of that contact, were sufficient "to ensure that the parties 'receive[d] the trial by an unbiased jury to which the Constitution entitles them.'" *Id.* at 290 (quoting *Anello,* 765 F.2d at 258).

Proceeding through the same analysis as to jurors who were exposed to Juror 523's comments about what her boss purportedly said to her, the court ultimately reaches the same conclusion. This court again treated the information that Juror 523 had exposed other jurors to the comments purportedly made to her by her boss as involving a "colorable claim of jury taint [that had] surface[d] during jury deliberations" and performed the twofold inquiry

required by *Bradshaw. Id.* at 289. As to the first prong of the inquiry under *Bradshaw,* as this court also found in subsection 2 of this section, ten trial jurors and one alternate juror were actually subjected to the potentially taint-producing event of hearing some statement by Juror 523 about her boss's comments on October 21, 2004. However, eight of the trial jurors recalled only that Juror 523 said something to the effect that her boss was giving her a "hard time," while only two trial jurors and one alternate recalled more specific recitations of what the boss purportedly said. *See id.* (the first inquiry in the investigation of pre-verdict jury "taint" is "whether some taint-producing event actually occurred"). The court also found, although the evidence is more tenuous, that one trial juror, Juror 855, and one alternate, Alternate Juror 914, heard reports of such purported comments on more than one occasion. As to the second prong of the inquiry, this court also found above that this extraneous contact on October 21, 2004, had, at best, only slight "magnitude" and had no prejudicial effect, even as to jurors who recalled hearing specific content of the boss's purported comments, because the court finds that these jurors' statements that the purported comments would have no effect upon their ability to be fair and impartial in their "penalty phase" deliberations were credible, again in light of the nature and circumstances of the purported comments. *Id.* (the second inquiry is "to assess the magnitude of the event and the extent of any resultant prejudice"); *see also Rutherford,* 371 F.3d at 644 (the court may properly consider such denials without violating Rule 606(b)); *Elias,* 269 F.3d at 1020 (same); *Henley,* 238 F.3d at 1118 (same). The court also finds, for the same reason, that the "magnitude" of individual reports of the boss's purported comments on other occasions and even the cumulative effect of multiple reports of

such statements on the jurors, if there were such multiple reports, was also slight at best, under the circumstances.

Assuming, again for the sake of argument, that there might nevertheless have been some patina of prejudice to jurors who remembered hearing Juror 523's report or reports of purported comments by her boss, the court again finds that adequate prophylactic measures were sufficient to alleviate that prejudice. *See id.* ("If the court finds both a taint-producing event and a significant potential for prejudice, the court must then consider the extent to which prophylactic measures (such as the discharge of particular jurors or the pronouncement of curative instructions) will suffice to alleviate that prejudice."). First, even supposing that any juror heard the reports of purported comments by Juror 523's boss during the "merits phase" or deliberations on the "merits," which the court finds is but poorly supported by the record, the jurors were all repeatedly instructed that they must decide the case based on the evidence presented and the court's instructions. *Id.* (considering the effectiveness of curative instructions). Second, Juror 523 was removed from the jury for the "penalty phase," and the remaining jurors and newly-seated alternate were instructed to begin their deliberations anew, which cured the possible "taint" on the "penalty phase" deliberations and verdict. *Id.* (also considering the effectiveness of removing particular jurors).

Therefore, as to other jurors who heard Juror 523's reports of purported comments by her boss, the court again finds that the "painstaking process" of investigating and evaluating the purported incidents of "taint" were sufficient "to ensure that the parties 'receive[d] the trial by an unbiased jury to which the Constitution entitles them.'" *Id.* at 290 (quoting *Anello,* 765 F.2d at 258). Where any "taint" to Juror

523 or the other jurors was "cured," the court concludes under this first alternative analysis that the "interest of justice" plainly does not require a new trial in Honken's case on either the "merits" or the "penalty." *See* Fed.R.Crim.P. 33(a) (providing for a new trial "if the interest of justice so requires"); *Campos,* 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a) to require a showing of a "miscarriage of justice").

***ii. Application of the "no Remmer presumption" standard.*** In *Remmer I,* the Supreme Court established a "presumption of prejudice" standard for extraneous contacts with jurors, as follows:

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish ... that such contact with the juror was harmless to the defendant.

*Remmer I,* 347 U.S. at 229, 74 S.Ct. 450. In *Stockton v. Commonwealth of Virginia,* 852 F.2d 740 (4th Cir.1988), *cert. denied,* 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 822 (1989), the Fourth Circuit Court of Appeals observed, "Our system of criminal justice rests in large measure upon a confidence in conscientious juror deliberations and juror attentiveness, both to the evidence at trial and the instructions of the trial judge." *Stockton,* 852 F.2d at 744. However, that court opined further that "[t]his confidence is not to be displaced every time a third party communication reaches the ears of a juror during trial." *Id.* (citing *Tanner v. United States,* 483

U.S. 107, 120–21, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), and *Phillips,* 455 U.S. at 209, 102 S.Ct. 940). "Thus, while a presumption of prejudice attaches to an impermissible communication, the presumption is not one to be casually invoked." *Id.* at 745.

Subsequently, various courts, including this one and the Eighth Circuit Court of Appeals, have cast doubt on the continuing viability of the *Remmer* presumption. In *Tunstall v. Hopkins,* 306 F.3d 601 (8th Cir.2002), *cert. denied,* 538 U.S. 968, 123 S.Ct. 1767, 155 L.Ed.2d 525 (2003), the Eighth Circuit Court of Appeals held that federal law did not mandate application of a presumption of prejudice in that case, noting, in pertinent part, the following:

> In [*Remmer I* ], the Supreme Court held that "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is ... deemed presumptively prejudicial." *Accord United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *Smith v. Phillips,* 455 U.S. 209, 215, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Several circuits, including ours, have extended the *Remmer* presumption to claims alleging juror exposure to extraneous information, including claims of mid-trial media exposure. *See, e.g., Mayhue v. St. Francis Hosp. of Wichita, Inc.,* 969 F.2d 919, 922 (10th Cir.1992); *United States v. Perkins,* 748 F.2d 1519, 1533–34 (11th Cir. 1984); *United States v. Hillard,* 701 F.2d 1052, 1064 (2d Cir.1983); *United States v. Bassler,* 651 F.2d 600, [6]03 (8th Cir.1981). However, other circuits have confined the application of *Remmer* to cases alleging third-party contact with jurors. *See, e.g., United States v. Lloyd,* 269 F.3d 228, 238 (3d Cir.2001); *United States v. Williams–Davis,* 90 F.3d 490, 501–02 (D.C.Cir.1996); *United States v. Boylan,* 898 F.2d 230, 260–61 (1st Cir.1990).

*Tunstall,* 306 F.3d at 610–11(footnote omitted). This court likewise recently noted that, as stated in *Tunstall,* "there is considerable disagreement over the application of the *Remmer* presumption." *Atwood v. Mapes,* 325 F.Supp.2d 950, 968 (N.D.Iowa 2004); *see also United States v. Scull,* 321 F.3d 1270, 1280 n. 5 (10th Cir. 2003) ("We note that this circuit and others have questioned the appropriate breadth of *Remmer's* presumption of prejudice rule, postulating the standard should be significantly narrowed, or replaced altogether.") (citing cases), *cert. denied sub nom. Bono v. United States,* 540 U.S. 864, 124 S.Ct. 175, 157 L.Ed.2d 116 (2003). However, the court need not be drawn into the dispute over the continued viability of *Remmer,* because the court will simply apply both a *"Remmer* presumption" standard and a "no *Remmer* presumption" standard, beginning with the latter, which the court finds is the standard that is more likely applicable in this case.

In this circuit, the Eighth Circuit Court of Appeals has held that " '[t]he presumption of prejudice does not apply unless the extrinsic contact relates to "factual evidence not developed at trial." ' " *United States v. Wallingford,* 82 F.3d 278, 281 (8th Cir.1996). In *Wallingford,* the court held that the presumption did not apply, where the issue was the effect of a restaurant cashier's comment to a juror, who was wearing a juror identification badge, that the cashier " 'hope[d] you don't find 'em guilty.' " *Id.* The court held that this " 'off-hand remark' did not refer to the factual evidence at the trial." *Id.* Similarly, the comment that the court finds that Juror 523's boss actually made, that she should have made an "outrageous" comment to get out of jury service, cannot reasonably be construed to refer to the *factual evidence* at the trial. Indeed, the

other alleged comments, that someone, presumably Honken, was "guilty, guilty, guilty," and that the jury should "fry him," are likewise " 'off-hand remark[s]' [that] did not refer to the factual evidence at the trial" any more than did the "off-hand remark" of the cashier in *Wallingford* that she hoped the juror would find the defendant guilty. Like the comments of the cashier in *Wallingford,* all of the comments allegedly at issue here are "off-hand remarks" by a person who had no actual contact with or knowledge of the case and who could not reasonably be supposed to have any such contact or knowledge. While the person who made the comment in this case was nominally the juror's "boss," not a stranger randomly encountered during a lunch break, the record shows that the "boss" had only random, casual contact with Juror 523, only very rare and superficial work-related contact, and no direct supervisory authority over Juror 523. In these circumstances, the court finds that the potential and actual impact of the so-called "boss's" comment was no greater than that of "off-hand remarks" from any other person with no actual contact with or knowledge of the case and who could not reasonably be supposed to have any such contact or knowledge. Again, the court rejects Honken's contention that the record supports any inference that Juror 523 was in fear for her job if her conduct as a juror did not conform to her boss's supposed expectations about the outcome of the case.

Furthermore, this case presents nothing like the sort of "private communication, contact, or tampering" at issue in *Tucker,* to which the Eighth Circuit Court of Appeals held that the *Remmer* presumption *does* apply. *See Tucker,* 137 F.3d at 1030. The contact at issue in *Tucker* involved a juror who had allegedly discussed the trial of a former governor with her husband, whom she had married during the trial, and her husband *did* have some contact with or information about the defendant that could have had a bearing on the juror's view of the case, where the husband had been denied clemency on a drug charge by the former governor. *Tucker,* 137 F.3d at 1024 & 1030. Again, this court simply rejects Honken's contention that the record shows "tampering," because Juror 523 was supposedly put in fear of her job, if she did not render a verdict consistent with her boss's purported view that Honken was guilty and should get the death penalty. Instead, the court finds, first, that Juror 523 was not actually in fear for her job because of the one comment by her boss that the court finds was actually made, and second, that she had no reason to believe that the one comment that the court finds that her boss actually made was a serious statement of the boss's expectations about how she should vote in the case. Thus, the court finds that no prejudice can be presumed in this case.

Finally, as in *Wallingford,* the court finds that Honken did not prove actual prejudice in this case. *See Wallingford,* 82 F.3d at 281 (after concluding that there was no *Remmer* presumption of prejudice, finding that the defendant "did not prove actual prejudice"). As in *Wallingford,* " '[i]n context, [this court] do[es] not believe that any reasonable person could interpret the [purported comments of Juror 523's boss, even if the content of those comments was known] to be anything other than a casual' non-specific remark." *Id.* (quoting *United States v. Day,* 830 F.2d 1099, 1104 (10th Cir.1987), and citing other cases finding no prejudice from casual remarks to jurors). The evidence is plain that the speaker of the purported comments knew nothing about the case at the time that the remarks were supposedly made and there was no reason for jurors who heard about the remarks, including Juror 523, to believe otherwise. Again, the court finds that Juror 523 was not

actually in fear for her job because of the one comment by her boss that the court finds was actually made, and also finds that she had no reason to believe that the one comment that the court finds that her boss actually made was a serious statement of the boss's expectations about how she should vote in the case. The court also finds that Juror 523 simply ignored that one comment and that it had no effect on her ability to be fair and impartial in reaching the "merits" verdict in which she did participate.

Thus, under this alternative analysis, the court again finds that the "interest of justice" plainly does not require a new trial in Honken's case on either the "merits" or the "penalty." *See* FED.R.CRIM.P. 33(a) (providing for a new trial "if the interest of justice so requires"); *Campos*, 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a) to require a showing of a "miscarriage of justice").

*iii. Application of the "Remmer presumption" standard.* Again in the alternative, the court will apply a *"Remmer* presumption of prejudice" standard. However, the court finds that, even if the *Remmer* presumption applies, the government has carried its heavy burden to rebut that presumption of prejudice in this case. *United States v. Scull,* 321 F.3d 1270, 1280 (10th Cir.2003) (even though the presumption of prejudice "weighs heavily in favor of the defendant, ... it is not insurmountable"), *cert. denied sub nom. Bono v. United States,* 540 U.S. 864, 124 S.Ct. 175, 157 L.Ed.2d 116 (2003).

In *Remmer II,* the Supreme Court found that a presumption of prejudice applied, where "during the trial one juror, Smith, had been approached by one Satterly, an outsider, with a suggestion that the juror could make some easy money if he would make a deal with petitioner *Remmer.*" *Remmer II,* 350 U.S. at 378, 76 S.Ct. 425. The juror, in turn reported the incident to the trial judge, who reported it to the district attorney, who, with the court's permission, reported it to the Federal Bureau of Investigation. *Id.; see also id.* at 380, 76 S.Ct. 425. An FBI agent subsequently questioned the juror about the incident at the juror's place of business during a recess in the trial. *Id.* at 381, 76 S.Ct. 425. The juror "mentioned [to two other jurors] that there was some question as to whether he had been approached during the trial and that he had reported the incident to the trial judge," and told one of the jurors that he had been under "terrific pressure." *Id.* The Court found that the hearing revealed "such a state of facts that neither [the juror allegedly tampered with] nor anyone else could say that he was not affected in his freedom of action as a juror"; indeed, the juror "was a disturbed and troubled man from the date of the [impermissible] contact until after the trial." *Remmer II,* 350 U.S. at 381, 76 S.Ct. 425. The Court found that the juror in question "had been subjected to extraneous influences to which no juror should be subjected, for it is the law's objective to guard jealously the sanctity of the jury's right to operate as freely as possible from outside unauthorized intrusions purposefully made." *Id.* at 382, 76 S.Ct. 425.

Subsequently the Eighth Circuit Court of Appeals held that the *Remmer* presumption of prejudice applies to "private communication, contact, or tampering." *See Tucker,* 137 F.3d at 1030. In *Tucker,* the court found that, if the presumption applied, it shifted the burden to the government to prove that the intrusion had no effect on the deliberations and verdict. *Id.* The court then considered whether the presumption of prejudice existed in that case, where a juror had married during the trial of a former governor a man to whom the former governor had denied clemency for a drug conviction. *Id.* at 1024 & 1030. However, the court conclud-

ed that it "d[id] not have sufficient facts before [it] to ascertain whether the presumption of prejudice should apply, since [the record] d[id] not reiterate the substance of the alleged communications between [the juror] and [her husband]." *Id.* at 1030. Nevertheless, the court concluded that "whether the presumption shifts the burden of proof to the government or not, the ultimate question is the same: 'Did the intrusion affect the jury's deliberations and thereby its verdict?'" *Id.* (quoting *United States v. Olano,* 507 U.S. 725, 739, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)).

Thus, to reach the point where this court can apply the *Remmer* presumption of prejudice in this case, this court must reach the strained conclusion that this case does, after all, involve "private communication, contact, or tampering" that invokes the presumption. In the alternative, the court can simply "cut to the chase," and consider the ultimate question identified in *Tucker,* which must be asked whether or not the presumption of prejudice applies. That question is, "Did the intrusion affect the jury's deliberations and thereby its verdict?" *Id.* (internal quotation marks and citations omitted). The court elects to proceed to the ultimate question.

As to that ultimate question, the court in *Tucker* held that "prejudice is possible even if [the juror who was subjected to the intrusion] was the only juror to be contaminated." *Id.* at 1032. Furthermore, "[c]ontamination ... occurs when, rather than being exposed to a fact not in evidence, a juror is subjected to psychological pressure by an outsider trying to coopt that juror's vote. In such a case, the effect on the particular juror is intense and can be harmful to the litigants, even though the rest of the jury remains unaware of the impropriety and even though no extraneous evidence is admitted." *Id.*

The court is unpersuaded by Honken's efforts to match this case to *Remmer II* or *Tucker.* First, while the court agrees that Juror 523 was a "disturbed and troubled" juror, *see Remmer II,* 350 U.S. at 381, 76 S.Ct. 425, the court found above, and reiterates here, that the juror was not "disturbed and troubled" by the only comment by her boss that the court finds was actually made, but was "disturbed and troubled" by her participation as a juror in a capital trial and the additional stress of having to "change gears" to return to work when not in trial or deliberations. That sort of "disturbance" is far removed from the "disturbance" created by a bribery attempt and subsequent FBI investigation in *Remmer,* or conversation and close relationship with a person who may have a grudge against the defendant, as in *Tucker.*

Moreover, while the court in *Tucker* did not know precisely what communications the juror might have received to influence her vote, it is clear in this case that Juror 523 was *not* subjected to any "psychological pressure by an outsider trying to coopt [her] vote." *Tucker,* 137 F.3d at 1032. The only comment that the court finds that the boss actually made was not, and was not understood by Juror 523, to indicate any expectation about how she should vote. Rather, it was a humorous comment about what she could have said to get out of jury service, was so taken by Juror 523, and plainly had no effect on Juror 523's performance of her duties in this case. Similarly, none of the purported comments by Juror 523's boss that were reported to other jurors could have had any effect on their deliberations or verdict, in either phase, where the reported comments were not known to most of them until after the "merits" verdict had already been reached, no juror was under any possible influence by Juror 523's boss, and all of the jurors uniformly stated that the comments would

have no effect on their ability to be fair and impartial in their "penalty phase" deliberations. Thus, even if the court could presume prejudice, which it really cannot under the circumstances, it would find that the government has carried its burden to rebut that presumption and to prove that the comments made to Juror 523 did not " 'affect the jury's deliberations and thereby its verdict.' " *Tucker,* 137 F.3d at 1030 (quoting *Olano,* 507 U.S. at 739, 113 S.Ct. 1770, and stating this to be the ultimate question, whether the *Remmer* presumption of prejudice applied or not).

Finally, in the Tenth Circuit, where the *Remmer* presumption is apparently alive and well, the presumption can be overcome if the government proves that "the extraneous information was harmless beyond a reasonable doubt," for example, by " 'show[ing] the existence of overwhelming evidence of [the] defendant's guilt.' " *Scull,* 321 F.3d at 1280; (quoting *United States v. Davis,* 60 F.3d at 1479, 1485 (10th Cir.1995), and describing this showing as the "most common means" of showing harmlessness); *but see Henley,* 238 F.3d at 1115 (noting that, in *Remmer II,* "[t]he Court did not consider the weight of the government's case or indicate in any way whether the evidence of guilt was or was not overwhelming"). To the extent that consideration of the evidence of the defendant's guilt is relevant to the question of whether or not the *Remmer* presumption of prejudice has been overcome, the court notes that the evidence of Honken's guilt in this case *was* overwhelming and that no juror harbored any "residual doubt" about the "merits" verdict, nor does the court.

Therefore, even if the court applies the *Remmer* presumption of prejudice, or at least considers the ultimate question that would have to be answered if that presumption applies, the court also finds that the "interest of justice" plainly does not require a new trial in Honken's case on either the "merits" or the "penalty." *See* FED.R.CRIM.P. 33(a) (providing for a new trial "if the interest of justice so requires"); *Campos,* 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a) to require a showing of a "miscarriage of justice").

*iv. Application of the "concealment of bias" standard.* Finally, the court must consider Honken's alternative argument that Juror 523, and possibly other jurors, "concealed bias" by not apprising the court during *voir dire* or at any other time that they had heard the extraneous comments attributed to Juror 523's boss or to other members of the community. Resolution of this argument, likewise, depends upon the *Tucker* decision by the Eighth Circuit Court of Appeals.

In *Tucker,* the court held that, to prevail on a claim that a juror failed to respond to a question during *voir dire,* the claimant "would have to prove three things about the voir dire: 1) that [the juror in question] answered dishonestly, not just inaccurately; 2) that [the juror] was motivated by partiality; and 3) that the true facts, if known, would have supported striking [the juror] for cause." *Tucker,* 137 F.3d at 1026. The court agrees with the government that Honken cannot meet any of these requirements, let alone all three.

The first requirement for proof of this claim requires consideration of whether or not the juror " 'could have honestly believed' " that no response to the pertinent *voir dire* question was required. *See id.* at 1028. This, in turn, requires consideration of whether the answer (or presumably, the lack of an answer), was "reasonable." *Id.* In *Tucker,* the court determined that the juror "was alleged to have concealed a relationship of great significance to her," that is, her marriage to a person who had been denied clemency on a drug conviction by the defendant, a former governor, "and

one that would have been of great significance to [the defendant] if he had known of it." *Id.* Here, in contrast, Juror 523 failed to disclose an off-hand, humorous remark of someone who was not her direct supervisor and with whom she had only a casual relationship. Moreover, the nature of the humorous comment was such that the court finds that Juror 523 could have honestly and reasonably believed that it did not constitute comment about Honken's trial, or even that it was a serious comment about her jury service in that trial. To put it tritely, Honken is trying to make a mountain out of a molehill. There is simply no evidence that Juror 523's failure to disclose her boss's off-hand, humorous remark was "dishonest," even if it was somehow "inaccurate." *Id.* at 1026 (first element requires "dishonesty" not merely "inaccuracy").

Similarly, the failure of other jurors to disclose Juror 523's comments to the effect that her boss was giving her a "hard time" about serving on the jury was not "dishonest," because those jurors could reasonably and honestly have been believed that the comments had nothing to do the evidence or outcome of Honken's trial. Moreover, other jurors could honestly and reasonably have believed that the other purported comments by Juror 523's boss, if they were aware of the content of those supposed comments, had nothing to do with the evidence or with a serious suggestion as to the appropriate outcome. It is equally clear that the comments of other persons that some of the jurors reported during the questioning on October 25, 2004, were so trivial that reasonable people could have believed that there was no duty to report them. Realistic responses of reasonable people to such rubbish are not the same as Honken's heightened sensitivity under the circumstances.

Even were the court to assume "dishonesty" in failure to report the comments of Juror 523 or others—which, again, the court cannot reasonably do—the court cannot find that there is any evidence that any juror "was motivated by partiality." *Tucker*, 137 F.3d at 1026 (second requirement of a "concealed bias" claim). While Honken seems to assert that there is no other reason than partiality for jurors to conceal such information, the court finds that the more reasonable reason for their failure to report the comments was the obvious triviality of the comments. Furthermore, the jurors were repeatedly instructed to decide the case on the basis of the evidence presented and the court's instructions, not anything else, and not only does the overwhelming weight of the evidence against Honken strongly support the conclusion that the jurors did just that, but the care evinced by the jurors' various findings shows a conscientious consideration of the evidence, including mitigation evidence, and conscientious consideration of Honken as an individual.

Finally, had Juror 523 brought to the court's attention during *voir dire* of the "qualified pool" that her boss had suggested "outrageous" comments that would have gotten her out of jury duty, the court has considerable doubt that any reasonable judge would have excused her on that basis alone, and the same is true if the other jurors had reported any of the comments by Juror 523 or members of the community. *Tucker*, 137 F.3d at 1026 (the third element of a "concealed bias" claim requires proof that "the true facts, if known, would have supported striking [the juror] for cause"). Only if the juror professed an inability to set aside the comments, or the court did not find the juror's testimony that he or she could put aside the comments to be credible—either of which is hard to imagine, given the nature of the comments-would any reasonable judge have even contemplated striking the jurors.

Thus, Honken has not demonstrated that "concealed bias" of jurors has resulted in a "miscarriage of justice" in his case. *See* FED.R.CRIM.P. 33(a) (providing for a new trial "if the interest of justice so requires"); *Campos,* 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a) to require a showing of a "miscarriage of justice"). Therefore, he is not entitled to a new trial on the basis of any "concealed bias" of any juror.

### I. Cumulative Effect Of Alleged Errors

 Honken has argued, at least implicitly, that cumulative errors and biased rulings by the court have resulted in a miscarriage of justice in his case, warranting a new trial. Such an argument is in sharp contrast to Honken's counsel's effusive comments, during the oral arguments on Honken's motion for judgment of acquittal or new trial, about how well-tried the case had been, at least up until Juror 523 made her disclosures. Realtime Transcript, Oral Arguments on Motion For Judgment Of Acquittal Or New Trial, July 12, 2005, p. 13 (stating, "I think this Court prepared itself in terms of pretrial rulings," and "the Court I believe presented one of the best efforts I have ever experienced in my 33 years of doing this in trying to ferret out issues, problems with prospective jurors," and praising the Court's "probing questions," outlining of the presumption of innocence standard, and emphasis on whether prospective jurors' prior opinions could affect their ability to be fair jurors). Moreover, where the court cannot find any marginal merit to any of Honken's claims, the court cannot find that the accumulation of small nothings ultimately amounts to any violation of Honken's constitutional rights.

### IV. CONCLUSION

Dustin Honken was represented by two of the finest and most experienced criminal defense lawyers in the state of Iowa as well as by a nationally prominent death penalty specialist from Kansas City, Missouri. These three lawyers provided Dustin Honken with exceptionally competent and zealous representation at every stage of these lengthy proceedings. Honken and his counsel were provided by the Criminal Justice Act with extraordinary financial resources for investigative and expert services, including a jury consultant from a nationally prominent firm who participated fully prior to and during the lengthy jury selection process. They also made extensive use of the services of a nationally recognized mitigation expert to assist in the presentation of their mitigation case. Defense counsel were exceptionally well-prepared and challenged the government's case with unsurpassed zeal, most notably in vigorously cross-examining nearly every witness called by the government. They put on a very able defense, admittedly with very little to work with factually. From this court's perspective, no stone was left unturned by the defense in either the "merits" or the "penalty" phases. But at the end of the day, the government's avalanche of circumstantial evidence on the merits, masterfully presented and argued by two outstanding prosecutors, resulted in guilty verdicts on all counts. The simply horrific nature of the murders, and the presence of very strong aggravating factors and relatively weak mitigating factors, resulted in the imposition of the death penalty for the murders of the two children.

 This court has not been hesitant to grant motions for new trial in criminal cases, when the court was convinced that the weight of the evidence was against the verdict or that some other flaw in the process had caused a miscarriage of justice. *See, e.g., United States v. Schneider,* 157 F.Supp.2d 1044 (N.D.Iowa 2001) (prosecutor's improper comments during closing argument warranted a new trial); *United*

*States v. Campos,* 132 F.Supp.2d 1181 (N.D.Iowa 2001) (granting a motion for a new trial, because this court found that the evidence weighed sufficiently heavily against the verdict that a miscarriage of justice may have occurred), *rev'd,* 306 F.3d 577 (8th Cir.2002); *United States v. Huerta–Orozco,* 132 F.Supp.2d 763 (N.D.Iowa) (also concluding that the evidence weighed sufficiently against the verdict to warrant a new trial), *aff'd,* 272 F.3d 561 (8th Cir. 2001); *United States v. Ortiz,* 40 F.Supp.2d 1073 (N.D.Iowa 1999) (granting two defendants a new trial on two counts of three counts against them, because the weight of the evidence was against the verdicts on those two counts); *United States v. Saborit,* 967 F.Supp. 1136 (N.D.Iowa 1997) (granting a new trial based on the weight of the evidence against the verdict). However, this is not such a case. While the court has grappled with every ruling and every instruction in this case, in an effort to make this trial as free from error as the court could possibly make it, and has considered carefully the weight of the evidence, the court has no "residual doubt" about its conclusion that there has been no "miscarriage of justice" that would warrant a new trial for Honken. *See* FED.R.CRIM.P. 33(a) (providing for a new trial "if the interest of justice so requires"); *Campos,* 306 F.3d at 579 (interpreting the "interest of justice" requirement of Rule 33(a) to require a showing of a "miscarriage of justice"). To the extent that the weight of the evidence against Honken is relevant to disposition of his post-trial challenges, the court reiterates that there was a tsunami of evidence of Honken's guilt-far and away the most overwhelming proof of the guilt of a criminal defendant that the undersigned has encountered in his judicial tenure. Moreover, while no reasonable person could describe Honken's trial as "perfect," "taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and ... the Constitution does not guarantee such a trial." *United States v. Hasting,* 461 U.S. 499, 508–09, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) (citing *Brown v. United States,* 411 U.S. 223, 231–32, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), in turn citing *Bruton v. United States,* 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)). " 'A defendant is entitled to a fair trial but not a perfect one.' " *Bruton,* 391 U.S. at 135, 88 S.Ct. 1620 (quoting *Lutwak v. United States,* 344 U.S. 604, 619, 73 S.Ct. 481, 97 L.Ed. 593 (1953)). The court has every confidence that Honken had the fair trial to which he was constitutionally entitled and, consequently, every confidence in the "merits" and "penalty" verdicts against him, even though his trial was not "perfect."

Whether considered separately or in their totality, the court finds that Honken's arguments do no warrant either a judgment of acquittal or a new trial in this case. Therefore, defendant Honken's November 17, 2004, Motion For A Judgment Of Acquittal, Or, In The Alternative, For A New Trial Pursuant To Fed.R.Crim.P. 29(c) And 33 (docket no. 578) is **denied.** The jury's "merits" and "penalty" verdicts in this case shall stand.

Furthermore, Honken's June 28, 2005, Application To File A Motion For Reconsideration [Of] The Denial Of Juror Questionnaire (docket no. 685–1) is **granted** to the extent that the court has reconsidered its order of June 16, 2005 (docket no. 675), in light of Honken's belated Memorandum In Support Of Defendant's Unresisted Application To Obtain Juror Questionnaire Of Potential [Johnson] Juror # 16 (docket no. 685–2), but **denied** as to any other relief. The court **reaffirms** its order of June 16, 2005 (docket no. 675), which denied Honken's Unresisted Application To Obtain Ju-

1058

ror Questionnaire Of Potential [Johnson] Juror # 16 (docket no. 655).

Finally, the following motions, briefs, and orders concerning Honken's request for the questionnaire of Prospective Johnson Juror 16 are hereby **unsealed:** Honken's May 2, 2005, Unresisted Application To Obtain Juror Questionnaire Of Potential Juror # 16 (docket no. 655); Order of May 3, 2005 (docket no. 656); Order of May 10, 2005 (docket no. 659); Order of June 16, 2005 (docket no. 674); Order of June 22, 2005 (docket no. 677); Honken's June 28, 2005, Application To File A Motion For Reconsideration [Of] The Denial Of Juror Questionnaire (docket no. 685–1), and his Memorandum In Support Of Defendant's Unresisted Application To Obtain Juror Questionnaire Of Potential [Johnson] Juror # 16 (docket no. 685–2); and the government's June 29, 2005, Resistance To Defendant's Application To Obtain Juror Questionnaire Of Johnson Potential Juror # 16 (docket no. 687).

**IT IS SO ORDERED.**